# 14-1377-cv

## United States Court of Appeals

### for the

### Second Circuit

QUINCY MUTUAL FIRE INSURANCE CO.,

*Plaintiff-Appellee,*

– v. –

NEW YORK CENTRAL MUTUAL FIRE INSURANCE CO.,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK (SYRACUSE)

## JOINT APPENDIX
## Volume I of IX (Pages A-1 to A-290)

WARD GREENBERG HELLER
& REIDY LLP
*Attorneys for Plaintiff-Appellee*
300 State Street
Rochester, New York 14614
(585) 454-0730

SARETSKY KATZ DRANOFF
& GLASS, L.L.P.
*Attorneys for Defendant-Appellant*
475 Park Avenue South
New York, New York 10016
(212) 973-9797

i

# Table of Contents

**Page**

District Court Docket Entries...................................................... A-1

Complaint, Filed June 27, 2012, with Civil Cover Sheet......... A-14

Summons in a Civil Action, Dated June 28, 2012 ................... A-25.1

Answer, Filed July 26, 2012...................................................... A-26

Joint Pre-Trial Stipulation, Filed January 17, 2014 ................ A-30

    Exhibit A to Stipulation -
    Exhibit List............................................................................ A-53

Notice of Motion *in limine* by Plaintiff,
    Dated January 17, 2014......................................................... A-70

Memorandum of Law in Support of Plaintiff's Motion
    *in limine*, Dated January 17, 2104..................................... A-72

Declaration of Scott R. Jennette, Esq., for Plaintiff, in
    Support of Motion *in limine*, Dated January 17, 2014........ A-83

    Exhibit A to Jennette Declaration -
    Excerpts of Quincy Mutual Fire Insurance Company
    Umbrella Policy..................................................................... A-87

    Exhibit B to Jennette Declaration -
    Excerpts of Deposition Transcript of James Hardy,
    Dated April 23, 2013............................................................. A-128

    Exhibit C to Jennette Declaration -
    Excerpts of Deposition Transcript of David J. Monahan,
    Dated March 26, 2013........................................................... A-135

    Exhibit D to Jennette Declaration -
    Excerpts of Deposition Transcript of Diane R. Wildey,
    Dated July 26, 2013............................................................... A-140

    Exhibit E to Jennette Declaration -
    Defendant's Expert Report of Thomas R. Newman,
    Dated August 29, 2013, and *Curriculum Vitae* ................... A-144

Declaration of Christopher D'Amato, Esq., Dated
    July 9, 2013, and Filed January 17, 2014............................ A-171

    Exhibit A to D'Amato Declaration -
    Summons and Complaint, in *Horton v. Warden*,
    Dated October 18, 2001 ....................................................... A-179

ii

**Page**

Exhibit B to D'Amato Declaration -
Medical Report by Anthony M. Avellanosa, M.D.,
Dated December 18, 2003.................................................... A-186

Exhibit C to D'Amato Declaration -
Decision and Order, in *Horton v. Warden*,
Dated May 18, 2005............................................................ A-199

Exhibit D to D'Amato Declaration -
Appellate Division, Third Department Memorandum and
Order, in *Horton v. Warden*, Dated August 3, 2006 ............ A-205

Exhibit E to D'Amato Declaration -
Letter from Christopher D. D'Amato, Esq., to the
Honorable Elizabeth Garry, Dated January 17, 2007........... A-212

Exhibit F to D'Amato Declaration -

    (i) Letter from Christopher D. D'Amato, Esq., to
    Frank Losurdo, Esq., Dated January 23, 2007,
    Enclosing Economic Loss for Peggy Horton ................... A-215

    (ii) Letter from Christopher D. D'Amato, Esq., to
    Frank Losurdo, Esq., Dated January 29, 2007,
    Enclosing Life Care Plan Prepared by Comprehensive
    Rehabilitation Consultants, Inc., with an Economic
    Analysis Attached thereto ................................................. A-227

Exhibit G to D'Amato Declaration -
Letter from Christopher D. D'Amato, Esq., to
Frank Losurdo, Esq., Dated June 4, 2007 ........................... A-251

Exhibit H to D'Amato Declaration -
Letter from David Monahan to Christopher D.
D'Amato, Esq., Dated June 12, 2007 .................................. A-256

Exhibit I to D'Amato Declaration -
Letter from Raymond M. Schlather, Esq., to
David Monahan, Dated July 20, 2007.................................. A-258

Exhibit J to D'Amato Declaration -
Judgment, in *Horton v. Warden*,
Dated November 5, 2009 .................................................... A-262

Exhibit K to D'Amato Declaration -
Satisfaction of Judgment, Dated December 1, 2009 ............ A-264

iii

**Page**

Declaration of Raymond M. Schlather, Esq., Dated
    October 16, 2013, and Filed January 17, 2014.................... A-266

    Exhibit A to Schlather Declaration -
    Letter from Raymond M. Schlather, Esq., to
    David Monahan, Dated July 20, 2007
    (Reproduced herein at pp. A-258–A-261)

    Exhibit B to Schlather Declaration -
    Letter from David Monahan to Raymond M.
    Schlather, Esq., Dated August 2, 2007................................ A-272

    Exhibit C to Schlather Declaration -
    Letter from Raymond M. Schlather, Esq., to
    David Monahan, Dated August 7, 2007............................... A-274

    Exhibit D to Schlather Declaration -
    Letter from David Monahan to Raymond M.
    Schlather, Esq., Dated August 22, 2007.............................. A-277

    Exhibit E to Schlather Declaration -
    Letter from Raymond M. Schlather, Esq., to
    Frank Losurdo, Esq., Dated March 17, 2008 ...................... A-279

Declaration of James H. Cosgriff, III, Esq., for Defendant,
    in Opposition to Plaintiff's Motion *in limine*, Dated
    January 23, 2014, and Filed January 24, 2014 .................... A-281

Defendant's Memorandum of Law in Opposition to
    Plaintiff's Motion *in limine*, Dated January 23, 2014,
    and Filed January 24, 2014 ................................................. A-286

Plaintiff's Deposition Designations, Filed January 24, 2014..... A-292

    Annexed to Plaintiff's Deposition Designations -

      (i) Declaration of Scott R. Jennette, Esq.,
      Dated January 24, 2014.................................................. A-397

      (ii) Letter from Scott R. Jennette, Esq., to the Honorable
      David E. Peebles, Dated January 24, 2014...................... A-399

Plaintiff's Memorandum of Law in Opposition to Defendant's
    Request for Leave to Amend Its Answer, Dated
    January 27, 2014 ................................................................. A-402

Transcript of Bench Trial before the Honorable
    David E. Peebles, Dated February 4, 2014 .......................... A-406

iv

**Page**

Plaintiff's Witnesses:

    David Monahan                       Direct ................... A-447

Transcript of Bench Trial before the Honorable
    David E. Peebles, Dated February 5, 2014 ......................... A-625

Plaintiff's Witnesses:

    Raymond M. Schlather          Direct ................... A-626
                                    Cross .................... A-671
                                    Redirect................. A-734

    Lisa Grealish                         Direct ................... A-735
                                    Cross .................... A-788
                                    Redirect................. A-830

Transcript of Bench Trial before the Honorable
    David E. Peebles, Dated February 6, 2014 ......................... A-833

Defendant's Witnesses:

    Hugh Leonard                    Direct ................... A-835

    Keith Miller                       Direct ................... A-887
                                    Cross .................... A-915

Trial Exhibit List ...................................................... A-964

P-1     Deposition Transcript of Christopher D'Amato,
         Dated January 28, 2014, with Deposition Exhibits
         A–D thereto ................................................. A-981

P-2     Plaintiff's Deposition Designations,
         Filed January 24, 2014
         (Reproduced herein at pp. A-292–A-401)

D-2     Deposition Transcript of James Hardy,
         Dated April 23, 2013.................................. A-1262

Stipulated Joint Exhibits:

1        Defendant's Responses to Plaintiff's First Set
         of Interrogatories ....................................... A-1390

2        Defendant's Supplemental Response to Plaintiff's
         First Set of Interrogatories........................... A-1398

v

**Page**

3       Quincy Large Loss Report,
        Dated October 22, 2009 ............................................... A-1402

4       Quincy Large Loss Report,
        Dated December 27, 2007 ............................................ A-1403

5       Quincy Claims Diary ................................................... A-1404

5A      Quincy Claims Diary Entry, with Handwritten Notes,
        Dated May 26, 2009 ................................................... A-1459

6       Quincy Insurance Policy ............................................. A-1467

7       Quincy Claims Handling Objectives
        and Performance Standards ......................................... A-1507

8       Quincy Litigation Management Claims
        Handling Guidelines .................................................. A-1515

9       New York Central Claims File Diary ........................... A-1520

9A      New York Central Claims File Diary,
        David Monahan Deposition Exhibit 2 ......................... A-1581

10      New York Central Memorandum,
        Dated March 4, 1999 ................................................. A-1642

11      New York Central Memorandum, Undated ................. A-1643

12      New York Central Claim Analysis ............................. A-1644

13      New York Central Claim Analysis ............................. A-1646

14      New York Central Claim Analysis ............................. A-1648

15      New York Central Claim Analysis ............................. A-1651

16      New York Central Claim Analysis ............................. A-1655

17      New York Central Claim Analysis ............................. A-1660

18      New York Central Claim Analysis ............................. A-1662

19      New York Central Casualty Loss Report,
        Dated March 16, 2004 ............................................... A-1667

20      New York Central Casualty Loss Report,
        Dated June 19, 2007 .................................................. A-1668

21      New York Central Casualty Loss Report,
        Dated September 20, 2007 .......................................... A-1669

vi

**Page**

22     New York Central Casualty Loss Report,
Dated October 19, 2009 ................................................. A-1670

23     New York Central Casualty Loss Report,
Dated January 3, 2010 .................................................... A-1674

24     New York Central Casualty Loss Report,
Dated June 18, 2010 ..................................................... A-1676

25     New York Central Mutual Insurance Policy ................ A-1678

26     Police Accident Report, Dated November 21, 2000 .... A-1723

27     New York Central Request for Police Report,
Dated November 27, 2000 ............................................ A-1724

28     Peggy Horton Property Damage Estimate,
Dated November 27, 2000 ............................................ A-1725

29     Peggy Horton Accident Statement,
Dated November 30, 2000 ............................................ A-1726

30     Letter from Christopher D. D'Amato to New York
Central, Dated December 20, 2000 .............................. A-1729

31     Letter from Randall Meschutt to Christopher
D'Amato, Dated January 19, 2001 .............................. A-1730

32     Letter from Ezra Sherman to Randolph Warden,
Dated January 30, 2001 ................................................ A-1731

33     New York Central Suit File Instruction Sheet,
Dated November 15, 2001 ............................................ A-1732

34     Civil Summons and Complaint,
Dated October 16, 2001 ............................................... A-1733

35     Letter from James Hardy to David Monahan,
Dated December 4, 2001 ............................................... A-1739

36     Letter from Lisa Lajam to David Monahan,
Dated December 13, 2001 ............................................ A-1740

37     Letter from Frank Losurdo to James Hardy,
Dated December 14, 2001 ............................................ A-1742

37A    Attachment, Letter from Lisa Lajam to
David Monahan, Dated December 13, 2001 ............... A-1743

vii

**Page**

37B    Attachment, Warden Answer,
       Dated December 6, 2001 ............................................. A-1745

38     Letter from Frank Losurdo to James Hardy,
       Dated December 14, 2001 ........................................... A-1750

39     Letter from David Monahan to James Hardy,
       Dated December 27, 2001 ........................................... A-1751

40     Letter from Lisa Lajam to David Monahan,
       Dated April 25, 2002 ................................................. A-1752

41     Verified Bill of Particulars,
       Dated February 18, 2002 ............................................ A-1755

42     Letter from Michelle Potts to Peggy Horton,
       Dated (as Received by New York Central)
       December 10, 2002 ...................................................... A-1761

43     Letter from Frank Losurdo to David Monahan,
       Dated March 12, 2003 ................................................. A-1762

44     Letter from Frank Losurdo to James Hardy,
       Dated March 20, 2003 ................................................. A-1766

45     Letter from Frank Losurdo to David Monahan,
       Dated August 27, 2003 ............................................... A-1768

46     Letter from Lisa Lajam to David Monahan,
       Dated September 9, 2003 ............................................ A-1771

46A    Attachment, State Department of Temporary
       and Disability Assistance Report ................................ A-1777

47     Letter from Frank Losurdo to David Monahan,
       Dated February 3, 2004 .............................................. A-1781

47A    Attachment, Independent Medical Examination Report
       by Dr. Avellanosa, Dated December 18, 2003 .............. A-1784

48     Letter from Frank Losurdo to James Hardy,
       Dated February 12, 2004 ............................................ A-1796

49     Letter from Frank Losurdo to David Monahan,
       Dated May 28, 2004 .................................................... A-1797

50     First Supplemental Bill of Particulars,
       Dated August 17, 2004 ................................................ A-1798

viii

**Page**

51     Letter from Robert J. Moore to New York Central,
Dated August 26, 2004 ................................................. A-1800

52     Letter from Frank Losurdo to David Monahan,
Dated November 4, 2004 ............................................ A-1801

53     Letter from Frank Losurdo to David Monahan,
Dated April 24, 2005 ................................................... A-1803

54     Summary Judgment Decision and Order,
Dated May 18, 2005 .................................................... A-1804

55     Letter from Frank Losurdo to David Monahan,
Dated May 25, 2005 .................................................... A-1809

56     Letter from Frank Losurdo to David Monahan,
Dated December 16, 2005 ........................................... A-1811

57     Letter from Frank Losurdo to David Monahan,
Dated December 22, 2005 ........................................... A-1812

58     Letter from Frank Losurdo to David Monahan,
Dated March 21, 2006 ................................................. A-1813

59     Letter from Frank Losurdo to David Monahan,
Dated April 24, 2006 ................................................... A-1814

60     Letter from Frank Losurdo to David Monahan,
Dated June 9, 2006 ...................................................... A-1815

61     Letter from Frank Losurdo to David Monahan,
Dated August 9, 2006 .................................................. A-1816

62     Memorandum and Order, Dated August 3, 2006 ......... A-1817

63     Letter from Frank Losurdo to James Hardy,
Dated January 19, 2007 ............................................... A-1823

63A    Attachment, Letter from Christopher D'Amato
to Justice Garry, Dated January 17, 2007 .................... A-1825

64     Letter from Frank Losurdo to David Monahan,
Dated January 23, 2007 ............................................... A-1828

65     Letter from Frank Losurdo to Randolph Warden,
Dated January 23, 2007 ............................................... A-1830

66     Letter from Christopher D'Amato to Frank Losurdo,
Dated January 23, 2007 ............................................... A-1831

ix

**Page**

66A   Attachment, Economic Loss Report............................ A-1832

67   Letter from Christopher D'Amato to Frank Losurdo,
Dated January 29, 2007 ................................................. A-1842

67A   Attachment, Life Care Plan by Comprehensive
Rehabilitation Consultants, Inc. ................................... A-1843

68   Letter from Christopher D'Amato to
Frank Losurdo, Dated February 1, 2007 ..................... A-1866

68A   Attachment, Vocational Rehabilitation Report
by K.W. Reagles & Associates .................................... A-1867

69   Letter from Frank Losurdo to David Monahan,
Dated February 10, 2007 .............................................. A-1906

69A   Attachment, Plaintiff's Expert Disclosures ................. A-1907

70   Letter from Frank Losurdo to David Monahan,
Dated February 12, 2007 .............................................. A-1954

71   Letter from Frank Losurdo to James Hardy,
Dated April 12, 2007 .................................................... A-1956

72   Letter from Frank Losurdo to James Hardy,
Dated May 25, 2007 ..................................................... A-1958

73   Letter from Frank Losurdo to David Monahan,
Dated May 25, 2007 ..................................................... A-1959

73A   Attachment, Defendant's Expert Disclosures,
Dated May 25, 2007 ..................................................... A-1960

74   Letter from Christopher D'Amato to Frank Losurdo,
Dated June 4, 2007 ....................................................... A-2005

75   Letter from Frank Losurdo to James Hardy,
Dated June 7, 2007 ....................................................... A-2009

76   Letter from Frank Losurdo to James Hardy,
Dated June 11, 2007 ..................................................... A-2010

77   Letter from Frank Losurdo to David Monahan,
Dated June 11, 2007 ..................................................... A-2012

78   Consent Order and Agreement between Dr. Avellanosa
and New York State Board for Professional Medical
Conduct, Dated September 14, 2000 ............................ A-2013

x

**Page**

| 79 | Letter from David Monahan to Christopher D'Amato, Dated June 12, 2007 | A-2030 |
| 80 | Letter from Frank Losurdo to James Hardy, Dated July 16, 2007 | A-2031 |
| 81 | Fax from David Monahan to Frank Losurdo | A-2033 |
| 81A | Attachment, Letter from Raymond Schlather to David Monahan, Dated July 20, 2007 | A-2034 |
| 82 | Letter from David Monahan to Raymond Schlather, Dated August 2, 2007 | A-2037 |
| 83 | Letter from Raymond Schlather to David Monahan, Dated August 7, 2007 | A-2038 |
| 84 | Letter from New York Central to Raymond Schlather, Dated August 16, 2007 | A-2040 |
| 85 | Fax from Frank Losurdo to David Monahan, Dated August 21, 2007 | A-2041 |
| 85A | Attachment, Letter from James Hardy to Raymond Schlather, Dated August 17, 2006 | A-2042 |
| 86 | Letter from David Monahan to Raymond Schlather, Dated August 22, 2007 | A-2044 |
| 87 | Letter from Hugh Leonard to Frank Losurdo, Dated September 10, 2007 | A-2045 |
| 88 | Fax from Frank Losurdo to David Monahan, Dated September 14, 2007 | A-2046 |
| 88A | Attachment, Letter from Frank Losurdo to David Monahan, Dated September 14, 2007 | A-2047 |
| 89 | Letter from Frank Losurdo to David Monahan, Dated September 25, 2007 | A-2048 |
| 90 | Letter from Hugh Leonard to Frank Losurdo, Dated October 2, 2007 | A-2049 |
| 91 | Letter from Frank Losurdo to Hugh Leonard, Dated October 10, 2007 | A-2050 |
| 92 | Letter from Frank Losurdo to Hugh Leonard, Dated October 15, 2007 | A-2051 |

xi

**Page**

93     Letter from Frank Losurdo to David Monahan,
Dated December 20, 2007 ............................................. A-2052

94     Letter from Frank Losurdo to Hugh Leonard,
Dated December 20, 2007 ............................................. A-2053

95     Letter from Frank Losurdo to Keith Miller,
Dated January 8, 2008 .................................................. A-2054

96     Letter from Keith Miller to David Monahan,
Dated March 14, 2008 ................................................... A-2056

97     Letter from Keith Miller to Schuyler County Clerk,
Dated March 28, 2008 ................................................... A-2057

97A   Attachment to Letter, Consent to Change Attorney,
Dated March 13, 2008 ................................................... A-2058

98     Letter from Raymond Schlather to Frank Losurdo,
Dated March 17, 2008 ................................................... A-2059

99     Letter from Keith Miller to David Monahan,
Dated June 30, 2008 ..................................................... A-2060

100   Letter from Hugh Leonard to Keith Miller,
Dated March 10, 2009 ................................................... A-2061

101   Letter from Keith Miller to David Monahan,
Dated April 22, 2009 .................................................... A-2062

102   Letter from Keith Miller to Christopher D'Amato,
Dated April 27, 2009 .................................................... A-2063

103   Letter from Keith Miller to Christopher D'Amato,
Dated June 11, 2009 ..................................................... A-2064

103A  Attachment to Letter, Independent Medical
Examination by Robert S. Nolan, M.D., Ph.D.,
Dated May 11, 2009 ..................................................... A-2065

104   Letter from Keith Miller to David Monahan,
Dated July 27, 2009 ..................................................... A-2077

104A  Attachment to Letter, Report of K.W. Reagles
& Associates, L.L.C. .................................................... A-2079

xii

**Page**

104B   Attachment to Letter, Report of Comprehensive
Rehabilitation Consultants, Inc. and Economic
Loss Report .................................................................. A-2172

105   Letter from Hugh Leonard to Keith Miller,
Dated August 4, 2009 .................................................. A-2204

106   Letter from Hugh Leonard to David Monahan,
Dated September 11, 2009 ........................................... A-2205

107   Faxed Letter from Christopher D'Amato to
the Honorable J.C. Argetsinger, Dated
September 25, 2009 ...................................................... A-2209

108   Faxed Letter from Hugh Leonard to Keith Miller,
Dated September 28, 2009 ........................................... A-2212

109   Letter from Keith Miller to Christopher D'Amato,
Dated September 28, 2009 ........................................... A-2214

110   Letter from Christopher D'Amato to the
Honorable J.C. Argetsinger, Dated
September 29, 2009 ...................................................... A-2216

111   Letter from Hugh Leonard to Keith Miller,
Dated September 29, 2009 ........................................... A-2219

112   Letter from Keith Miller to David Monahan,
Dated October 4, 2009 ................................................. A-2221

112A   Attachment, Second Supplemental Bill of Particulars,
Dated September 17, 2009 ........................................... A-2223

113   Letter from Raymond Schlather to Hugh Leonard,
Dated September 30, 2009 ........................................... A-2228

114   Letter from Christopher D'Amato to Keith Miller,
Dated October 7, 2009 ................................................. A-2229

114A   Attachment to Letter, Updated Life Care
Costs Report ................................................................. A-2230

115   Letter from Christopher D'Amato to Keith Miller,
Dated October 6, 2009 ................................................. A-2235

115A   Attachment to Letter, Updated Comprehensive
Rehabilitation Consultants, Inc. Report ...................... A-2236

xiii

**Page**

116    Letter from Christopher D'Amato to Keith Miller,
Dated October 8, 2009 ................................................. A-2255

117    Letter from Keith Miller to James Hardy,
Dated October 9, 2009 ................................................. A-2256

118    Letter from Keith Miller to David Monahan,
Dated October 9, 2009 ................................................. A-2258

119    Letter from Keith Miller to Hugh Leonard,
Dated October 9, 2009 ................................................. A-2260

120    Letter from Hugh Leonard to Keith Miller,
Dated October 14, 2009 ............................................... A-2262

121    Letter from Raymond Schlather to Hugh Leonard,
Dated October 14, 2009 ............................................... A-2263

122    Letter from Christopher D'Amato to Keith Miller,
Dated October 15, 2009 ............................................... A-2264

123    Letter from Christopher D'Amato to Keith Miller,
Dated October 16, 2009 ............................................... A-2292

124    Letter from Keith Miller to James Hardy,
Dated October 17, 2009 ............................................... A-2295

125    Letter from Hugh Leonard to Keith Miller,
Dated October 18, 2009 ............................................... A-2298

126    Letter from Raymond Schlather to Hugh Leonard,
Dated October 19, 2009 ............................................... A-2300

127    Email from Keith Miller to David Monahan,
Dated October 26, 2009 ............................................... A-2301

127A  Attachment to Email, Proposed Judgment ................... A-2302

128    Letter from Keith Miller to the Honorable
J.C. Argetsinger, Dated November 3, 2009 ................. A-2304

128A  Attachment, Signed Judgment,
Dated November 5, 2009 ............................................. A-2306

129    Letter from Keith Miller to David Monahan,
Dated December 7, 2009 .............................................. A-2307

129A  Attachment, Signed Satisfaction of Judgment,
Dated December 1, 2009 .............................................. A-2308

**Page**

130    Letter from Hugh Leonard to David Monahan,
       Dated June 24, 2010 ...................................................... A-2310

131    Letter from David Monahan to Hugh Leonard,
       Dated July 19, 2010........................................................ A-2314

132    Arnot Ogden Medical Center Chart,
       Dated January 24, 2001 ................................................. A-2316

133    Buffalo Neurosurgery Group Letter,
       Dated June 2, 2001 ........................................................ A-2318

134    Mercy Hospital of Buffalo Operative Report by
       P. Jeffrey Lewis, M.D., Dated October 11, 2001 ......... A-2321

135    Mercy Hospital of Buffalo Operative Report by
       Timothy R. Rasmusson, M.D., Dated
       October 11, 2001 ........................................................... A-2323

136    Industrial Medicine Associates, P.C. Orthopedic
       Examination by Pranab K. Datta, M.D.,
       Dated May 31, 2002 ....................................................... A-2325

137    Industrial Medicine Associates, P.C. Adult Psychiatric
       Examination by Mary Ann Moore, Psy.D.,
       Dated May 31, 2002 ....................................................... A-2330

138    Buffalo Neurosurgery Group Letter,
       Dated July 30, 2002........................................................ A-2336

139    Mercy Hospital of Buffalo Operative Report by
       P. Jeffrey Lewis, M.D., Dated August 29, 2002 .......... A-2338

140    Buffalo Neurosurgery Group Letter,
       Dated September 10, 2002 ............................................ A-2339

141    Associated Radiologists of the Finger Lakes
       Radiological Report, Dated October 18, 2002 ............. A-2341

142    Schuyler Hospital History and Physical Report,
       Dated October 28, 2002 ................................................ A-2342

143    Schuyler Hospital Report of Operation,
       Dated October 28, 2002 ................................................ A-2344

144    Buffalo Neurosurgery Group Letter,
       Dated March 18, 2003 .................................................... A-2345

xv

**Page**

145    Buffalo Neurosurgery Group Letter,
       Dated August 6, 2004.................................... A-2346

146    Buffalo Neurosurgery Group Letter,
       Dated October 15, 2004 ............................... A-2347

147    Mercy Hospital of Buffalo Operative Report,
       Dated November 29, 2004 ........................... A-2349

148    Buffalo Neurosurgery Group Letter,
       Dated December 7, 2004.............................. A-2350

149    Letter from P. Jeffrey Lewis, M.D., to Christopher
       D'Amato, Dated March 25, 2005.................................. A-2351

150    Buffalo Neurosurgery Group Letter,
       Dated November 9, 2007 .............................. A-2353

151    Mercy Hospital of Buffalo Operative Reports by
       P. Jeffrey Lewis, M.D., Dated December 17, 2007 ..... A-2355

152    Schuyler Hospital Operative Report,
       Dated November 10, 2008 ........................... A-2358

153    Plaintiff's Expert Report of Thomas F. Segalla, Esq.,
       Dated August 7, 2013.................................. A-2359

154    Plaintiff's Supplemental Expert Report of Thomas F.
       Segalla, Esq., Dated September 16, 2013 .................. A-2400

155    Defendant's Expert Report of Thomas R.
       Newman, Esq., Dated August 27, 2013 ...................... A-2405

Plaintiff's Proposed Findings of Fact and Conclusions
       of Law, Dated March 3, 2014 ............................. A-2430

Defendant's Proposed Findings of Fact and Conclusions
       of Law, Dated March 3, 2014 ............................. A-2503

Decision and Order of the Honorable David E. Peebles,
       Dated March 31, 2014, Appealed From.............................. A-2543

Judgment, Dated March 31, 2014, Appealed From ................. A-2599

Notice of Appeal, Dated April 21, 2014 ................... A-2600

A-1

APPEAL,CLOSED,CONSENT

# U.S. District Court
## Northern District of New York - Main Office (Syracuse) [LIVE - Version 6.1]
### (Binghamton)
## CIVIL DOCKET FOR CASE #: 3:12-cv-01041-DEP

| | |
|---|---|
| Quincy Mutual Fire Insurance Co. v. New York Central Mutual Fire Insurance Co. | Date Filed: 06/27/2012 |
| | Date Terminated: 03/31/2014 |
| Assigned to: Magistrate Judge David E. Peebles | Jury Demand: None |
| Demand: $1,428,000 | Nature of Suit: 110 Insurance |
| Case in other court: 2nd Circuit, 14-01377 | Jurisdiction: Diversity |
| Cause: 28:1332 Diversity-Insurance Contract | |

**Plaintiff**

| | | |
|---|---|---|
| **Quincy Mutual Fire Insurance Co.** | represented by | **Scott R. Jennette** |
| | | Ward, Greenberg Law Firm |
| | | 300 State Street |
| | | Rochester, NY 14614 |
| | | 585-454-0700 |
| | | Fax: 585-423-5910 |
| | | Email: sjennette@wardgreenberg.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **William R. Leinen** |
| | | Ward Greenberg Heller & Reidy LLP |
| | | 300 State Street |
| | | Rochester, NY 14614 |
| | | 585-454-0700 |
| | | Fax: 585-423-5910 |
| | | Email: wleinen@wardgreenberg.com |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **New York Central Mutual Fire Insurance Co.** | represented by | **James H. Cosgriff , III** |
| | | Petrone, Petrone Law Firm - Williamsville Office |
| | | 5500 Main Street, Suite 342 |
| | | Williamsville, NY 14221 |
| | | 716-204-1087 |
| | | Fax: 716-204-2507 |
| | | Email: j.cosgriff@pnpny.com |

A-2

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/27/2012 | 1 | COMPLAINT against New York Central Mutual Fire Insurance Co. (Filing fee $350 receipt number 2235494) filed by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Civil Cover Sheet)(sfp, ) (Entered: 06/28/2012) |
| 06/28/2012 | 2 | G.O. 25 FILING ORDER ISSUED: Rule 16 Initial Conference set for 11/2/2012 at 10:00 AM in Binghamton before Magistrate Judge David E. Peebles. Civil Case Management Plan due by 10/19/2012. (sfp, ) (Entered: 06/28/2012) |
| 06/28/2012 | 3 | Summons Issued as to New York Central Mutual Fire Insurance Co.. (sfp, ) (Entered: 06/28/2012) |
| 06/29/2012 | 4 | FRCP 7.1 CORPORATE DISCLOSURE STATEMENT by Quincy Mutual Fire Insurance Co.. (Jennette, Scott) (Entered: 06/29/2012) |
| 07/12/2012 | 5 | AFFIDAVIT of Service for Summons, Complaint, General Order # 25 *(Filing Order)* served on Patrick Harrigan, NYSDFS on July 5, 2012, filed by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Acknowledgement of Service on Superintendent of Insurance)(Jennette, Scott) (Entered: 07/12/2012) |
| 07/26/2012 | 6 | NOTICE of Appearance by William R. Leinen on behalf of Quincy Mutual Fire Insurance Co. (Leinen, William) (Entered: 07/26/2012) |
| 07/26/2012 | 7 | NOTICE of Appearance by James H. Cosgriff, III on behalf of New York Central Mutual Fire Insurance Co. (Cosgriff, James) (Entered: 07/26/2012) |
| 07/26/2012 | 8 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 7 Notice of Appearance (Cosgriff, James) (Entered: 07/26/2012) |
| 07/26/2012 | 9 | ANSWER to 1 Complaint by New York Central Mutual Fire Insurance Co.. (Cosgriff, James) (Entered: 07/26/2012) |
| 07/26/2012 | 10 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 9 Answer to Complaint (Cosgriff, James) (Entered: 07/26/2012) |
| 07/26/2012 | 11 | DEMAND for Trial by Jury by New York Central Mutual Fire Insurance Co.. (Cosgriff, James) (Entered: 07/26/2012) |
| 07/26/2012 | 12 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 11 Jury Demand (Cosgriff, James) (Entered: 07/26/2012) |
| 07/30/2012 | | Reset Hearings: The In-Person Initial Conference set for 11/2/12 at 10:00 AM is rescheduled for 9/7/2012 at 11:00 AM in Binghamton before Magistrate Judge David E. Peebles. The Civil Case Management Plan is now due by 8/31/12. (sal, ) (Entered: 07/30/2012) |
| 08/15/2012 | 13 | Letter Motion from Scott R. Jennette for Quincy Mutual Fire Insurance Co. requesting adjournment of Initial Conference submitted to Judge Hon. David Peebles . (Jennette, Scott) (Entered: 08/15/2012) |
| | | |

A-3

| 08/16/2012 | | TEXT ORDER granting 13 Letter Request. The initial conference scheduled for 9/7/12 has been rescheduled to 10/4/12 at 12:00 pm in-person, in Syracuse. The parties are to note that the time slot of 11:00 am that chambers had originally given the parties is no longer available, and also that the location for the conference has been changed from Binghamton to Syracuse. The Civil Case Management Plan is therefore due 9/24/2012. Authorized by Judge David E. Peebles. (cam, ) (Entered: 08/16/2012) |
|---|---|---|
| 09/24/2012 | 14 | CIVIL CASE MANAGEMENT PLAN by Quincy Mutual Fire Insurance Co.. (Jennette, Scott) (Entered: 09/24/2012) |
| 10/04/2012 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Initial Pretrial Conference held on 10/4/2012. Mandatory disclosures will be exchanged by 11/1/12. Joinder and amendment deadlines are set for 11/30/12. Mediation deadline is set for 1/31/13. Discovery deadline is set for 5/30/13. Motion filing deadline is set for 6/30/13. This will be a jury trial lasting approximately 5 days in Syracuse. Next telephone conference is set for 2/7/13 at 3:00 PM. Plaintiff's counsel is directed to initiate the call to Chambers. APP: Scott Jennette, Esq., and James Cosgriff, III, Esq.. (sal, ) (Entered: 10/04/2012) |
| 10/04/2012 | | Set/Reset Hearings: Telephone Conference set for 2/7/2013 at 3:00 PM before Magistrate Judge David E. Peebles. Plaintiff's counsel is directed to initiate the call to Chambers, which can be reached at (315) 234-8620. (sal, ) (Entered: 10/04/2012) |
| 10/04/2012 | 15 | UNIFORM PRETRIAL SCHEDULING ORDER: Anticipated length of jury trial: 5 days. Preferred Trial Location: Syracuse. Mandatory disclosures must be exchanged by 11/1/2012. Joinder of Parties due by 11/30/2012. Amended Pleadings due by 11/30/2012. Deadline for completion of mediation is 1/31/2013. Discovery due by 5/30/2013. Motions to be filed by 6/30/2013. Signed by Magistrate Judge David E. Peebles on 10/4/12. (sal, ) (Entered: 10/04/2012) |
| 01/22/2013 | 16 | Letter Motion from Scott R. Jennette for Quincy Mutual Fire Insurance Co. requesting Discovery Conference submitted to Judge Hon. David Peebles . (Jennette, Scott) (Entered: 01/22/2013) |
| 01/23/2013 | | TEXT ORDER terminating 16 Letter Request. This letter will be discussed further with the parties during the telephone conference already scheduled for 2/7/2013 at 3:00 PM before Magistrate Judge David E. Peebles. Plaintiff's counsel is directed to initiate the call to Chambers, which can be reached at (315) 234-8620. Authorized by Magistrate Judge David E. Peebles on 1/23/13. (sal, ) (Entered: 01/23/2013) |
| 02/07/2013 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Telephone Conference held on 2/7/2013. Magistrate Judge Peebles will issue a text order directing defendant's counsel to respond/object to plaintiff's requests for production of documents served on 10/26/2012 and provide a privilege log concerning any withheld documents on or before 2/28/2013. If plaintiff's counsel is not satisfied w/ such responses/objections after conferring w/ defendant's counsel in good faith, then plaintiff's counsel has permission to file a motion to compel discovery and Magistrate Judge Peebles will consider |

| | | |
|---|---|---|
| | | awarding sanctions. Judge adheres to the requirement of mediation in this action and extends the mediation deadline to 4/30/2013. Discovery deadline is extended until 8/30/2013 and dispositive motion filing deadline is extended until 9/30/2013. Next telephone conference is set for 6/11/2013 at 3:00 PM. Defendant's counsel is directed to initiate the call to Chambers. APP: Scott Jennette, Esq., and James Cosgriff, III, Esq.. (sal, ) (Entered: 02/07/2013) |
| 02/07/2013 | | TEXT ORDER : Defendant's counsel is directed to respond/object to plaintiff's requests for production of documents served on 10/26/2012 and provide a privilege log concerning any withheld documents on or before 2/28/2013. Authorized by Magistrate Judge David E. Peebles on 2/7/13. (sal, ) (Entered: 02/07/2013) |
| 02/07/2013 | | TEXT SCHEDULING ORDER extending the deadlines as follows: Deadline for completion of mediation is 4/30/2013. Discovery due by 8/30/2013. Dispositive Motions to be filed by 9/30/2013. Authorized by Magistrate Judge David E. Peebles on 2/7/13. (sal, ) (Entered: 02/07/2013) |
| 02/07/2013 | | Set/Reset Hearings: A Telephone Conference is set for 6/11/2013 at 3:00 PM before Magistrate Judge David E. Peebles. Defendant's counsel is directed to initiate the call to Chambers, which can be reached at (315) 234-8620. (sal, ) (Entered: 02/07/2013) |
| 02/20/2013 | 17 | ORDER ON CONSENT to Jurisdiction by US Magistrate Judge. Case reassigned to Magistrate Judge David E. Peebles. (Signed by Judge Norman A. Mordue on 2/20/2013) (amt) (Entered: 02/20/2013) |
| 02/27/2013 | 18 | **STRICKEN PER TEXT ORDER ENTERD ON 3/5/13**ANSWER to Interrogatories by New York Central Mutual Fire Insurance Co..(Cosgriff, James) Modified on 3/5/2013 (sal, ). (Entered: 02/27/2013) |
| 02/27/2013 | 19 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 18 Answer to Interrogatories (Cosgriff, James) (Entered: 02/27/2013) |
| 03/05/2013 | 20 | TEXT ORDER TO STRIKE 18 Answer to Interrogatories filed by New York Central Mutual Fire Insurance Co.. This submission is being stricken from the docket and will not be considered by the Court. Pursuant to Local Rule 26.2, the Court does not accept the filing of discovery materials, such as, Interrogatories, Document Requests, unless the Court specifically directs such documents be filed or when submitted in support of a motion filed pursuant to Rule 37 of the Federal Rules of Civil Procedure. Since the Court has not directed the filing of Discovery in this action, nor is Plaintiff's submission in support of a motion filed pursuant to Rule 37, neither discovery materials nor certificates of service regarding the same are to be filed with the Court. Authorized by Magistrate Judge David E. Peebles on 3/5/13. (sal, ) (Entered: 03/05/2013) |
| 03/14/2013 | 21 | MOTION to Compel *New York Central* filed by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Declaration Declaration of Scott R. Jennette, Esq., # 2 Exhibit(s) Exhibit A - Quincy Document Demands, # 3 Exhibit(s) Exhibit B - Quincy Interrogatory Demands, # 4 Exhibit(s) Exhibit C - Letter, # 5 Exhibit(s) Exhibit D - Letter, # 6 Exhibit(s) Exhibit E - Letter, # 7 Exhibit(s) Exhibit F - Letter, # 8 Exhibit(s) Exhibit G - New York Central Responses, # 9 Exhibit(s) |

CM/ECF LIVE - U.S. District Court - NYND                                    Page 5 of 14

| | | |
|---|---|---|
| | | Exhibit H - Letter, # 10 Exhibit(s) Exhibit I - Letter, # 11 Exhibit(s) Exhibit J - Letter, # 12 Exhibit(s) Exhibit K - E-mail) (Jennette, Scott) (Entered: 03/14/2013) |
| 03/14/2013 | 22 | CERTIFICATE OF SERVICE by Quincy Mutual Fire Insurance Co. re 21 MOTION to Compel *New York Central* (Jennette, Scott) (Entered: 03/14/2013) |
| 03/14/2013 | 23 | Letter Motion from Scott R. Jennette, Esq. for Quincy Mutual Fire Insurance Co. requesting Expedited Hearing on Quincy's Motion to Compel submitted to Judge Peebles . (Jennette, Scott) (Entered: 03/14/2013) |
| 03/14/2013 | 24 | TEXT ORDER granting 23 Letter Request for an expedited schedule regarding plaintiff's motion to compel. Authorized by Magistrate Judge David E. Peebles on 3/14/13. (sal, ) (Entered: 03/14/2013) |
| 03/14/2013 | | TEXT NOTICE of Hearing on Motion 21 MOTION to Compel *New York Central* : Response to Motion is due by 3/22/2013. Any Reply to Response to Motion is due by 3/26/2013 and limited to 3 pages. Motion Hearing is set for 4/3/2013 at 10:30 AM in Syracuse before Magistrate Judge David E. Peebles. ORAL ARGUMENT WILL BE HEARD AND APPEARANCES ARE REQUIRED. (sal, ) (Entered: 03/14/2013) |
| 03/25/2013 | 25 | Letter Motion from Scott R. Jennette for Quincy Mutual Fire Insurance Co. requesting Withdrawing Motion to Compel submitted to Judge Peebles . (Jennette, Scott) (Entered: 03/25/2013) |
| 03/25/2013 | 26 | TEXT ORDER : Based upon the representations made by counsel, the 25 Letter Request to withdraw plaintiff's 21 Motion to Compel Discovery is granted and the motion hearing set for 4/3/13 at 10:30 AM in Syracuse is cancelled. Parties are reminded that the next status telephone conference in this matter remains set for 6/11/2013 at 3:00 PM before Magistrate Judge David E. Peebles. Defendant's counsel is directed to initiate the call to Chambers, which can be reached at (315) 234-8620. Authorized by Magistrate Judge David E. Peebles on 3/25/13. (sal, ) (Entered: 03/25/2013) |
| 05/14/2013 | 27 | Letter Motion from Scott R. Jennette for Quincy Mutual Fire Insurance Co. requesting Modified Scheduling Order submitted to Judge Peebles . (Jennette, Scott) (Entered: 05/14/2013) |
| 05/14/2013 | 28 | TEXT ORDER granting 27 Letter Request the extend the deadline for plaintiff to provide expert disclosures until 7/16/2013; defendant to provide its expert disclosures by 7/31/2013; and plaintiff to provide its rebuttal expert disclosures by 8/16/2013. All other deadlines remain the same. Authorized by Magistrate Judge David E. Peebles on 5/14/13. (sal, ) (Entered: 05/14/2013) |
| 06/11/2013 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Telephone Conference held on 6/11/2013. Depositions have been conducted. Discovery has been exchanged with the exception of one issue. Plaintiff's counsel has not received an answer yet to Interrogatory No. 12, which was served upon defendant's counsel back in October of last year. A motion to compel was previously filed by plaintiff's counsel in March of this year, but was subsequently withdrawn based upon Attorney Cosgriff's promise that the requested information would be provided by the motion return date. Judge |

| | | |
|---|---|---|
| | | Peebles will issue a text order directing defendant's counsel to provide a response to Interrogatory No. 12, as well as the claim committee meeting recordings (tapes or transcripts), to plaintiff's counsel by 6/21/2013. Judge reiterates that the deadlines in this matter will not be extended. Mediation was conducted, however, the parties were far apart and the session was unsuccessful. Parties are contemplating filing dispositive motions. No new conference is set before Magistrate Judge Peebles. APP: Scott Jennette, Esq., and Brandon Byrne, Esq.. (sal, ) (Entered: 06/11/2013) |
| 06/11/2013 | 29 | TEXT ORDER : Defendant's counsel is directed to provide a response to Interrogatory No. 12, as well as the claim committee meeting recordings (tapes or transcripts), to plaintiff's counsel by 6/21/2013. Authorized by Magistrate Judge David E. Peebles on 6/11/13. (sal, ) (Entered: 06/11/2013) |
| 07/03/2013 | 30 | Letter Motion from Scott R. Jennette for Quincy Mutual Fire Insurance Co. requesting Modified Scheduling Order submitted to Judge Peebles . (Jennette, Scott) (Entered: 07/03/2013) |
| 07/08/2013 | 31 | TEXT ORDER granting 30 Letter Request for an extension of certain deadlines as follows: plaintiff's expert disclosure is due by 8/7/2013; defendant's expert disclosure deadline is due by 8/29/2013; and plaintiff's rebuttal expert disclosure is due by 9/16/2013. All other deadlines remain in place. Authorized by Magistrate Judge David E. Peebles on 7/8/13. (sal, ) (Entered: 07/08/2013) |
| 08/29/2013 | 32 | Letter Motion from James H. Cosgriff, III for New York Central Mutual Fire Insurance Co. requesting Extension/Modification of Scheduling Order submitted to Judge Peebles . (Cosgriff, James) (Entered: 08/29/2013) |
| 08/29/2013 | 33 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 32 Letter Motion from James H. Cosgriff, III for New York Central Mutual Fire Insurance Co. requesting Extension/Modification of Scheduling Order submitted to Judge Peebles (Cosgriff, James) (Entered: 08/29/2013) |
| 08/29/2013 | 34 | TEXT ORDER denying 32 Letter Request. The letter request of defendant for extension of the discovery and motion filing deadlines in this case is DENIED. This case has been pending since 6/27/12. The parties were advised during a telephone conference held on 6/11/13 that the deadlines in this case would not be extended. Despite that admonition, partial relief from the courts. Rule 16 scheduling order was granted on 7/8/13, solely with regard to expert disclosure with a notation all other deadlines remain in place. While defendant asserts, as a basis in part for its application, plaintiffs service of a second set of interrogatories on 8/21/13, those interrogatories are void since they were not served at least thirty days prior to the close of fact discovery, see N.D.N.Y.L.R. 16.2, and therefore they do not provide good cause to extend the discovery deadline. This ruling is without prejudice to the parties conducting fact depositions in the case beyond August 30, 2013, upon mutual consent, provided, however, that such depositions will not serve as a basis to extend the dispositive motion filing deadline. Authorized by Magistrate Judge David E. Peebles on 8/29/13. (cam, ) (Entered: 08/29/2013) |
| 10/01/2013 | | TEXT NOTICE of Hearing: A Final Pretrial Telephone Conference is set for 10/7/2013 at 3:30 PM before Magistrate Judge David E. Peebles. Defendant's |

| | | |
|---|---|---|
| | | counsel is directed to initiate the call to Chambers, which can be reached at (315) 234-8620. (sal, ) (Entered: 10/01/2013) |
| 10/07/2013 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Telephone Conference held on 10/7/2013. Settlement will be discussed further by the parties. Parties may stipulate to have a bench trial in this action instead of a jury trial. Judge sets a pretrial submission deadline of 1/10/2014. This will be set as a jury trial at this time and scheduled for 2/4/2014 at 9:30 AM in Syracuse before Magistrate Judge Peebles, which will last approx. 5-7 days. A notice regarding pretrial submission will be issued to the parties shortly. APP: Scott R. Jennette, Esq., and James H. Cosgriff, III, Esq. (sal, ) (Entered: 10/08/2013) |
| 10/08/2013 | | TEXT NOTICE TO COUNSEL: Parties are directed to notify the court on or before 12/2/2013 as to whether or not this action will proceed as a jury trial on 2/4/2014. In the event the parties wish to proceed with a bench trial on 2/4/2014, then a stipulation indicating same must be filed with the court on or before 12/2/2013. (sal, ) (Entered: 10/08/2013) |
| 10/08/2013 | 35 | NOTICE of Hearing: This notice supersedes the Uniform Pretrial Scheduling Order, Dkt. No. 15 , issued in this action. A Jury Trial is set in this action for 2/4/2014 at 9:30 AM in Syracuse before Magistrate Judge David E. Peebles. The parties are directed to refer to Local Rule 47.3 in the event the trial is postponed, settled or otherwise disposed of in advance of the actual trial date. If ANY technology is needed for this trial, counsel must notify CRD for MJ Peebles, Shelly Muller, IMMEDIATELY in order to accommodate this request and to set up a time and day to test this equipment prior to the date of trial. Any motions in limine must be filed on or before 1/10/2014. Any responses to such motions must be filed by 1/22/2014. Oral argument regarding any motions in limine will thereafter be set by the court and most likely be heard before the start of trial on 2/4/2014. Counsel for each party must electronically file their pretrial submissions with the court onor before 1/10/2014. Please read carefully the attached information before filing your pretrial submissions with the Court. On or before 1/10/2014, each party shall indicate to the other party the portion of any deposition to be offered at trial. To the extent possible, objections are to be resolved between the parties. All designations, objections to the deposition designations, and counter-designations shall be filed by 1/24/2014 and will be resolved by the court. (sal, ) (Entered: 10/08/2013) |
| 11/26/2013 | 36 | STIPULATION *Withdrawing Jury Demands and Proceeding with Non-Jury Trial* by Quincy Mutual Fire Insurance Co. submitted to Judge Peebles. (Jennette, Scott) (Entered: 11/26/2013) |
| 11/27/2013 | 37 | STIPULATION AND ORDER: Approving the # 36 Stipulation to Withdraw Jury Demand Pursuant to Fed. R. Civ. P. 38(D). Signed by Magistrate Judge David E. Peebles on 11/27/2013. (nmk) (Entered: 11/27/2013) |
| 11/27/2013 | | Docket Sheet updated to reflect the Jury Demand selection is None pursuant to the # 37 Stipulation and Order. (nmk) (Entered: 11/27/2013) |
| 12/10/2013 | | Reset Hearings: Based upon the recent Stipulation filed in this matter, the Jury Trial set for 2/4/2014 is reset as a Bench Trial for that same date starting at 9:30 |

| | | |
|---|---|---|
| | | AM in Syracuse before Magistrate Judge David E. Peebles. (sal, ) (Entered: 12/10/2013) |
| 01/08/2014 | 38 | Letter Motion from James H. Cosgriff, III for New York Central Mutual Fire Insurance Co. requesting Modification of Pretrial Scheduling Order submitted to Judge David E. Peebles . (Cosgriff, James) (Entered: 01/08/2014) |
| 01/09/2014 | 39 | TEXT ORDER GRANTING 38 Letter Request. Pretrial submissions are due by 1/17/14. Authorized by Magistrate Judge David E. Peebles on 1/9/14. (cam, ) (Entered: 01/09/2014) |
| 01/17/2014 | 40 | Witness List by New York Central Mutual Fire Insurance Co.. (Cosgriff, James) (Entered: 01/17/2014) |
| 01/17/2014 | 41 | TRIAL BRIEF by New York Central Mutual Fire Insurance Co.. (Cosgriff, James) (Entered: 01/17/2014) |
| 01/17/2014 | 42 | Witness List by Quincy Mutual Fire Insurance Co.. (Jennette, Scott) (Entered: 01/17/2014) |
| 01/17/2014 | 43 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 41 Trial Brief, 40 Witness List (Cosgriff, James) (Entered: 01/17/2014) |
| 01/17/2014 | 44 | PRETRIAL STIPULATION *Joint* by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Exhibit(s) Joint Exhibit List)(Jennette, Scott) (Entered: 01/17/2014) |
| 01/17/2014 | 45 | TRIAL BRIEF by Quincy Mutual Fire Insurance Co.. (Jennette, Scott) (Entered: 01/17/2014) |
| 01/17/2014 | 46 | MOTION in Limine filed by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Memorandum of Law, # 2 Declaration of Scott Jennette, # 3 Exhibit(s) A to Jennette Declaration, # 4 Exhibit(s) B to Jennette Declaration, # 5 Exhibit(s) C to Jennette Declaration, # 6 Exhibit(s) D to Jennette Declaration, # 7 Exhibit(s) E to Jennette Declaration, # 8 Declaration of Christopher D'Amato with Exhibits, # 9 Declaration of Raymond Schlather with Exhibits) (Jennette, Scott) (Attachment 8 replaced on 1/21/2014) (nmk, ). (Entered: 01/17/2014) |
| 01/17/2014 | 47 | NOTICE by Quincy Mutual Fire Insurance Co. *of pretrial submissions* (Jennette, Scott) (Entered: 01/17/2014) |
| 01/17/2014 | 48 | CERTIFICATE OF SERVICE by Quincy Mutual Fire Insurance Co. (Jennette, Scott) (Entered: 01/17/2014) |
| 01/20/2014 | 49 | LETTER MOTION and RESPONSE in Opposition re 46 MOTION in Limine filed by New York Central Mutual Fire Insurance Co.. (Cosgriff, James) Modified on 1/21/2014 to make a pending motion.(sal, ). (Entered: 01/20/2014) |
| 01/20/2014 | 50 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 49 Response in Opposition to Motion *in Limine filed by Plaintiff* (Cosgriff, James) (Entered: 01/20/2014) |
| 01/20/2014 | 51 | NOTICE by Quincy Mutual Fire Insurance Co. re 49 Response in Opposition to Motion *Letter to Hon. David E. Peebles* (Jennette, Scott) (Entered: 01/20/2014) |
| | | |

| 01/21/2014 | | TEXT ORDER granting 49 Letter Request for an extension of time until 1/24/2014 to file a response to plaintiff's 46 motion in limine. Authorized by Magistrate Judge David E. Peebles on 1/21/14. (sal, ) (Entered: 01/21/2014) |
|---|---|---|
| 01/21/2014 | | TEXT NOTICE of Hearing on Plaintiff's Motion 46 in Limine : Response to Motion due by 1/24/2014. Motion Hearing is set for 2/4/2014 at 9:30 AM in Syracuse before Magistrate Judge David E. Peebles. (sal, ) (Entered: 01/21/2014) |
| 01/21/2014 | | CLERK'S CORRECTION OF DOCKET ENTRY: The Clerk replaced the # 8 attachment of the # 46 Motion in Limine in order to apply redactions to personal identifiers. (nmk) (Entered: 01/21/2014) |
| 01/22/2014 | 52 | Witness List by New York Central Mutual Fire Insurance Co.. (Attachments: # 1 Certificate of Service)(Cosgriff, James) (Entered: 01/22/2014) |
| 01/24/2014 | 53 | RESPONSE in Opposition re 46 MOTION in Limine filed by New York Central Mutual Fire Insurance Co.. (Attachments: # 1 Memorandum of Law, # 2 Certificate of Service)(Cosgriff, James) (Entered: 01/24/2014) |
| 01/24/2014 | 54 | PLAINTIFF'S DEPOSITION DESIGNATIONS: filed by Quincy Mutual Fire Insurance Co. (Attachments: # 1 Declaration of Scott R. Jennette, Esq., # 2 Cover Letter, # 3 Certificate of Service) (nmk) (Entered: 01/27/2014) |
| 01/27/2014 | 55 | REPLY to 53 Response to 46 Motion in Limine in Opposition to New York Central's Request for Leave to Amend its Answer (Attachments: # 1 Certificate of Service)(Jennette, Scott) Modified on 1/27/2014 to reflect this is a reply and not a notice (sal, ). (Entered: 01/27/2014) |
| 02/04/2014 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Bench Trial held on 2/4/2014. After hearing oral argument from counsel, Judge Peebles RESERVES DECISION on plaintiff's 46 Motion in Limine. Opening statements are made by counsel. Parties stipulate to admit into evidence joint exhibits 1-155, w/ the exception of joint exhibits 126, 130, and 131. Plaintiff calls David J. Monahan as a witness. Court recesses until tomorrow, February 5, 2014, at 9:30 AM. APP: Scott Jennette, Esq., William Leinen, Esq., and James Cosgriff, III, Esq.. (Court Reporter Eileen McDonough). (sal, ) (Entered: 02/04/2014) |
| 02/05/2014 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Bench Trial held on 2/5/2014. Plaintiff calls Raymond M. Schlather, Esq. and Lisa Grealish as witnesses. Joint Exhibit 126 is now marked and received into evidence. Court recesses until tomorrow, February 6, 2014, at 10:30 AM. APP: Scott Jennette, Esq. and James Cosgriff, III, Esq.. (Court Reporter Eileen McDonough). (sal, ) (Entered: 02/05/2014) |
| 02/06/2014 | | TEXT Minute Entry for proceedings held before Magistrate Judge David E. Peebles: Bench Trial completed on 2/6/2014. Plaintiff's counsel offers the video deposition and transcript of Christopher D'Amato as an exhibit, which is marked as P-1. Judge receives P-1 as evidence. Plaintiff rests. Defendant's counsel calls Hugh Leonard as a witness. Attorney-client privilege issue is discussed on the record. Defendant's counsel offers the deposition of James Hardy as evidence, which is marked as exhibit D-2. Judge recieves D-2 as evidence. Plaintiff's |

| | | |
|---|---|---|
| | | deposition designations, Dkt. No. 54 , are marked as exhibit P-2 and received into evidence. Defendant's counsel calls Keith Miller as a witness. Plaintiff's counsel offers P-3 as an exhibit. Judge recieves P-3 as evidence. Defendant rests. Judge RESERVES DECISION and a written order will be forthcoming. Proposed findings of fact and conclusions of law are due to be filed on or before 3/1/2014. Closing arguments are to be included in such post trial submissions. Court is adjourned. APP: Scott Jennette, Esq., William Leinen, Esq., and James Cosgriff, III, Esq.. (Court Reporter: Eileen McDonough) (sal, ) (Entered: 02/10/2014) |
| 02/07/2014 | 56 | Letter Motion from Scott R. Jennette for Quincy Mutual Fire Insurance Co. requesting Modification of Post-Trial Submission Deadline and Additional Exhibit submitted to Judge Peebles . (Attachments: # 1 Proposed Exhibit, # 2 Certificate of Service)(Jennette, Scott) (Entered: 02/07/2014) |
| 02/10/2014 | 57 | TEXT ORDER granting 56 Letter Request for an extension of time to file proposed findings of fact and conclusions of law on or before 3/3/2014. Additionally, based upon consent of the parties, Joint Exhibit 98A (complete letter from Raymond Schlather to Frank Losurdo dated 3/17/2008) is received as evidence and now part of the trial record. Authorized by Magistrate Judge David E. Peebles on 2/10/14. (sal, ) (Entered: 02/10/2014) |
| 02/10/2014 | 58 | Court Exhibit List regarding exhibits marked and received as evidence concerning the bench trial held on 2/4/2014 through 2/6/2014 before Magistrate Judge Peebles. (sal, ) (Entered: 02/10/2014) |
| 02/12/2014 | 59 | TRANSCRIPT of Proceedings: Bench Trial (Testimony of David Monahan) held on 2/4/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/5/2014. Redacted Transcript Deadline set for 3/17/2014. Release of Transcript Restriction set for 5/13/2014. Notice of Intent to Redact due by 2/18/2014 (etm, ) (Entered: 02/12/2014) |
| 02/12/2014 | 60 | TRANSCRIPT of Proceedings: Bench Trial (Testomony of Raymond Schlather) held on 2/5/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the |

| | | |
|---|---|---|
| | | court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/5/2014. Redacted Transcript Deadline set for 3/17/2014. Release of Transcript Restriction set for 5/13/2014. Notice of Intent to Redact due by 2/18/2014 (etm, ) (Entered: 02/12/2014) |
| 02/12/2014 | 61 | TRANSCRIPT of Proceedings: Bench Trial (Testimony of Lisa Grealish) held on 2/5/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/5/2014. Redacted Transcript Deadline set for 3/17/2014. Release of Transcript Restriction set for 5/13/2014. Notice of Intent to Redact due by 2/18/2014 (etm, ) (Entered: 02/12/2014) |
| 02/12/2014 | 62 | TRANSCRIPT of Proceedings: Bench Trial (Testimony of Keith Miller) held on 2/6/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 3/5/2014. Redacted Transcript Deadline set for 3/17/2014. Release of Transcript Restriction set for 5/13/2014. Notice of Intent to Redact due by 2/18/2014 (etm, ) (Entered: 02/12/2014) |
| 02/18/2014 | 63 | NOTICE OF INTENT TO REQUEST REDACTION by James H. Cosgriff, III re 59 Transcript,,,,, 61 Transcript,,,,, 60 Transcript,,,,, 62 Transcript,,,,,. (Cosgriff, James) (Entered: 02/18/2014) |

A-12

| 03/03/2014 | 64 | Proposed Findings of Fact and Conclusions of Law by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Certificate of Service)(Jennette, Scott) (Entered: 03/03/2014) |
|---|---|---|
| 03/03/2014 | 65 | Proposed Findings of Fact and Conclusions of Law by New York Central Mutual Fire Insurance Co.. (Attachments: # 1 Certificate of Service)(Cosgriff, James) (Entered: 03/03/2014) |
| 03/31/2014 | 66 | ORDER that plaintiff Quincy Mutual's motion *in limine* (Dkt. No. 46) is DENIED; and that the clerk enter judgment in the action in favor of plaintiff Quincy Mutual Fire Insurance Co., and against defendant New York Central Mutual Fire Insurance Co., in the amount of $1,000,000.00, together with prejudgment interest from January 1, 2006, until the entry of judgment, calculated at the rate of nine percent per year. Signed by Magistrate Judge David E. Peebles on 3/31/14. Signed by Magistrate Judge David E. Peebles on 3/31/14. (sal, ) (Entered: 03/31/2014) |
| 03/31/2014 | 67 | JUDGMENT is entered in this action, pursuant to the Decision & Order dated March 31, 2014 (Dkt. 66 ) issued by Magistrate Judge David E. Peebles, in favor of plaintiff Quincy Mutual Fire Insurance Co., and against defendant New York Central Mutual Fire Insurance Co., in the amount of $1,000,000.00, together with prejudgment interest from January 1, 2006, until the entry of judgment, calculated at the rate of nine percent per year. (sal, ) (Entered: 03/31/2014) |
| 04/11/2014 | | Exhibits used during the bench trial were picked up at the Syracuse Clerk's Office today, 4/11/2014, by James Cosgriff, Esq., III. Plaintiff's counsel had previously advised the court that they did not need these exhibit binders back. (sal, ) (Entered: 04/11/2014) |
| 04/21/2014 | 68 | BILL OF COSTS by Quincy Mutual Fire Insurance Co.. (Attachments: # 1 Declaration of Scott R. Jennette, # 2 Exhibit(s) 1-9)(Jennette, Scott) (Entered: 04/21/2014) |
| 04/22/2014 | 69 | NOTICE OF APPEAL as to 66 Order Dismissing Case,, by New York Central Mutual Fire Insurance Co.. Filing fee $ 505, receipt number 0206-2913914. (Cosgriff, James) (Entered: 04/22/2014) |
| 04/22/2014 | 70 | CERTIFICATE OF SERVICE by New York Central Mutual Fire Insurance Co. re 69 Notice of Appeal (Cosgriff, James) (Entered: 04/22/2014) |
| 04/23/2014 | 71 | TRANSCRIPT of Proceedings: Bench Trial held on 2/4/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber |

| | | |
|---|---|---|
| | | before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/14/2014. Redacted Transcript Deadline set for 5/27/2014. Release of Transcript Restriction set for 7/22/2014. Notice of Intent to Redact due by 4/28/2014 (etm, ) (Entered: 04/23/2014) |
| 04/23/2014 | 72 | TRANSCRIPT of Proceedings: Bench Trial held on 2/5/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/14/2014. Redacted Transcript Deadline set for 5/27/2014. Release of Transcript Restriction set for 7/22/2014. Notice of Intent to Redact due by 4/28/2014 (etm, ) (Entered: 04/23/2014) |
| 04/23/2014 | 73 | TRANSCRIPT of Proceedings: Bench Trial held on 2/6/2014 before Judge Peebles, Court Reporter/Transcriber: Eileen McDonough, Telephone number: 315-234-8546. **IMPORTANT NOTICE - REDACTION OF TRANSCRIPTS:** In order to remove personal identifier data from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within 5 business days of this date. The policy governing the redaction of personal information is located on the court website at www.nynd.uscourts.gov. Read this policy carefully. If no Notice of Intent to Redact is filed within 5 business days of this date, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available on the web 90 days from today's date. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/14/2014. Redacted Transcript Deadline set for 5/27/2014. Release of Transcript Restriction set for 7/22/2014. Notice of Intent to Redact due by 4/28/2014 (etm, ) (Entered: 04/23/2014) |
| 04/23/2014 | 74 | ELECTRONIC NOTICE AND CERTIFICATION: sent to US Court of Appeals regarding the # 69 Notice of Appeal. (nmk) (Entered: 04/23/2014) |
| 04/28/2014 | 75 | Costs Taxed in amount of $6819.49 against New York Central Mutual Fire Insurance Co. (sal, ) (Entered: 04/28/2014) |
| 05/08/2014 | | USCA Case Number is 14-1377 for 69 Appeal filed by New York Central Mutual Fire Insurance Co. (cbm ) (Entered: 05/08/2014) |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

QUINCY MUTUAL FIRE INSURANCE CO.

                              Plaintiff,

      -vs-

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.

                              Defendant.

---

**COMPLAINT**

Case No. 3:12-CV-1041[NAM/DEP]

Plaintiff Quincy Mutual Fire Insurance Company ("Quincy") for their complaint against defendant New York Central Mutual Fire Insurance Company ("NY Central") states as follows:

## JURISDICTION AND VENUE

1.      This Court possesses jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action is between a citizen of the state of Massachusetts and a citizen of the state of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because NY Central is subject to personal jurisdiction in this District and thus resides within this District.

## PARTIES

3.      Quincy is a corporation organized under the laws of the Commonwealth of Massachusetts and is authorized to conduct insurance business in the State of New York. Quincy's principal place of business is in Quincy, Massachusetts.

4.      Upon information and belief, NY Central is organized and existing under the laws of New York, and is licensed to conduct insurance business in the State of New York.  NY Central's office and principal place of business is located in Edmeston, New York.

## FACTUAL ALLEGATIONS

### The Insurance Policies

5.      Upon information and belief, NY Central issued to Randolph Warden ("Warden") in the State of New York Personal Automobile Liability Insurance Policy No. 7104220 ("NY Central Policy") for the period 8/11/2000 to 8/11/2001.

6.      Upon information and belief, pursuant to the terms of the NY Central Policy, NY Central undertook to pay on behalf of Warden those sums that Warden (the insured) becomes legally responsible to pay as damages because of bodily injury or property damage because of an auto accident up to the amount of $500,000 per accident.

7.      Upon information and belief, the NY Central policy included a "Supplementary Payments" provision obligating NY Central to pay interest accruing after entry of a judgment in any suit it defends in addition to its $500,000 limit of liability.

8.      Quincy issued to Warden Home Owners Policy No. HP 195802 ("Quincy Policy") for the period 7/29/2000 to 7/29/2001.

9.      Pursuant to the terms of the HO 440 Personal Umbrella Liability Endorsement in the Quincy Policy, Quincy undertook to pay that portion of the damages for personal injury or property damage for which Warden is legally responsible that exceeds the limits of any and all underlying auto bodily injury and property damage coverage maintained by Warden up to the amount of $1 Million for any one occurrence.

10.     Pursuant to the terms of the HO 440 Personal Umbrella Liability Endorsement, the umbrella coverage under Quincy Policy is excess to the NY Central Policy and is not triggered until the coverage extended under the NY Central Policy is exhausted.

**The Underlying Action and Claims**

11.     On November 21, 2000, Peggy Horton ("Horton") sustained catastrophic bodily injuries in a motor vehicle accident that occurred as a result of Warden's failure to yield the right of way at an intersection controlled by a stop sign in the Town of Ulysses, New York.

12.     In the fall of 2001, Horton, through her counsel, filed a civil action for personal injuries against Warden in the Supreme Court of Schuyler County.

13.     NY Central retained legal counsel to represent Warden ("Defense Counsel").

14.     NY Central informed Quincy that NY Central believed Horton's damages were within the limits of the $500,000 primary indemnity automobile policy Warden had purchased.

15.     The medical records produced in discovery reflect that Horton underwent a surgical fusion at the level of L4-L5 on October 11, 2001.  A second surgical procedure was performed on August 29, 2002 consisting of the insertion of percutaneous pedical screw instrumentation at the same level due to lumbar instability at the fusion site.   On October 28, 2002, Horton underwent a third surgical procedure involving a repair of a large ventral incisional hernia of her lower abdomen that developed after the October 2001 adnominal surgery to fuse her spine.

16.     At the request of the defense, Horton underwent an independent medical examination ("IME") on December 18, 2003 by a neurosurgeon, Anthony M. Avellanosa, M.D. In his report, Dr. Avellanos concluded that Horton sustained a radial tear and fissures of her L4-L5 disc as a direct result of the subject motor vehicle accident and that the surgical fusion

3

surgeries were medically necessary. Dr. Avellanos opined further that Horton's scar formation, surgical trauma, and surgical implantation will cause a significant and permanent disability. Finally, he concluded that Horton had not reached maximum medical improvement and that she will not be able to return to her job as a nurse.

17.    In the fall of 2004, Horton moved for summary judgment on the issue of both liability and the serious injury threshold.

18.    By letter dated November 4, 2004, Warden's counsel wrote to NY Central advising that he "expect[s] that liability would be assessed against our insured [Warden] at trial . . . even if we survive summary judgment."

19.    By decision and order dated May 18, 2005, the trial court granted summary judgment in favor of plaintiff on the issue of both liability and serious injury.

20.    As a result, Warden became legally obligated to pay interest at a rate of 9% per annum from the date of entry of the judgment determining liability.

**NY Central's Bad Faith Settlement Negotiations**

21.    Despite the fact that Warden's counsel acknowledged that the summary judgment determination was "expected," and that interest continued to accrue, NY Central authorized the appeal of the trial court's order granting summary judgment to the Appellate Division, Third Department.

22.    As a result of a mandatory settlement conference in January 2006, Horton's counsel advised that his client would settle the case for the $500,000 limits of the NY Central Policy, which was the only coverage disclosed by Warden's counsel in discovery.  NY Central rejected the demand, and extended an offer of $75,000.

23.    After Warden's insurance defense counsel disclosed the $1 Million umbrella coverage under the Quincy Policy, Plaintiff's Counsel withdrew his $500,000 demand and increased it to $1.5 Million.

24.    On August 3, 2006, the Appellate Division, Third Department, affirmed the lower court's finding of liability and serious injury and found Defense Counsel's arguments "meritless."

25.    In January 2007, Plaintiff's Counsel served the expert reports of a life planner and an economist projecting plaintiff's economic losses in the range of $2.4 to $4.5 Million and increased Horton's demand for settlement to $3.5 Million.

26.    In spite of that fact that liability and serious injury had been conclusively established, that interest had been accruing at a rate of 9% for two years, that the defense medical expert had confirmed that plaintiff's multiple surgeries were caused by the accident and that her disability was permanent, and that the trial court judge expressed his unbiased view that the damages were far in excess of the NY Central policy limits at a pretrial conference held on June 1, 2007, NY Central refuse to increase its $75,000 offer.

27.    On June 4, 2007, Horton's Counsel sent a letter to NY Central asserting that it has been negotiating in bad faith.

28.    Warden's insurance defense counsel furnished the June 4, 2007 "bad faith" letter to NY Central and Quincy.  Quincy advised that it could not contribute to the settlement, pursuant to the terms of its policy, until NY Central's $500,000 primary policy limit was tendered.

29.    On July 20, 2007, Warden's personal counsel wrote to NY Central, requesting that NY Central tender the $500,000 limits and stating that anything less would be in bad faith.

5

Warden's personal counsel further stated that the plaintiff would settle for approximately $1 Million *in toto* and encouraged NY Central to tender its policy limits so that Horton's counsel could negotiate with Quincy.

30.     On December 17, 2007, Horton underwent a fourth surgical procedure that consisted of a fusion at the L5-S1 level.

31.     On November 10, 2008, Horton underwent a fifth surgical procedure to repair a large ventral incisional hernia of the lower abdomen.

32.     In July 2009, Horton's counsel served updated expert reports concluding that plaintiff has $255,700 in past lost wages, $416,350 in future lost earnings, and $2.5 to 4.6 Million in life care expenses.

33.     In spite of these events, NY Central made no attempt to settle the case and advised that it would not increase its settlement offer of $75,000.

34.     By letter dated September 11, 2009, counsel for Quincy wrote to NY Central asserting that NY Central has failed to exercise good faith in negotiating the claim and demanded that it make every attempt to settle the matter within its policy limits.

35.     On September 28, 2009, just three weeks before trial, NY Central offered $497,558.07, which represented the $500,000 primary policy limit less a prior payment for property damages.

36.     After NY Central tendered its policy limits, Warden's insurance defense counsel sent a letter to Quincy urging it to settle the case based on facts that NY Central had been ignoring for years:

- Horton had not worked since the accident as an LPN, resulting in $255,000 of past lost wages;

6

- Warden's expert economist concluded that Horton's future wage loss is at least $375,000;

- Horton's experts have concluded that her future medical is at least $2-$4 Million; and

- The interest accumulated over 4 ½ years since the entry of the judgment on liability will be substantial.

37.   On November 5, 2009, a stipulated judgment was entered against Warden in the amount of $1,069,726.20, plus interest at 9% from May 20, 2005.

38.   Counsel advised the Court of the judgment on the record during which time it was made clear that Quincy and NY Central reserved the right to resolve remaining disputes with respect to apportionment and other issues at a later date.

39.   Thereafter, Quincy paid its portion of the judgment in the amount of $572,168.13, plus $427,831.87 in accrued interest.

40.   Plaintiff's counsel entered a Satisfaction of Judgment in the Schuyler County Clerk's Office in the amount of $1,069,726.20 on December 2, 2009.

## FIRST CAUSE OF ACTION FOR BREACH OF DUTY OF GOOD FAITH AND/OR EQUITABLE SUBROGATION

41.   Quincy repeats and re-alleges paragraphs 1 – 40 as if fully set forth herein.

42.   NY Central, as the primary insurance carrier, had exclusive control over the settlement negotiations with Horton concerning her claims related to the Accident.

43.   As the primary insurer, NY Central owed Quincy, the excess insurer, a duty to act in good faith in defending and timely settling the underlying action against its insured.

44.   NY Central knew or should have known that the value of Horton's claim against Warden was in excess of the NY Central policy limits.

7

45.    NY Central knew or should have known that interest was continuing to accrue at rate of 9% per annum from the entry of summary judgment on liability.

46.    NY Central failed to engage in timely settlement negotiations with Horton in good faith and, as a result, Quincy lost the opportunity to resolve the case for an amount less than its policy limits.

47.    NY Central retained the use of its $500,000 policy limits while the case proceeded through the various adjudicatory levels.

48.    NY Central's actions were in gross disregard of Quincy's interests in settling the underlying litigation and evidenced a pattern of conscious and knowing indifference to the probability that Quincy would be held accountable for a judgment in excess of the primary limits if a timely settlement offer within NY Central's policy limits was not accepted.

49.    As result of NY Central's delay in tendering the policy limits, Quincy has been damaged in amount of $1,000,000, plus interests and costs.

50.    Quincy is entitled to judgment in the amount of $1,000,000, plus interests and costs.

## SECOND CAUSE OF ACTION FOR INDEMNIFICATION FOR INTEREST PAID ON THE JUDGMENT

51.    Quincy repeats and re-alleges paragraphs 1 – 50 as if fully set forth herein.

52.    As a result of the entry of the judgment on liability in 2005, interest in the amount of $427,831.87 was added to the $1,069,726.20 judgment entered on November 5, 2009.

53.    Quincy paid its portion of the judgment in the amount of $572,168.13, plus the entire amount of the $427,831.87 in accrued interest.

54.    Pursuant to the NY Central Policy, NY Central was obligated to pay all interest which accrued after any judgment is entered in addition to its policy limits, including the $427,831.87 of interest.

55.    NY Central's failure to pay the interest in the amount of $427,831.87 was in breach of the terms and conditions of its policy.

56.    Quincy has duly demanded, in accordance with all applicable terms and conditions of the insurance policies, that NY Central reimburse it in the amount of $427,831.87, plus interest.

57.    Despite due demand, NY Central has failed and/or refused to indemnify and reimburse Quincy.

58.    As a result of the foregoing, Quincy is entitled to be indemnified and reimbursed in the amount of $427,831.87, plus interest and costs.

### THIRD CAUSE OF ACTION FOR DECEPTIVE BUSINESS PRACTICES

59.    Quincy repeats and re-alleges paragraphs 1 – 58 as if fully set forth herein.

60.    Upon information and belief, NY Central's actions concerning its settlement and claims handling practices were a consumer-oriented practice which adversely affected the public at large.

61.    NY Central deliberately and materially deceived and misled its insured and Quincy with regard to its effort to settle the underlying litigation within its policy limits in violation of N.Y. GEN. BUS. LAW § 349.

62.    As a result of this deceptive and misleading practice, Quincy suffered damages in the amount of $1,000,000, plus costs and interest.

### DEMAND FOR JURY TRIAL

63.    Plaintiff demands a trial by jury on all causes of action.

**WHEREFORE**, Quincy demands entry of judgment in their favor as follows:

a.    Awarding Quincy damages in the amount of $1,000,000 on the first and third causes of action and $427,831.87 on the second cause of action;

b.    Awarding Quincy costs, expenses, and disbursements incurred in connection with this action, including attorneys' fees, in the maximum amount permitted by applicable law.

c.    Granting Quincy such other and further relief as the Court deems proper.

Dated: Rochester, New York                    WARD GREENBERG HELLER & REIDY LLP
      June 27, 2012


                        By:_____/s/ Scott R. Jennette_____
                                  Scott R. Jennette


                            *Attorneys for Plaintiff*
                            300 State Street
                            Rochester, New York  14614
                            (585) 454-0700
                            sjennette@wardgreenberg.com

JS 44   (Rev. 09/11)

Case 3:12-cv-01041-DEP   Document 1-1   Filed 06/27/12   Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Quincy Mutual Fire Insurance Company | New York Central Mutual Fire Insurance Company |

| **(b)**  County of Residence of First Listed Plaintiff   Norfolk, Massachusetts | County of Residence of First Listed Defendant   Otsego, New York |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*<br>Scott R. Jennette, Ward Greenberg Heller & Reidy, LLP, 300 State Street<br>Rochester, New York  14614; 585-454-0700 | Attorneys *(If Known)* |
|---|---|

**II.  BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 2  U.S. Government
  Defendant
- ☐ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☒ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.  NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure<br>of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury -<br>Product Liability | ☐ 690 Other | ☐ 423 Withdrawal<br>28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product<br>Liability | ☐ 367 Health Care/<br>Pharmaceutical | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel &<br>Slander | Personal Injury<br>Product Liability | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment<br>& Enforcement of Judgment | ☐ 330 Federal Employers'<br>Liability | ☐ 368 Asbestos Personal<br>Injury Product | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent<br>☐ 840 Trademark | ☐ 460 Deportation<br>☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted<br>Student Loans | ☐ 345 Marine Product<br>Liability | **PERSONAL PROPERTY** | **LABOR** | | Corrupt Organizations |
| (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards<br>Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment<br>of Veteran's Benefits | ☐ 355 Motor Vehicle<br>Product Liability | ☐ 371 Truth in Lending<br>☐ 380 Other Personal | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/<br>Exchange |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal<br>Injury | Property Damage | ☐ 740 Railway Labor Act<br>☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | ☐ 362 Personal Injury -<br>Med. Malpractice | ☐ 385 Property Damage<br>Product Liability | Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. | | ☐ 895 Freedom of Information<br>Act |
| | | | Security Act | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate<br>Sentence | | ☐ 870 Taxes (U.S. Plaintiff<br>or Defendant) | Act/Review or Appeal of<br>Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party<br>26 USC 7609 | ☐ 950 Constitutionality of<br>State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/<br>Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities -<br>Employment | ☐ 540 Mandamus & Other<br>☐ 550 Civil Rights | ☐ 462 Naturalization Application<br>☐ 463 Habeas Corpus - | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities -<br>Other | ☐ 555 Prison Condition<br>☐ 560 Civil Detainee - | Alien Detainee<br>(Prisoner Petition) | | |
| | ☐ 448 Education | Conditions of<br>Confinement | ☐ 465 Other Immigration<br>Actions | | |

**V.  ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1  Original
  Proceeding
- ☐ 2  Removed from
  State Court
- ☐ 3  Remanded from
  Appellate Court
- ☐ 4  Reinstated or
  Reopened
- ☐ 5  Transferred from
  another district
  *(specify)*
- ☐ 6  Multidistrict
  Litigation

**VI.  CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:
Breach of duty of good faith, indemnification, deceptive business practices.

**VII. REQUESTED IN
COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

**VIII. RELATED CASE(S)
IF ANY**
*(See instructions):*   JUDGE ___   DOCKET NUMBER ___

DATE
06/27/2012

SIGNATURE OF ATTORNEY OF RECORD
/s/ Scott R. Jennette

**FOR OFFICE USE ONLY**

RECEIPT # 2235494   AMOUNT  $350.00   APPLYING IFP ___   JUDGE  NAM   MAG. JUDGE  DEP

3:12-CV-1041

Case 3:12-cv-01041-DEP   Document 1-1   Filed 06/27/12   Page 2 of 2

JS 44 Reverse  (Rev. 09/11)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.      (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.      Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdiction be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to  suits under 28 U.S.C. 1331, where jurisdicti on arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.      Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.      Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.      Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.      Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause **Do not cite jurisdictional statutes unless diversity.**      Example:      U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.      Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.      Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of New York ▼

| | |
|---|---|
| Quincy Mutual Fire Insurance Company | ) |
| | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| New York Central Mutual Fire Insurance Company | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   3:12-CV-1041[NAM/DEP]

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  New York Central Mutual Fire Insurance Company
1899 Central Plaza East
Edmeston, New York  13335


A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:
Scott R. Jennette
Ward Greenberg Heller & Reidy LLP
300 State Street
Rochester, New York 14614


If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


*Clerk of Court*

Date: _____06/28/2012_____                                  s/ S. Potter
                                                         _____
                                                         *Signature of Clerk or Deputy Clerk*

Case 3:12-cv-01041-DEP   Document 3   Filed 06/28/12   Page 2 of 2

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.   3:12-CV-1041[NAM/DEP]

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏  I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

❏  I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏  I returned the summons unexecuted because _____ ; or

❏  Other *(specify):*

_____ .



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                                    *Server's signature*

                                              _____
                                                                    *Printed name and title*


                                              _____
                                                                    *Server's address*

Additional information regarding attempted service, etc:

**A-26**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

QUINCY MUTUAL FIRE INSURANCE CO.

|  |  |
|---|---|
| Plaintiff, | **ANSWER** |
| vs. | Case No.: |
|  | 3:12-CV-1041[NAM/DEP] |

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.

Defendant.

---

Defendant, NEW YORK CENTRAL MUTUAL FIRE INSURANCE CO., by its attorneys, PETRONE & PETRONE, P.C., answers plaintiff's Complaint as follows:

1.    Admits the allegations contained in paragraphs 4 and 5 of the Complaint.

2.    Denies the allegations contained in paragraphs 26, 33, 44, 46, 48, 49, 50, 54, 55, 57, 58, 60, 61 and 62 of the Complaint.

3.    Denies knowledge or information sufficient to form a belief as to the allegations contained in paragraphs 2, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 28, 29, 30, 31, 32, 34, 35, 36, 37, 38, 39, 40, 42, 43, 45, 47, 52, 56 and 63 of the Complaint.

4.    With respect to the allegations contained in paragraphs 41, 51 and 59 of the Complaint, admits such allegations as are elsewhere herein admitted, denies such allegations as are elsewhere herein denied and denies having knowledge or information to form a belief regarding those allegations as are elsewhere herein similarly treated.

5.    Denies each and every other allegation of the Complaint not heretofore specifically admitted or denied.

## FOR A FIRST AFFIRMATIVE DEFENSE

6.    Upon information and belief, any damages sustained by plaintiff have been caused in whole or in part by its own conduct and therefore, plaintiff is barred from recovering such damages.

## FOR A SECOND AFFIRMATIVE DEFENSE

7.    Upon information and belief, the damages allegedly sustained by plaintiff, if any, were caused by actions or omissions of individuals not under the control, direction or supervision of defendant and for whose conduct defendant was not responsible.

## FOR A THIRD AFFIRMATIVE DEFENSE

8.    Upon information and belief, the damages allegedly sustained by plaintiff, none being admitted, can be attributed to several causes and accordingly, should be apportioned among the various causes according to respective contribution of each such cause to the harm sustained, if any.

## FOR A FOURTH AFFIRMATIVE DEFENSE

9.    Upon information and belief, plaintiff's Complaint fails to state a cause of action in that defendant's actions were premised upon bonafide reasons and conditions then and there existing.

## FOR A FIFTH AFFIRMATIVE DEFENSE

10.    Upon information and belief, plaintiff's Complaint fails to state a cause of action in that plaintiff's allegations are speculative and conclusory and thus, do not support a finding of bad faith on the part of defendant.

## FOR A SIXTH AFFIRMATIVE DEFENSE

11.    Upon information and belief, plaintiff's Complaint fails to state a cause of action in that defendant's collective actions were premised upon rational and reasonable bases and thus, not subject to a finding of bad faith.

**WHEREFORE**, judgment is demanded as follows:

1.    Dismissing the Complaint;

2.    Diminishing the damages otherwise recoverable pursuant to pertinent sections of CPLR and FRCP; and

3.    For such other, further and different relief which may seem just, proper and equitable.

Dated:   July 26, 2012
       Williamsville, New York

                                    James H. Cosgriff, III, Esq.
                                    PETRONE & PETRONE, P.C.
                                    Attorneys for Defendant
                                    Office and Post Office Address
                                    5500 Main Street, Suite 342
                                    Williamsville, New York 14221
                                    (716) 204-1087

**TO:**
Scott R. Jennette, Esq.
WARD GREENBERG HELLER & REIDY, LLP
Attorneys for Plaintiff
300 State Street
Rochester, New York 14614
(585) 454-0700

**A-30**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————

QUINCY MUTUAL FIRE INSURANCE CO.,

               Plaintiff,

     -vs-

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.,

               Defendant,
——————————————————————

              **JOINT PRETRIAL
              STIPULATION**

              CASE NO. 3: 12-CV-1041 (DEP)

Pursuant to the Court's Order of October 8, 2013 (Dkt. No. 35), Plaintiff Quincy Mutual Fire Insurance Co. ("Quincy") and defendant, New York Central Mutual Fire Insurance Co. ("New York Central"), submit the following Joint Pretrial Stipulation.

## BASIS OF FEDERAL JURISDICTION

This Court possesses jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action is between a citizen of the state of Massachusetts (Quincy) and a citizen of the state of New York (New York Central), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## LIST OF EXHIBITS WHICH CAN BE STIPULATED INTO EVIDENCE OR WHICH WILL BE OFFERED WITHOUT OBJECTION AS TO FOUNDATION

Attached hereto as Exhibit A is an Exhibit List enumerating the documents and photographs that the parties have no objection as to foundation, but reserve the right to challenge the admissibility of a document on the ground of relevance.

## RELEVANT FACTS NOT IN DISPUTE

1.    New York Central issued to Randolph Warden ("Warden") in the State of New York Personal Automobile Liability Insurance Policy No. 7104220, which provided primary liability insurance coverage for the period 8/11/2000 to 8/11/2001 in the amount of $500,000 (the "New York Central Policy").

2.    The New York Central Policy included the following provision under Part A—Liability Coverage:

> **Supplementary Payments**
>
> In addition to our limit of liability, we will pay on behalf of an "insured:"
>
> > 3. Interest accruing after a judgment is entered in any suit we defend.

3.    Quincy issued to Warden in the State of New York Home Owners Policy No. HP 195802, which provided excess liability insurance coverage for the period 7/29/2000 to 7/29/2001 in the amount of $1,000,000 per occurrence.

4.    The Quincy Policy contained the following provision:

> LIMIT OF LIABILITY: (1) The limit of liability of this endorsement is one million dollars ($1,000,000) for any one occurrence. Our liability for damages resulting from one occurrence is only for that portion of the damages which exceeds the [primary policy] limit.
>
> *******
>
> Conditions of this endorsement . . . (8) Other insurance. If a covered person has other collectible insurance that covers damages this endorsement also covers, this endorsement shall be excess to and will not contribute with such other insurance. This does not include insurance bought to apply in excess of the amount of deductible plus the limit of coverage of this endorsement.

5.      The Quincy Policy also contained the following provision:

> COVERAGES (2) If it is claimed that a covered person is legally
> responsible for damages 1) which are not payable under any
> underlying insurance due to exhaustion of all underlying insurance,
> 2) which are covered under this endorsement except for the
> retained limit, we will:  . . . (3) pay all our expenses; pay all court
> costs a covered person is charged; pay all interest accruing after a
> judgment is entered until we pay, tender or deposit in court that
> part of the judgment this policy covers.

6.      On October 18, 2001, Peggy Horton ("Horton"), by her attorneys, Cellino & Barnes, P.C., Christopher D'Amato, Esq., of counsel, filed a Summons and Complaint in the New York Supreme Court, Schuyler County, under Index # 01-237 (the "Underlying Litigation").

7.      The Complaint alleged that Horton sustained serious personal injuries in a motor vehicle accident on November 21, 2000, when Warden negligently failed to yield to the right of way at an intersection controlled by a stop sign in the Town of Ulysses, New York.

8.      The Complaint sought damages in amount of $1,000,000.

9.      Warden was ticketed for a violation of Vehicle and Traffic Law § 1142(a) (failing to yield to the right of way at a stop sign) and pleaded guilty to the charge of Failure to Obey a Traffic Control Device under Vehicle and Traffic Law § 1110(a) related to the November 21, 2000 accident.

10.     Warden's insurance agent provided timely notice of the claim to New York Central and to Quincy.

11.     New York Central accepted coverage and assigned the claim to David Monahan, Senior Casualty Examiner, to adjust the loss, under the supervision of Diane Wildey, Casualty Manager/AVP.

3

12.     Quincy Mutual accepted coverage and assigned the claim to James Hardy, Senior Litigation Examiner, to monitor the claim under the supervision of Ray Congdon, General Liability and Litigation Manager, and Lisa Grealish, Executive Counsel and Vice President of Claims.

13.     New York Central retained the law firm Brown & Michaels, P.C., Frank Losurdo, Esq., of counsel, to represent and defend Warden in the Underlying Litigation.

14.     At the time of the November 21, 2000 automobile accident, Horton was a 37-year old married mother of three, and was employed as a licensed practical nurse with Altieri Sterling House of Ithaca, earning $12.36 per hour.

15.     Horton never returned to work as a nurse or to any other employment position after the November 2000 accident.

16.     On November 13, 2001, New York Central set a reserve amount of $5,000 related to the Horton claim.

17.     On November 14, 2001, Quincy set a reserve amount of $2,500 related to the Horton claim.

18.     Medical records obtained in discovery disclosed that Horton underwent a surgical fusion by Jeffery Lewis, M.D., at the level of L4-L5 on October 11, 2001.

19.     On March 20, 2002, New York Central set a reserve in the amount of $50,000 related to the Horton claim.

20.     On August 29, 2002, a second surgical procedure was performed by Dr. Lewis consisting of the insertion of percutaneous pedicle screw instrumentation at the level of L4-L5 due to lumbar instability at the fusion site caused by *pseudarthrosis* (non-union) of the L4 and L5 vertebral bone segments.

4

21.    On October 28, 2002, Horton was diagnosed with a large 20 x 20 cm incarcerated incisional hernia of the left lower abdomen (along the scar line associated with the incision from the prior L4-5 fusion surgery).   On the same date, she underwent a third surgical procedure by Dr. Abraham to repair the hernia.

22.    By letter to New York Central dated March 12, 2003, Attorney Losurdo reported on the discovery depositions of Warden and Horton as follows:

- Warden testified he did not see Horton's vehicle before he entered the intersection controlled by the stop sign;

- Horton testified that she was traveling in excess of 50 mph and that her vehicle was approximately 4 car lengths away when Warden pulled from the stop sign into the intersection;

- "There is the potential for a large lost wage claim" and "[w]e will also need to assess the psychological records when they are received."

23.    On March 23, 2003, New York Central set a reserve amount of $175,000 related to the Horton claim.

24.    By letter dated August 27, 2003, Attorney Losurdo advised New York Central on the status of the Underlying Litigation, stating "I expect that the majority of fault will be assessed to our insured because he failed to look left immediately before entering the intersection" and that "we have limited evidence to defeat" a motion for summary judgment.

25.    On or about September 2, 2003, New York Central received a report from the New York State Department of Temporary and Disability Assistance, Division of Disability

Determinations (the "State Disability Report"), regarding a psychiatric examination of Horton

performed by Ruana M. Starer, Ph.D., which occurred in August 2001.

26.    The State Disability Report concluded that Horton suffered from "Major

Depression" and "Post-Traumatic Stress Disorder" as a result of the November 21, 2000

accident.

27.    On December 18, 2003, at the request of New York Central's assigned counsel,

Horton underwent an independent medical examination by Anthony Avellanosa, M.D.

28.    In Dr. Avellenosa's report of December 18, 2003, he concluded as follows:

> "Subsequently, the performance of a more specific diagnostic test (lumbar
> discogram and CT scan) on May 15, 2001 have demonstrated the presence of two
> fissures at the nine o'clock position on the right L4-5 disc.  The discogram in this
> particular case is considered abnormal or positive indicating the presence of a
> herniated disc at the L4-5 level.  The presence of this radial tear/fissurs at L4-5 is
> indicative of a direct injury to the intervertebral disc subsequent to the motor
> vehicle accident of November 21, 2000."

29.    In his report, which was provided to New York Central on or about February 3,

2004, Dr. Avellanosa concluded as follows:

- Horton sustained a radial tear, two fissures and herniation of
  her L4-5 disc as a direct result of the subject motor vehicle
  accident;

- Horton's surgical fusion surgeries were medically necessary;

- Horton had not reached maximum medical improvement and
  required further physical therapy;

- Horton was unable to return to her job as a nurse at the present
  stage; and

- Horton's scar formation, surgical trauma, and surgical
  implantation will cause a significant and permanent injury.

30.     By letter to New York Central dated February 3, 2004, Attorney Losurdo advised that Horton had "sought psychological treatment and the staff psychiatrist has indicated that she has Major Depressive Disorder secondary to the MVA involving our insured."

31.     On March 4, 2004, Quincy set a reserve amount of $5,000 related to the Horton claim.

32.     By letter dated November 4, 2004, Attorney Losurdo advised New York Central that plaintiff had filed a motion for summary judgment on the issues of liability and serious injury and stated that he "expected that the liability would be assessed against our insured at trial."

33.     By letter dated November 4, 2004, Attorney Losurdo advised New York Central that his accident reconstruction expert will not give an opinion for the defense at trial, and as a result, a finding of liability by the jury was likely.

34.     On November 29, 2004, plaintiff underwent a fourth surgical procedure, which involved the removal of the Sextant pedicle screw instrumentation at L4-5.

35.     By letter to New York Central dated April 24, 2005, Attorney Losurdo reported that "we will have a difficult time defending against liability at trial based on our insured's statement and testimony regarding the fact that he failed to look before proceeding into the roadway."

36.     By letter dated May 25, 2005, Attorney Losurdo advised New York Central that the Supreme Court, Schuyler County, granted Horton's motion and entered judgment on liability and serious injury by Decision and Order, dated May 18, 2005.

37.     In the May 25, 2005 letter to New York Central, Attorney Losurdo stated "There is not much basis for appealing the serious injury finding since plaintiff relied on our own IME"

and "the accident reconstruction expert we retained, Paul Van Vorce, was reluctant to do a written report and will not testify at trial based on his investigation."

38.    In the May 25, 2005 letter to New York Central, Attorney Losurdo stated:

"[e]ven though we are unlikely to avoid full liability at trial, we discussed the benefits of filing an appeal of [the summary judgment] Order to protect the interests of the insured and for negotiation purpose.  Plaintiff's inconsistent testimony regarding her speed and VanVorce's calculation regarding plaintiff's stopping distance give us a basis for appeal."

39.    New York Central was aware at that time that under New York law, interest began to accrue at 9 % per annum following the May 18, 2005 entry of summary judgment on liability.

40.    New York Central authorized Attorney Losurdo to appeal the May 18, 2005 Decision and Order to the Appellate Division, Third Department.

41.    In December 2005, prior to the disclosure of Quincy's umbrella policy to plaintiff, Horton's counsel demanded the $500,000 limits of New York Central's policy to settle the Underlying Litigation.

42.    In December 2005, New York Central responded with an initial settlement offer of $75,000.

43.    On August 3, 2006, the Appellate Division, Third Department, affirmed the Supreme Court's Decision and Order granting Horton summary judgment on the issues of liability and serious injury.

44.    In its Decision, the Appellate Division, Third Department, stated that "defendant's principal argument on appeal – that plaintiff's prior accident and preexisting degenerative condition raise issues of fact concerning causation and serious injury – are meritless."

8

45.      In his August 9, 2006 letter, Attorney Losurdo advised New York Central that "I do not feel that we have any further appeal options on these issues."

46.      Diane Wildey testified at her deposition that based on the Third Department's Decision, New York Central did not have any remaining arguments or defenses on the issue of liability, causation, and/or serious injury.  (*See* Wildey Tr. pp. 177: 5-25; 178-182; 183:1-4).

47.      On September 14, 2006, Quincy set a reserve amount of $12,500 related to the Horton claim.

48.      By letter dated January 19, 2007, Attorney Losurdo informed New York Central of plaintiff's increased demand to settle for $3.5 Million based upon plaintiff's experts' pecuniary loss estimates.

49.      Horton's attorney disclosed plaintiff's expert loss reports to Attorney Losurdo by letters dated January 23, 2007 and January 29, 2007.

50.      By letter dated January 23, 2007, Attorney Losurdo advised New York Central that the trial on damages was scheduled to commence on August 20, 2007.

51.      On or about February 12, 2007, Attorney Losurdo forwarded copies of Horton's expert reports, which concluded that as a result of the injuries sustained in the motor vehicle accident, Horton is permanently and totally disabled and will incur substantial wage loss and medical and life care expenses as follows:

- $170,373.00 in past wage loss;

- $1,029,084.00 in future wage loss damages; and

- $2,391,755.00 to $4,461,528.00 in life care costs.

52.    By letter to New York Central dated February 12, 2007, Attorney Losurdo stated: "Plaintiff is making a claim of depression.  We have opted not to retain an expert on this issue because it is often problematic."

53.    New York Central did not conduct a psychological independent medical exam to evaluate Horton's claims for PTSD and/or depression.

54.    New York Central and Attorney Losurdo elected not to retain a life care expert to assess the propriety of plaintiff's life care expense claims and instead decided to rely on a medical record review for purposes of cross-examining plaintiff's expert.

55.    In the spring of 2007, Raymond Schlather, Esq., provided notice that he was retained by Warden as his personal counsel to monitor the Underlying Litigation and protect Mr. Warden's interests.

56.    Quincy claims examiner, James Hardy, noted in his diary on May 3, 2007 that New York Central "expect[s] to formulate an evaluation range prior to the pre-trial conference now scheduled for 6-1-07" and "[t]his is a possible umbrella exposure loss in which the primary carrier, New York Central Mutual has assigned Losurdo to provide defense."

57.    A written verdict potential assessment was not performed by New York Central or its retained counsel until October 2009.

58.    By letter dated May 23, 2007, Attorney Losurdo informed New York Central that it was Quincy's position that it would not contribute to a settlement until New York Central tendered its policy limits.

59.    On May 25, 2007, Attorney Losurdo served Warden's expert disclosures, including an independent medical examination by Dr. Avellanosa dated October 2, 2001, an independent medical examination by Dr. Avellanosa dated December 28, 2003, an addendum

report by Dr. Avellanosa, dated March 23, 2007, an addendum report by Dr. Avellanosa, dated

May 23, 2007, a vocational rehabilitation report by Charlie Clearly, dated April 16, 2007, a

report of a medical records review conducted by Kenneth D. Pearson, dated May 4, 2007 and a

report by Matthew McCabe on plaintiff's lost wage and economic losses.

      60.    In Dr. Avellanosa's March 23, 2007 addendum report, he stated:

> "Based on the review of medical records, clinical history of
> direct injury to the lumbar spine/discs/muscles and soft tissues,
> multiple surgical fusion procedures, residual neurological
> symptoms, the intensity of residual pain and the findings on my
> clinical examination of June 2003, it is my medical opinion that
> Ms. Peggy L. Horton has sustained a marked permanent
> disability caused by the motor vehicle accident of November 1,
> 2000. However, in spite of this marked permanent disability, I find
> her capable and able to return to a sedentary work capacity (Lifting
> less than 10 lbs., occasional carrying, able to walk short
> distances, no reaching overhead, no climbing ladders or
> crawling, she can push or pull with one or both hands up to 5
> lbs. of force i.e. desk drawer, she is capable of performing 8-
> hour sedentary work per day, 5 days per week with frequent
> changes in position.)."

      61.    In his April 16, 2007 vocational rehabilitation report, Mr. Clearly concluded

based on Dr. Avellanosa's reports, that while Horton is unable to return to work as a nurse, she

would be able to return to work in sedentary positions.

      62.    In his report on Horton's lost wage and economic losses, Mr. McCabe estimated

that Horton had a work-life expectancy of 54.9 years (17.9 years remaining after her accident)

and a pre-injury earning capacity of $557,265 as a nurse.

      63.    On May 31, 2007, New York Central increased the reserve from $175,000 to

$375,000.

      64.    The last reserve adjustment was four years earlier on March 20, 2003 ($50,000 to

$175,000).

65.     On June 1, 2007, the Supreme Court, Schuyler County, Justice Garry presiding, held a pretrial conference in the Underlying Litigation.

66.     At the June 1, 2007 pretrial conference, plaintiff's attorney D'Amato advised that Horton was willing to reduce plaintiff's settlement demand from $3.5 Million to $1.5 Million, which was the amount of combined insurance coverage.

67.     At the June 1, 2007 pretrial conference, Attorney Losurdo, acting on behalf of New York Central, advised that New York Central's offer would remain at $75,000.

68.     On June 4, 2007, Horton's counsel faxed and mailed a "bad faith" letter addressed to Attorney Losurdo, with copy to Quincy, advising as follows:

- Justice Garry stated that she believed that the verdict potential and accrued interest exceeded the combined coverage of $1.5 million;

- Defendant's IME physician, Dr. Avellanosa, had disciplinary problems and was no longer permitted to perform surgeries due to a rash of malpractice claims.

- Horton applied for and was granted social security disability due to inability to work.

- Horton was being treated for significant depression.

69.     By letter to New York Central dated June 4, 2007, Attorney Losurdo reported as follows:

"At the conference, the Judge was putting significant pressure on New York Central to increase its offer of $75,000.  Judge Garry indicated that she … wanted me to advise [New York Central] that she viewed this as a significant case with potential over the NYCM coverage (she relied on the fact that negligence and serious injury had been decided as a matter of law and our own expert, Dr. Avellanosa indicates that this is a significant injury as quoted in the appellate decision.)."

70.     By letter to New York Central dated June 6, 2007, Attorney Losurdo advised as follows:

- Dr. Avellenosa had prior disciplinary problems.

- In 2000, he had 7 pending malpractice actions.

- He reached an agreement with the State wherein he admitted to negligence and agreed to a "license suspension; three year probation (9/14/00 to 9/13/03)" and to a "license limited to prohibiting surgery of any kind."

- "[Dr. Avellenosa's] credibility will be significantly damaged under cross examination."

71.     By letter dated June 12, 2007, David Monahan responded to plaintiff's counsel's June 4, 2007 Bad Faith letter and extended a $75,000 settlement offer on behalf of New York Central and stated that New York Central was "willing to continue to negotiate a settlement."

72.     On July 13, 2007, the Supreme Court, Schuyler County, held a pretrial conference in the Underlying Litigation related to the pending trial on damages.

73.     At this time, the Court granted plaintiff's counsel's request for an adjournment of the trial on the ground that Horton's treating neurosurgeon recommended that Horton undergo a discectomy and fusion of a different level of her cervical spine at L5/S1, which became unstable due to the prior fusion at L4/L5.

74.     Mr. Monahan testified at his deposition that "another fusion surgery involving a different level of the lumbar spine [was] not a good development for the defense" and "could actually potentially increase the value of the case."  (Monahan Dep. Tr. 171-72.)

75.     By letter dated July 16, 2007, Attorney Losurdo informed New York Central about the July 13, 2007 pretrial conference, stating "The judge was not happy that there was no increased offer after her urging" and that "[Schlather] advised the Court that he believed that New York Central should tender the $500,000 policy so that plaintiff could negotiate with Quincy Mutual, the excess carrier."

13

76.    On July 20, 2007, Schlather sent a letter to New York Central, with copy to Quincy, concluding that "it is highly likely that a jury verdict will exceed $1,500,000 if the case goes to trial" and urging that New York Central promptly tender its $500,000 policy limits in accordance with its covenant of good faith "in order to facilitate settlement of this case at this time."

77.    In his July 20, 2007 letter, Schlather stated "I am requesting that once New York Central tenders its policy, Quincy Mutual negotiate in good faith to settle the case in all respects within the umbrella policy limits."

78.    In his July 20, 2007 letter, Schlather advised:

> "At the pre-trial conference held in the case on July 13, 2007, plaintiff's counsel stated that if New York Central Mutual offered its policy limits ($500,000), the plaintiff would negotiate a settlement within the limits of the umbrella coverage. My sense is that the plaintiff is prepared to settle the case for less than $1,000,000 in toto."

79.    New York Central did not increase its offer of $75,000.

80.    By letter dated August 2, 2007, New York Central advised Attorney Schlather as follows:

> "[T]he trial of August 20, 2007 has been adjourned without a new trial date since the plaintiff is going to have an additional surgery. In regards to Dr. Avellanosa we will further evaluate obtaining a new independent medical exam with a different doctor once the plaintiff has the additional surgery. As you are aware, the insured can if they wish, make an offer to the plaintiff on their own behalf to settle any possible uninsured excess exposure that they deem imprudent."

81.    By letter dated August 17, 2007, Quincy advised that it retained Leonard & Cummings LLC, Hugh Leonard, Esq., of counsel, to represent its interest "in view of the severity being alleged in this case and the contentiousness that appears to have developed[.]"

14

82.    After a discogram and an MRI revealed a herniated disc at the L5-S1 level, Horton underwent a fifth surgical procedure on December 17, 2007, which involved a transperintoneal exposure of the anterior lumbar spine at L5-S1 with a lumbar discectomy and interbody fusion using a Synsix peak interbody fusion cage, bone morphogenic protein and anterior lumbar plate at the L-5 and S-1 vertebral segments.

83.    On December 27, 2007, Quincy set a reserve amount of $52,500 related to the Horton claim.

84.    In January 2008, New York Central transferred the defense of Warden in the Underlying Litigation to Keith Miller, Esq.

85.    By letter to David Monahan dated March 14, 2008, Attorney Miller stated the trial was stayed until the end of 2008 and that "plaintiff must restore the case to the trial docket by February 12, 2009 or the case will be dismissed due to calendar default."

86.    By letter to Attorney Losurdo dated March 17, 2008, Attorney Schlather advised:

> "New York Central Mutual is persisting in grossly undervaluing this case and unreasonably exposing the personal assets of Mr. Warden to judgment.  Further, the reassignment [to Miller] under the circumstances suggests that New York Central Mutual has rejected your recommendation with respect to settlement of the claim, and apparently is gearing up for trial with counsel who may be more amenable to such a strategy."

87.    In April 2008, at the request of New York Central, Warden filed a consent to change attorney form in the Underlying Litigation, replacing Attorney Losurdo with Keith Miller, Esq.

88.    On November 10, 2008, Horton underwent a sixth surgical procedure by Dr. Abraham which involved the repair with a Marlex patch of a large (10 x 20 cm) ventral incisional hernia of the lower abdomen caused by the most recent fusion surgery.

89.     Horton has permanent incisional scars from her six surgeries.

90.     By letter dated April 22, 2009, Attorney Miller notified New York Central that the damages trial in the Underlying Litigation had been scheduled to begin on October 19, 2009.

91.     On May 11, 2009, Robert S. Nolan, M.D., performed a supplemental independent medical examination on Horton on behalf of the defense and concluded that Horton has "a failed back syndrome," that she "will require pain management," that "she has no good days, with no pain free intervals, with significant exacerbations in the level of her pain," and that, although her symptoms from a 1999 motor vehicle accident resolved, "30% the claimants complaints are attributable to this [the 1999] accident."

92.     By letter dated July 27, 2009, Attorney Miller provided New York Central with Horton's updated expert disclosures regarding anticipated future life care costs and earnings loss.

93.     Horton's updated earnings loss report estimated $255,700 in past earnings and $932,221 of future earnings loss.

94.     Horton's updated life care costs ranged from $2.5 million to $4.6 million.

95.     By letter dated September 11, 2009, Quincy's monitoring counsel, Hugh Leonard, advised New York Central that, in light of its failure to offer anything more than $75,000, plaintiff has withdrawn her demand to settle within the policy limits, and therefore urged New York Central to promptly increase its offer.

96.     By letter dated September 25, 2009, Horton's counsel wrote to Justice Argetsinger, stating:

- The Trial Court and the Appellate Court "determined as a matter of law, that defendant Warden was negligent for the happening of the motor vehicle accident and that Ms. Horton sustained serious injuries causally related to the subject motor vehicle accident, on May 20, 2005 (4 ½ years ago);

16

- "The available insurance coverage to defendant for this loss is a total of $1,500,000 ($500,000 primary … and $1,000,000 excess….");

- "It is my recollection that Justice Garry has likewise expressed her belief that the damages in this action exceed the available primary insurance policy limits of New York Central."

- Ms. Horton will be entitled to full payment of interest on any verdict from the date she was granted summary judgment on negligence (May 20, 2005 –4 ½ years of interest so far.").

97.    By letter to Attorney Miller dated September 28, 2009, Attorney Leonard advised that "Stephen Barnes, of Cellino & Barnes, contacted me on Friday, September 25th, with regard to the [Horton] matter.  Mr. Barnes advises that New York Central has increased its settlement offer to $200,000 but the plaintiff has not reduced her demand."

98.    In late September 2009, Attorney Miller provided an oral case valuation to New York Central.

99.    On September 28, 2009, New York Central offered $497,558.07 to settle the Underlying Litigation, which represented the $500,000 policy limits less prior payments for property damage.

100.    By letter dated September 29, 2009, Attorney Leonard wrote to Attorney Miller requesting information related to the upcoming trial for Quincy's use in settlement considerations.

101.    By letter to Justice Argetsinger dated September 29, 2009, Horton's counsel supplemented his September 25, 2009, providing additional particularity to the plaintiff's injuries, treatment and special damages.

102.    On September 30, 2009, Attorney Schlather wrote to Attorney Leonard demanding Quincy tender its policy limits in the Horton litigation.

17

103.    Senior Casualty Examiner Monahan testified at his deposition that this was the first verdict potential valuation that was performed by or on behalf of New York Central. (Monahan Dep. Tr. 195).

104.    By letter to New York Central dated October 4, 2009, Attorney Miller reported on the videotaped trial deposition of plaintiff's treating surgeon who performed the two incisional hernia repair procedures on Horton:

> "Each procedure fixed the problem.  However, the second procedure, following the most recent discectomy, required mesh.  Since Dr. Lew had used the site for the previous hernia surgery, there was too much scar tissue in the area of the sutures to form a strong enough closure. ...Dr. Abraham conclusively connected the two hernias to the two Lewis surgeries."

105.    By letter dated October 9, 2009, Attorney Miller wrote to Quincy regarding the upcoming damages trial and Quincy's settlement posture.

106.    By letter dated October 9, 2009, Attorney Miller wrote to Quincy with a case analysis of the Horton litigation, stating "It would seem prudent if Quincy actively engaged in settlement negotiations immediately."

107.    In the October 9, 2009 letter to Quincy, Attorney Miller urged it to tender its policy limits of $1 Million on the following grounds:

- although there is evidence of pre-existing degeneration, Horton was asymptomatic;

- Horton had not worked since the accident as an LPN, resulting in $255,000 of past lost wages;

- defendant's own economist came up with a "floor" of $375,000 for future wage loss even if the plaintiff obtains a sedentary employment position;

- future medical is estimated by plaintiff at $2-$4 Million and future wage loss is estimated at $655,000;

- Dr. Nolan's opinion that the surgeries were not necessary is not a defense since Mr. Warden is legally responsible for subsequent malpractice; and

- if the jury awards $1 Million, Quincy would be responsible to pay an additional $400,000 plus of interest on top of their limits.

108.    By letter dated October 9, 2009, Attorney Miller provided New York Central with a written verdict potential analysis of the Underlying Litigation and stated:

> "Even if everything goes my way I do not feel that there is any chance that I would be able to bring this case in for less than New York Central's $500,000 policy. Accordingly, I believe that New York Central's tender of the remaining balance of $497,558.07 was your only viable course of action."

109.    Monahan testified at his deposition that this was the first and only written verdict potential analysis that was performed by or on behalf of New York Central.  (Monahan Dep. Tr. p.263:10-25; p. 264: 1-2).

110.    By letter dated October 14, 2009 to Justice J.C. Argetsinger, Horton's counsel informed the Court that "Plaintiff is not making a psychological claim."

111.    By letter to Attorney Leonard dated October 14, 2009, Attorney Schlather advised that "I have reason to believe this case can be settled for the policy limits, *i.e.*, a total of 1.5 million dollars" and stated "I respectfully insist that your carrier proffer its full policy to settle the claim."

112.    By letter dated October 14, 2009, Attorney Leonard wrote to Attorney Miller regarding Horton's additional low back injuries from 1993-1996.

113.    By letter dated October 16, 2009, Horton's counsel wrote to Attorney Miller stating "this letter give notice to you, your client (Randolph Warden), New York Central Mutual

19

Insurance Company and Quincy Mutual Insurance Company, of what plaintiff perceives as to be bad faith negotiations on the part of the defendant and his insurance carrier(s)."

114.    By letter dated October 17, 2009, Attorney Miller wrote a bad faith letter to Quincy regarding Quincy's settlement negotiations in the Horton litigation.

115.    By letter dated October 19, 2009, Attorney Schlather wrote a bad faith letter to Quincy regarding Quincy's settlement negotiations in the Horton litigation.

116.    On October 22, 2009, Quincy set a reserve amount of $1,000,000 related to the Horton claim.

117.    Before the judgment was filed, New York Central and Quincy reserved the right to resolve any claims between them at a later date and that the entry of a judgment would not collaterally estop the insurers from seeking apportionment.

118.    On November 6, 2009, a stipulated judgment was entered in the Underlying Litigation in the amount of $1,069,726.20, with interest calculated from May 20, 2005 (the date of entry of the summary judgment) in the amount of $427,831.87.

119.    On November 12, 2009, New York Central issued a check in the amount of $497,558.07 to satisfy its portion of the stipulated judgment.

120.    On November 20, 2009, Quincy paid $572,168.13 toward the stipulated judgment, plus the accrued interest on the judgment in the amount of $427,831.87.

121.    On December 2, 2009, a satisfaction of judgment was entered in the Schuyler County Clerk's office in the Underlying Litigation.

122.    On June 24, 2010, Quincy, through its counsel, demanded New York Central reimburse Quincy the full amount of interest Quincy paid on the Horton judgment.

123.   On July 19, 2010, New York Central rejected Quincy's demand for indemnification.

## DISPUTED ISSUES OF FACT AND LAW

1.    At what point did New York Central have actual or constructive notice that Warden was at fault for the November 2000 motor vehicle accident?

2.    At what point did New York Central have actual or constructive notice that the verdict potential exceeded New York Central's $500,000 policy limits?

3.    Whether New York Central, as the primary insurer, breached a fiduciary obligation to Quincy, as the excess insurer, to tender the primary policy limits as soon as it became clear that their insured, Warden, was liable and as soon as it became clear that the verdict potential of Horton's damages exceeded the primary coverage?

4.    Whether New York Central's decision to not increase its offer above $75,000 until 2009 constituted bad faith?

5.    Whether New York Central's defense litigation strategy in the underlying litigation was reasonable?

6.    Whether the actions or inactions of New York Central, in allegedly failing to carry out its defense obligations, constitutes a disregard of the interests of Quincy when defending and considering settlement options presented in the underlying action?

7.    Whether New York Central's alleged breach of fiduciary obligations to Quincy exposed Quincy to additional indemnity under the Quincy policy.

8.    Whether Quincy could have resolved the underlying litigation for less than its $1 Million policy limits had New York Central tendered its policy limits earlier than September 28, 2009, and if so, in what amount could the case have been resolved?

9.      Whether New York Central is obligated, pursuant to the Supplementary Payments provision of the New York Central policy, to reimburse Quincy for the $427,831.87 of interest paid by Quincy to Horton in order to satisfy the judgment entered in the underlying litigation.

10.     Whether New York Central is obligated to reimburse Quincy for the $427,831.87 of interest paid by Quincy to Horton in order to satisfy the judgment entered in the underlying litigation, notwithstanding its contractual obligation under the Supplementary Payments provision, because such interest unnecessarily accrued as a result of New York Central's alleged bad faith?

11.     Whether Quincy, as an excess insurer, had a duty to mitigate its damages caused by New York Central's alleged breach of fiduciary duty?

12.     Whether Quincy, as an excess insurer, had a duty to mitigate its damages, and if so, whether Quincy could done so by attempting to negotiate a settlement of the excess coverage *prior to* the exhaustion of New York Central's primary policy limits?

13.     Whether Quincy could have resolved the underlying litigation for less than its $1 Million policy limits irrespective of when New York Central tendered its policy limits.

14.     Whether Quincy's actions or inactions in monitoring the underlying litigation constituted a failure to mitigate its damages?

15.     Whether Quincy's actions or inactions in monitoring the underlying litigation is a cognizable defense to Quincy's breach of fiduciary duty claim, and if so whether Quincy's conduct exposed itself to additional indemnity?

16.     Whether Quincy's actions or inactions while negotiating settlement between 9/28/09 and 10/19/09 exposed itself to additional indemnity?

17.     Whether Quincy is obligated, pursuant to the Supplementary Payments Provision of Quincy's policy, to pay the $427,831.87 of interest to satisfy the judgment entered in the underlying litigation?

Dated: January 17, 2014                    **WARD GREENBERG HELLER & REIDY LLP**

                                            By: _____ *s/ Scott R. Jennette* _____

                                            Scott R. Jennette (Bar Roll No. 302827)
                                            William R. Leinen (Bar Roll No. 517638)
                                            300 State Street
                                            Rochester, New York 14614
                                            585-454-0700
                                            sjennette@wardgreenberg.com
                                            wleinen@wardgreenberg.com

                                            *Attorneys for Plaintiff Quincy Mutual Fire Insurance Co.*

                                            **PETRONE & PETRONE, P.C.**

                                            By: ___ *s/ James H. Cosgriff, III* _____

                                            James H. Cosgriff, III, Esq. (Bar Roll No. 602948)
                                            5500 Main Street, Suite 342
                                            Williamsville, New York 14221
                                            716-204-1087
                                            j.cosgriff@pnpny.com

                                            *Attorneys for Defendant New York Central Mutual Fire Insurance Co.*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

Case No.  3:12-CV-1041(DEP)
Date:  January 17, 2014
Presiding Judge:  Hon. David E. Peebles

(x) Plaintiff (joint)                    (x) Defendant  (joint)                    ( ) Court

| Exhibit No. | Marked for Identification | Admitted Into Evidence | Remarks | Witness | Exhibit Description |
|---|---|---|---|---|---|
| 1 | | | | | Defendant's Responses to Plaintiff's First Set of Interrogatories |
| 2 | | | | | Defendant's Supplemental Response to Plaintiff's First Set of Interrogatories |
| 3 | | | | | Quincy Large Loss Report, dated 11/13/2001 |
| 4 | | | | | Quincy Large Loss Report, dated 11/13/2001 |
| 5 | | | | | Quincy Claims Diary |
| 5A | | | | | Quincy Claims Diary Entry with Handwritten Notes dated 5/26/2009 |
| 6 | | | | | Quincy Insurance Policy |
| 7 | | | | | Quincy Claims Handling Objectives and Performance Standards |
| 8 | | | | | Quincy Litigation Management Claims |

A-53

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Handling Guidelines |
| 9 | | | | | New York Central Claims File Diary |
| 9A | | | | | New York Central Claims File Diary, David Monahan Deposition Exhibit 2 |
| 10 | | | | | New York Central Memorandum, dated 03/04/1999 |
| 11 | | | | | New York Central Memorandum, Undated |
| 12 | | | | | New York Central Claim Analysis dated 07/20/2001 |
| 13 | | | | | New York Central Claim Analysis, dated 4/29/2002 |
| 14 | | | | | New York Central Claim Analysis, dated 2/20/2007 |
| 15 | | | | | New York Central Claim Analysis, dated 06/05/2007 |
| 16 | | | | | New York Central Claim Analysis, dated 09/11/2009 |
| 17 | | | | | New York Central Claim Analysis, dated 10/23/2009 |
| 18 | | | | | New York Central Claim Analysis, dated 12/1/2009 |
| 19 | | | | | New York Central Casualty Loss Report, |

**A-54**

| | | | | | |
|---|---|---|---|---|---|
| | | | | | dated 3/16/2004 |
| 20 | | | | | New York Central Casualty Loss Report, dated 6/19/2007 |
| 21 | | | | | New York Central Casualty Loss Report, dated 9/20/2007 |
| 22 | | | | | New York Central Casualty Loss Report, dated 10/19/2009 |
| 23 | | | | | New York Central Casualty Loss Report, dated 1/3/2010 |
| 24 | | | | | New York Central Casualty Loss Report, dated 6/18/2010 |
| 25 | | | | | New York Central Mutual Insurance Policy |
| 26 | | | | | Accident Police Report, dated 11/21/2000 |
| 27 | | | | | New York Central Request for Police Report, dated 11/27/2000 |
| 28 | | | | | Peggy Horton Property Damage Estimate, dated 11/27/2000 |
| 29 | | | | | Peggy Horton Accident Statement, dated 11/30/2000 |
| 30 | | | | | Letter from Christopher D'Amato to New York Central, dated 12/20/2000 |
| 31 | | | | | Letter from Randall Meschutt to Christopher |

A-55

| | | | | | |
|---|---|---|---|---|---|
| | | | | | D'Amato, dated 1/19/2001 |
| 32 | | | | | Letter from Sherman to Warden, dated 1/30/2001 |
| 33 | | | | | New York Central Suit File Instruction Sheet, dated 11/15/2001 |
| 34 | | | | | Civil Summons and Complaint, dated 10/16/2001 |
| 35 | | | | | Letter from James Hardy to David Monahan, dated 12/4/2001 |
| 36 | | | | | Letter from Lisa Lajam to David Monahan, dated 12/13/2001 |
| 37 | | | | | Letter from Frank Losurdo to James Hardy, dated 12/14/2001 |
| 37A | | | | | Attachment, Letter from Lisa Lajam to David Monahan, dated 12/13/2001 |
| 37B | | | | | Attachment, Warden Answer, dated 12/06/2001 |
| 38 | | | | | Letter from Frank Losurdo to James Hardy, dated 12/14/2001 |
| 39 | | | | | Letter from David Monahan to James Hardy, dated 12/27/2001 |
| 40 | | | | | Letter from Lisa Lajam to David Monahan, dated 04/25/2002 |

A-56

| | | | | | |
|---|---|---|---|---|---|
| 41 | | | | | Verified Bill of Particulars, dated 02/18/2002 |
| 42 | | | | | Letter from Michelle Potts to Peggy Horton, dated as received by New York Central 12/10/2002 |
| 43 | | | | | Letter from Frank Losurdo to David Monahan, dated 03/12/2003 |
| 44 | | | | | Letter from Frank Losurdo to James Hardy, dated 3/20/2003 |
| 45 | | | | | Letter from Frank Losurdo to David Monahan, dated 08/27/2003 |
| 46 | | | | | Letter from Lisa Lajam to David Monahan, dated 09/09/2003 |
| 46A | | | | | Attachment, State Department of Temporary and Disability Assistance Report |
| 47 | | | | | Letter from Frank Losurdo to David Monahan, dated 02/03/2004 |
| 47A | | | | | Attachment, Independent Medical Exam Report by Dr. Avellanosa, dated 12/18/2003 |
| 48 | | | | | Letter from Frank Losurdo to James Hardy, dated 2/12/2004 |
| 49 | | | | | Letter from Frank Losurdo to David Monahan, dated 05/28/2004 |
| 50 | | | | | First Supplemental Bill of Particulars, dated |

A-57

| | | | | | 08/17/2004 |
|---|---|---|---|---|---|
| 51 | | | | | Letter from Robert J. Moore to New York Central, dated 8/26/2004 |
| 52 | | | | | Letter from Frank Losurdo to David Monahan, dated 11/04/2004 |
| 53 | | | | | Letter from Frank Losurdo to David Monahan, dated 04/24/2005 |
| 54 | | | | | Summary Judgment Decision and Order, dated 05/18/2005 |
| 55 | | | | | Letter from Frank Losurdo to David Monahan, dated 5/25/2005 |
| 56 | | | | | Letter from Frank Losurdo to David Monahan, dated 12/16/2005 |
| 57 | | | | | Letter from Frank Losurdo to David Monahan, dated 12/22/2005 |
| 58 | | | | | Letter from Frank Losurdo to David Monahan, dated 03/21/2006 |
| 59 | | | | | Letter from Frank Losurdo to David Monahan, dated 04/24/2006 |
| 60 | | | | | Letter from Frank Losurdo to David Monahan, dated 06/09/2006 |
| 61 | | | | | Letter from Frank Losurdo to David Monahan, dated 08/09/2006 |

A-58

| 62 | | | | | Memorandum and Order, dated 08/03/2006 |
|---|---|---|---|---|---|
| 63 | | | | | Letter from Frank Losurdo to James Hardy, dated 01/19/2007 |
| 63A | | | | | Attachment, Letter from Christopher D'Amato to Justice Garry, dated 01/17/2007 |
| 64 | | | | | Letter from Frank Losurdo to David Monahan, dated 1/23/2007 |
| 65 | | | | | Letter from Frank Losurdo to Randolph Warden, dated 1/23/2007 |
| 66 | | | | | Letter from Christopher D'Amato to Frank Losurdo, dated 01/23/2007 |
| 66A | | | | | Attachment, Economic Loss Report |
| 67 | | | | | Letter from Christopher D'Amato to Frank Losurdo, dated 1/29/2007 |
| 67A | | | | | Attachment,  Life Care Plan by Comprehensive Rehabilitation Consultants, Inc. |
| 68 | | | | | Letter from Christopher D'Amato to Frank Losurdo 02/01/2007 |
| 68A | | | | | Attachment, Vocational Rehabilitation Report by K.W. Reagles & Associates |
| 69 | | | | | Letter from Frank Losurdo to David Monahan, dated 02/10/2007 |

A-59

| | | | | | |
|---|---|---|---|---|---|
| 69A | | | | | Attachment, Plaintiff's Expert Disclosures |
| 70 | | | | | Letter from Frank Losurdo to David Monahan, dated  2/12/2007 |
| 71 | | | | | Letter from Frank Losurdo to James Hardy, dated 04/12/2007 |
| 72 | | | | | Letter from Frank Losurdo to James Hardy, dated May 25, 2007 |
| 73 | | | | | Letter from Frank Losurdo to David Monahan, dated May 25, 2007 |
| 73A | | | | | Attachment, Defendant's Expert Disclosures, dated 05/25/2007 |
| 74 | | | | | Letter from Christopher D'Amato to Frank Losurdo, dated 06/04/2007 |
| 75 | | | | | Letter from Frank Losurdo to James Hardy, dated 06/07/2007 |
| 76 | | | | | Letter from Frank Losurdo to James Hardy, dated 06/11/2007 |
| 77 | | | | | Letter from Frank Losurdo to David Monahan, dated 6/11/2007 |
| 78 | | | | | Consent Order and Agreement between Dr. Avellanosa and New York State Board for Professional Medical Conduct, dated 09/14/2000 |

A-60

| | | | | | |
|---|---|---|---|---|---|
| 79 | | | | | Letter from David Monahan to Christopher D'Amato 06/12/2007 |
| 80 | | | | | Letter from Frank Losurdo to James Hardy, dated 7/16/2007 |
| 81 | | | | | Fax from David Monahan to Frank Losurdo |
| 81A | | | | | Attachment, Letter from Raymond Schlather to David Monahan, dated 07/20/2007 |
| 82 | | | | | Letter from David Monahan to Raymond Schlather, dated 08/02/2007 |
| 83 | | | | | Letter from Raymond Schlather to David Monahan, dated 8/7/2007 |
| 84 | | | | | Letter from New York Central to Raymond Schlather, dated 08/16/2007 |
| 85 | | | | | Fax from Frank Losurdo to David Monahan, dated 08/21/2007 |
| 85A | | | | | Attachment, Letter from James Hardy to Raymond Schlather, dated 08/17/2007 |
| 86 | | | | | Letter from David Monahan to Schlather, dated 8/22/2007 |
| 87 | | | | | Letter from Hugh Leonard to Frank Losurdo, dated 09/10/2007 |
| 88 | | | | | Fax from Frank Losurdo to David Monahan, dated 09/14/2007 |

A-61

| | | | | | |
|---|---|---|---|---|---|
| 88A | | | | | Attachment, Letter from Frank Losurdo to David Monahan, dated 9/14/2007 |
| 89 | | | | | Letter from Frank Losurdo to David Monahan, dated 09/25/2007 |
| 90 | | | | | Letter from Hugh Leonard to Frank Losurdo, dated 10/02/2007 |
| 91 | | | | | Letter from Frank Losurdo to Hugh Leonard, dated 10/10/2007 |
| 92 | | | | | Letter from Frank Losurdo to Hugh Leonard, dated 10/15/2007 |
| 93 | | | | | Letter from Frank Losurdo to David Monahan, dated 12/20/2007 |
| 94 | | | | | Letter from Frank Losurdo to Hugh Leonard, dated 12/20/2007 |
| 95 | | | | | Letter from Frank Losurdo to Keith Miller, dated 01/08/2008 |
| 96 | | | | | Letter from Keith Miller to David Monahan, dated 3/14/2008 |
| 97 | | | | | Letter from Keith Miller to Schuyler County Clerk, dated 3/28/2008 |
| 97A | | | | | Attachment to Letter, Consent to Change Attorney, dated 3/13/2008 |
| 98 | | | | | Letter from Raymond Schlather to Frank |

A-62

| | | | | | Losurdo, dated 03/17/2008 |
|---|---|---|---|---|---|
| 99 | | | | | Letter from Keith Miller to David Monahan, dated 6/30/2008 |
| 100 | | | | | Letter from Hugh Leonard to Keith Miller, dated 3/10/2009 |
| 101 | | | | | Letter from Keith Miller to David Monahan, dated 4/22/2009 |
| 102 | | | | | Letter from Keith Miller to Christopher D'Amato, dated 04/27/2009 |
| 103 | | | | | Letter from Keith Miller to Christopher D'Amato, dated 06/11/2009 |
| 103A | | | | | Attachment to Letter, Independent Medical Examination by Robert S. Nolan, M.D., Ph.D., dated 05/11/2009 |
| 104 | | | | | Letter from Keith Miller to David Monahan, dated 7/27/2009 |
| 104A | | | | | Attachment to Letter, Report of K.W. Reagles & Associates, L.L.C. |
| 104B | | | | | Attachment to Letter, Report of Comprehensive Rehabilitation Consultants, Inc. |
| 105 | | | | | Letter from Hugh Leonard to Keith Miller, dated 8/04/2009 |

**A-63**

| | | | | | |
|---|---|---|---|---|---|
| 106 | | | | | Letter from Hugh Leonard to David Monahan, dated 09/11/2009 |
| 107 | | | | | Faxed Letter from Christopher D'Amato to Hon. Argetsinger, dated 09/25/2009 |
| 108 | | | | | Faxed Letter from Hugh Leonard to Keith Miller, dated 09/28/2009 |
| 109 | | | | | Letter from Keith Miller to Christopher D'Amato, dated 09/28/2009 |
| 110 | | | | | Letter from Christopher D'Amato to Hon. Argetsinger, dated 09/29/2009 |
| 111 | | | | | Letter from Hugh Leonard to Keith Miller, dated 09/29/2009 |
| 112 | | | | | Letter from Keith Miller to David Monahan, dated 10/04/2009 |
| 112A | | | | | Attachment, Second Supplemental Bill of Particulars, dated 09/17/2009 |
| 113 | | | | | Letter from Raymond Schlather, dated 9/30/2009 |
| 114 | | | | | Letter from Christopher D'Amato to Keith Miller, dated 10/07/2009 |
| 114A | | | | | Attachment to Letter, Updated Life Care Costs Report |
| 115 | | | | | Letter from Christopher D'Amato to Keith |

A-64

| | | | | | |
|---|---|---|---|---|---|
| | | | | | Miller, dated 10/06/2009 |
| 115A | | | | | Attachment to Letter, Updated Comprehensive Rehabilitation Consultants Report |
| 116 | | | | | Letter from Christopher D'Amato to Keith Miller, dated 10/08/2009 |
| 116A | | | | | Attachment, Horton Images |
| 117 | | | | | Letter from Keith Miller to James Hardy, dated 10/09/2009 |
| 118 | | | | | Letter from Keith Miller to David Monahan, dated 10/09/2009 |
| 119 | | | | | Letter from Keith Miller to Hugh Leonard, dated 10/9/2009 |
| 120 | | | | | Letter from Hugh Leonard to Keith Miller, dated 10/14/2009 |
| 121 | | | | | Letter from Raymond Schlather to Hugh Leonard, dated 10/14/2009 |
| 122 | | | | | Letter from Christopher D'Amato to Keith Miller, dated 10/15/2009 |
| 123 | | | | | Letter from Christopher D'Amato Keith Miller, dated 10/16/2009 |
| 124 | | | | | Letter from Keith Miller to James Hardy, dated 10/17/2009 |

A-65

| | | | | | |
|---|---|---|---|---|---|
| 125 | | | | | Letter from Hugh Leonard to Keith Miller, dated 10/18/2009 |
| 126 | | | | | Letter from Raymond Schlather to Hugh Leonard, dated 10/19/2009[1] |
| 127 | | | | | Email from Keith Miller to David Monahan, dated 10/26/2009 |
| 127A | | | | | Attachment to Email, Proposed Judgment |
| 128 | | | | | Letter from Keith Miller to Hon. Argetsinger, dated 11/03/2009 |
| 128A | | | | | Attachment, Signed Judgment, dated 11/05/2009 |
| 129 | | | | | Letter from Keith Miller to David Monahan, dated 12/7/2009 |
| 129A | | | | | Attachment, Signed Satisfaction of Judgment, dated 12/01/2009 |
| 130 | | | | | Letter from Hugh Leonard to David Monahan, dated June 24, 2010[2] |
| 131 | | | | | Letter from David Monahan to Hugh Leonard, dated July 19, 2010[3] |
| 132 | | | | | Arnot Ogden Medical Center Chart Review, |

A-66

[1] Quincy objects to the relevancy of this exhibit.
[2] Quincy objects to the relevancy of this exhibit.
[3] Quincy objects to the relevancy of this exhibit.

| | | | | | |
|---|---|---|---|---|---|
| | | | | | dated 1/24/2001 |
| 133 | | | | | Buffalo Neurosurgery Group Letter, dated 6/2/2001 |
| 134 | | | | | Mercy Hospital of Buffalo Operative Report by Timothy R. Rasumsson, M.D., dated 10/11/2001 |
| 135 | | | | | Mercy Hospital of Buffalo Operative Report by P. Jeffrey Lewis, M.D., dated 10/11/2001 |
| 136 | | | | | Industrial Medicine Associates, P.C. Orthopedic Examination by Pranab K. Datta, M.D., dated 5/31/2002 |
| 137 | | | | | Industrial Medicine Associates, P.C. Adult Psychiatric Examination by Mary Ann Moore, M.D., dated 5/31/2002 |
| 138 | | | | | Buffalo Neurosurgery Group Letter, dated 7/30/2002 |
| 139 | | | | | Mercy Hospital of Buffalo Operative Report by P. Jeffrey Lewis, M.D., dated 8/29/2002 |
| 140 | | | | | Buffalo Neurosurgery Group Letter, dated 9/10/2002 |
| 141 | | | | | Associated Radiologists of the Finger Lakes Radiological Report, dated 10/18/2002 |
| 142 | | | | | Schuyler Hospital History and Physical Report, dated 10/28/2002 |

A-67

| | | | | | |
|---|---|---|---|---|---|
| 143 | | | | | Schuyler Hospital Report of Operation, dated 10/28/2002 |
| 144 | | | | | Buffalo Neurosurgery Group Letter, dated 3/18/2003 |
| 145 | | | | | Buffalo Neurosurgery Group Letter, dated 8/6/2004 |
| 146 | | | | | Buffalo Neurosurgery Group Letter, dated 10/15/2004 |
| 147 | | | | | Mercy Hospital Operative Report, dated 11/29/2004 |
| 148 | | | | | Buffalo Neurosurgery Group Letter, dated 12/7/2004 |
| 149 | | | | | Letter from P. Jeffrey Lewis, M.D. to Christopher D'Amato, dated 3/25/2005 |
| 150 | | | | | Buffalo Neurosurgery Group Letter, dated 11/9/2007 |
| 151 | | | | | Mercy Hospital of Buffalo Operative Report by P. Jeffrey Lewis, dated 12/17/2007 |
| 152 | | | | | Schuyler Hospital Operative Report, dated 11/10/2008 |
| 153 | | | | | Plaintiff's Expert Report of Thomas F. Segalla, Esq., dated 8/7/2013 |
| 154 | | | | | Defendant's Expert Report of Thomas R. |

A-68

| | | | | | Newman, Esq., dated 8/27/2013 |
|---|---|---|---|---|---|
| 155 | | | | | Plaintiff's Reply Expert Report of Thomas F. Segalla, Esq., dated 9/16/2013 |

Exhibits Returned to Counsel (Date):_____

Signature: _____

A-69

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

QUINCY MUTUAL FIRE INSURANCE CO.,

                Plaintiff,

     -vs-

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.,

                Defendant,

_____

**NOTICE OF MOTION**

Case No.: 3:12-CV-1041 (DEP)

      **PLEASE TAKE NOTICE** that upon the Declaration of Scott R. Jennette, Esq., with, exhibits, dated January 17, 2014; the Declaration of Christopher D'Amato, Esq., with exhibits, dated July 9, 2013; and the Declaration of Raymond Schlather, Esq., with exhibits, dated October 16, 201; and the accompanying memorandum of law, dated January 17, 2014; plaintiff, Quincy Mutual Fire Insurance Company, will move this Court before the Honorable David E. Peebles, at the United State Courthouse, 100 S. Clinton Street, Syracuse, New York 13261, on a date and time to be determined by the Court, for an Order pursuant to Rule 8(c) of the FEDERAL RULES OF CIVIL PROCEDURE, and Rules 401 and 702 of the Federal Rules of Evidence, and the precedent cited in the accompanying memorandum of law, precluding defendant New York Central Mutual Fire Insurance Co. from presenting any evidence or argument at trial, of (1) Quincy's alleged failure to mitigate its damages by deferring settlement negotiations of the excess coverage until the full limits of New York Central's primary coverage was tendered; and/or (2) Quincy actions or inaction in monitoring the underlying litigation *before* New York Central tendered the primary policy limits on September 28, 2009.

**PLEASE TAKE FURTHER NOTICE** that plaintiff intends to file and serve Reply papers.

Dated: January 17, 2014

**WARD GREENBERG HELLER & REIDY LLP**

By: _____ */s/ Scott R. Jennette* _____

Scott R. Jennette (Bar Roll No. 302827)
William R. Leinen (Bar Roll No. 517638)
300 State Street
Rochester, New York 14614
585-454-0700
sjennette@wardgreenberg.com
wleinen@wardgreenberg.com

*Attorneys for Plaintiff Quincy Mutual Fire
Insurance Co.*

TO:   James H. Cosgriff, Esq.
PETRONE & PETRONE, P.C.
*Attorneys for Defendant*
5500 Main Street, Suite 342
Williamsville, New York 14221
716-204-1087
j.cosgriff@pnpny.com

*New York Central Mutual Fire Insurance Co.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

QUINCY MUTUAL FIRE INSURANCE CO.,

                 Plaintiff,

          -vs-

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.,

                 Defendant,

_____

                       Case No.: 3:12-CV-1041 (DEP)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION *IN LIMINE***

**WARD GREENBERG HELLER & REIDY LLP**
300 State Street
Rochester, New York 14614
(585) 454-0700

*Attorneys for Plaintiff Quincy Mutual Fire
Insurance Co.*

## PRELIMINARY STATEMENT

Plaintiff, Quincy Mutual Insurance Company ("Quincy"), provided $1 Million of excess insurance coverage to its insured, Randolph Warden, in connection with a claim for serious personal injuries sustained by Peggy Horton arising out of a motor vehicle accident in November 2000 ("Horton Claim"). Defendant, New York Central Mutual Insurance Company ("New York Central"), provided the primary insurance coverage for that claim in the amount of $500,000.

In this action, Quincy alleges, among other things, that New York Central acted in bad faith and breached its fiduciary duty to Quincy in refusing to tender its primary policy limits to resolve the Horton Claim for nine years, and thereby deprived Quincy of an opportunity to resolve the matter for an amount considerably less than its policy limits. On August 29, 2013, New York Central served the expert report of Thomas R. Newman, Esq. (the "Newman Report"), in which he advances on pages 9-11 that Quincy failed to mitigate its damages by neglecting to make a monetary offer to settle the Horton claim before the $500,000 primary limits were tendered (i.e., exhausted).

It is respectfully submitted that New York Central should be precluded from introducing evidence in support of its "failure to mitigate" defense, through its expert[1] or otherwise, on the following grounds: New York Central failed to plead failure mitigate in its answer and therefore it waived the right to assert this defense; and as a matter of law, Quincy, as an excess insurer, had no duty to contribute toward a settlement until New York Central tendered the full amount of its primary coverage.

---

[1] Quincy and New York Central have agreed to offer the reports of their experts, Thomas Segalla, Esq., and Thomas Newman, Esq., respectively, in lieu of their testimony. In the event that the Court grants Quincy's preclusion motion, Quincy respectfully requests that Mr. Newman's mitigation opinions in paragraphs 35-44 be redacted from his report.


Additionally, it is respectfually submitted that New York Central should be precluded from introducing evidence at trial regarding Quincy's action or inaction in monitoring the underlying litigation on the ground that Quincy's culpable conduct, if any, is not a defense to a breach of fiduciary duty claim and Quincy had no duty to participate in the underlying defense *before* NewYork Central tendered the primary policy limits on September 28, 2009.  Thus, the evidence is neither relevant nor admissible as a matter of law.

## ARGUMENT

### I.   *New York Central Waived the Right to Assert a "Mitigation of Damages" Affirmative Defense by Failing to Plead it in its Answer*

The Federal Rules of Civil Procedure mandate that "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."  FED. R. CIV. P. 8(c); *Rose v. AmSouth Bank*, 391 F.3d 63, 65 (2d Cir. 2004). Failure to plead an affirmative defense in compliance with this rule precludes the responding party from asserting that defense. *Travellers Int'l, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1580 (2d Cir. 1994); *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004); *Broad Music, Inc. v. DFK Entm't, LLC*, No. 1:10-cv-1393, 2012 U.S. Dist. LEXIS 35089, at *7 n. 7 (N.D.N.Y. Mar. 15, 2012).

Although "mitigation of damages" is not listed in the text of Rule 8(c), it is well established that it is an affirmative defense that must be pleaded in a party's responsive pleading or it is waived. *Travellers Int'l A.G.*, 41 F.3d at 1580 ("Failure to mitigate damages is an affirmative defense and therefore must be pleaded."); *Morgenstern v. County of Nassau*, No. CV-04-58, 2009 U.S. Dist. LEXIS 116602, at *4 (E.D.N.Y. Dec. 15, 2009)("the defendants' failure to plead mitigation [of damages] operates as a waiver of this defense."); *Tufano v. Riegel Transp., Inc.*, 2006 U.S. Dist. LEXIS 8702, 16 (E.D.N.Y. Feb. 11, 2006) ("[Defendant] did not

plead failure to mitigate as an affirmative defense in its answer. . . and has thereby waived its right to do so now.").

New York Central filed its answer on July 26, 2012. (Dkt. 9). The affirmative defense of mitigation of damages was not advanced. The first notice that Quincy had that New York Central intended to pursue a mitigation of damages defense was when it received the Newman Report on August 29, 2013. Discovery closed the next day on August 30, 2013 and therefore Quincy had no opportunity to conduct any discovery on this defense.

Although New York Central's First Affirmative Defense alleges "culpable conduct," this defense is distinct from the affirmative defense of "failure to mitigate damages." As the cases cited by New York Central's expert establish, it is settled New York law that a mitigation of damages defense relates to the reasonable steps a "plaintiff could have taken *subsequent* to the incident giving rise to injuries, in order to reduce the amount of damages." *Novko v. State*, 285 A.D.2d 696, 697 (3d Dept. 2001) (emphasis supplied); *Holy Properties Ltd., L.P. v. Kenneth Cole Prods.*, 87 N.Y.2d 130, 133 (1995).

In contrast, "culpable conduct" is an affirmative defense available only in negligence actions and is appropriate where the *pre-injury* actions of the plaintiff caused or contributed to the injuries alleged in whole or in part. *See* NEW YORK CIVIL PRACTICE LAW & RULES, § 1411; *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 451 (S.D.N.Y. 2006).

It is submitted that New York Central waived the right to assert an affirmative defense of mitigation of damages, and should be precluded from introducing any evidence at trial in support of this claim through its expert's report or otherwise. *Travellers Int'l A.G.*, 41 F.3d at 1580.

## II. New York Central's Expert's Opinion on the Issue of Quincy's Purported Failure to Mitigate Damages is Contrary to New York Law and Lacks of Foundation

Even if this Court determines that New York Central did not waive the right to present a mitigation of damages affirmative defense, New York Central's expert opinion on Quincy's purported failure to mitigate damages by failing to negotiate settlement *prior to* New York Central's exhaustion of its limits is inadmissible because it is contrary to New York law and it is lacking in foundation.

### A. New York Central's Expert's Mitigation Theory is Contrary to New York Law.

New York Central's expert, Thomas R. Newman, Esq., posits that Quincy failed to mitigate its damages by not offering to negotiate a settlement of the excess coverage *prior to* the exhaustion of New York Central's primary policy limits. (Jennette Decl., Ex. E, ¶¶ 35-44).  In particular, he summarily concludes "nothing in the law or liability insurance industry custom and practice prevents an insurer from *voluntarily* attempting to settle its insured's excess exposure even before the primary insurer's policy limits have been exhausted." (*Id.* at ¶ 43)(emphasis in original). However, Mr. Newman's opinion is contrary to the well-established law, and the undisputed fact, that Quincy's excess policy (and New York Law) did not obligate it to tender its policy limits until *after* New York Central exhausted its limits.  Accordingly, the opinion should be precluded.

An excess insurer has no duty to contribute to a settlement until the limits of the primary policy are tendered. *Home Ins. Co. v. Liberty Mut. Ins. Co.*, 678 F. Supp. 1066, 1069 (S.D.N.Y. 1988)("New York courts have consistently found that an umbrella policy is not required to contribute to the payment of a settlement until all other applicable policies have been exhausted regardless of the wording of those policies 'other insurance' clauses."); *State Farm Fire & Cas. Co. v. LiMauro*, 65 N.Y.2d 369, 371 (1985).

5

In *LaMauro*, the Court held:

> An umbrella policy, which covers multiple risks but offers no primary coverage as to any of them and provides that it '***shall be in excess of, and shall not contribute with***' other collectible insurance covering a loss available to the insured, except such as in excess of the limits of the umbrella policy, is not required to contribute toward a loss until the limits of a liability policy covering the injury-causing automobile as a non-owned vehicle have been exhausted.

*Id.* at 371 (emphasis supplied).

Here, the "other insurance clause" in the Personal Umbrella Liability Endorsement to the Homeowners Policy issued by Quincy ("Quincy Umbrella Policy") is almost identical to the clause interpreted by the Court of Appeals in *LiMauro*. Quincy's Umbrella Policy establishes that Quincy had no obligation to contribute its policy limits until New York Central exhausted the entirety of its limits:

> "LIMIT OF LIABILITY: (1) The limit of liability of this endorsement is one million dollars ($1,000,000) for any one occurrence. **Our liability for damages resulting from one occurrence is only for that portion of the damages which exceeds the [primary policy] limit.**"
>
> *******
>
> "Conditions of this endorsement . . . (8) Other insurance. If a covered person has other collectible insurance that covers damages this endorsement also covers, **this endorsement shall be excess to and will not contribute with such other insurance.**"

(Jennette Dec. Ex. A, at QUINCY 000022-23 (emphasis supplied)).

The rationale for this well-settled rule is that tendering the excess coverage prior to the exhaustion of the primary limits inequitably shifts the excess carrier's bargained-for position as an excess insurer to that of a primary insurer, which is why the premiums for excess policies are lower. *Fed. Ins. Co. v. Estate of Irving Gould*, No. 10 Civ. 1160, 2011 U.S. Dist. LEXIS 114000, at *22 (S.D.N.Y. Sept. 28, 2011)(Excess insurers have a "bargained-for interest in

6

ensuring that the underlying policies are exhausted by actual payment [by the primary insurer].”); *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 94 (2d Cir. 2013)(excess insurers have “good reason to require actual payment up to the attachment points of the relevant [primary] policies, thus deterring the possibility of settlement manipulation.”).

Notably, Mr. Newman acknowledges this well-settled law in his report and his own treatise. (*Id.* at ¶ 43) (Quincy was “not *required to* tender any portion of its excess policy limits until [New York Central’s] policy exhausted its primary limits have been tendered and exhausted.” (emphasis in original); *see also* Ostrager & Newman, *Handbook on Insurance Coverage Disputes*, § 13.04 (13th ed., 2006) (“An excess insurer generally has no duty to contribute to a settlement until the primary insurer’s policy limits have been exhausted.”).

Thus, because Quincy, as the excess insurer, did not have a legal duty to contribute to a settlement *until* New York Central exhausted its policy limits, Mr. Newman’s opinion on Quincy’s purported failure to mitigate is contrary to law and must be precluded. *Anderson v. Dairy Farmers of Am., Inc.*, No. 08-4726, 2010 U.S. Dist. LEXIS 104191 (D. Minn. 2010) (Expert’s mitigation of damages opinion was precluded because it was contrary to law and therefore would not be helpful to a finder of fact in deciding the issues in the case).

## B. New York Central’s Expert Opinion is Not Based on a Reliable Factual Foundation.

In addition to being directly contradicted by settled law and the terms and conditions of Quincy’s policy of insurance, Mr. Newman’s failure to mitigate damages opinion is also inconsistent with the expectations of the parties and therefore lacks foundation.

At all times during the underlying litigation, Quincy was not expected to contribute toward a settlement in the underlying litigation *until* New York Central exhausted its policy limits. Diane Wildey, the New York Central’s Casualty Manager/AVP who supervised New

York Central's defense of the underlying litigation, affirmed that there was no expectation that Quincy, as the excess carrier, would or could voluntarily contribute to the settlement of the underlying litigation until the primary policy was exhausted (i.e., tendered). (Jennette Decl., Ex. D, at 109: 9-25; 110:2-6 ("Q: And as a matter of course and with these types of claims is it your experience that the excess does not have any obligation to contribute towards settlement until the primary's limits are exhausted. New York Central limits would be exhausted. . . . A: Correct.")). New York Central's claims adjuster for the underlying litigation, David Monahan, concurred, stating that he did not expect Quincy "to take any settlement position until New York Central Mutual's policy was exhausted."  (Jennette Decl., Ex. C, at 196:9-12).  In fact, Mr. Monahan further testified that the attorney assigned by New York Central to defend its insured did not attempt to involve Quincy in settlement negotiations until *after* New York Central tendered and exhausted its policy limits. (*Id.* at 266:11-20).

Similarly, Quincy's claims representative, James Hardy, who was assigned to monitor the underlying litigation, testified that Quincy's role as an excess insurer was relegated to passively monitor the primary insurer's defense of the case until the primary policy limits were exhausted. (Jennette Decl., Ex. B, at 70: 7-24; 82:17-24, 83: 1-7, 27:12-13).  In fact, Mr. Hardy reiterated that Quincy "had no basis for negotiating" with plaintiff until New York Central tendered its policy limits.  (*Id.* at 82: 22-24).

Likewise, the attorneys in the underlying litigation confirm that Quincy was not expected to negotiate or make any offers until New York Central tendered the limits of its policy.  The plaintiff's attorney, Christopher D'Amato, Esq., states in his Declaration that "Quincy had no obligation to respond or negotiate until New York Central tendered the underlying policy limits." (D'Amato Decl. at ¶ 22).  As is customary in personal injury litigation, Mr. D'Amato waited

8

until after New York Central tendered its policy limits in late September 2009 before he even began to negotiate with Quincy. (*Id.* at ¶¶ 29-30).

Similarly, Raymond Schlather, Esq., personal counsel to the insured in the underlying litigation, states that Quincy, as the excess carrier, was not expected to negotiate or contribute to a settlement until "New York Central tendered its policy limits." (*Id.* at ¶ 14).  Mr. Schlather conveyed his expectation to New York Central by letter dated July 19, 2007, in which he wrote, "I am requesting that once New York Central Mutual tenders its policy, Quincy Mutual negotiate in good faith to settle the case in all respects within the umbrella policy limits." (*Id.* at Ex. A, pg. 3).

Accordingly, because New York Central's expert opinion on Quincy's purported failure to mitigate damages is directly contradicted by the expectation of the parties, it lacks foundation and should be precluded under FED. R. EVIDENCE 702.  *Pinello v. Stihl AG & Co. KG*, 2011 U.S. Dist. LEXIS 34460, *21-22 (N.D.N.Y Mar. 31, 2011) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.").

### III.   *Evidence and Testimony Regading Quincy's Pre-tender Conduct in Monitoring the Underlying Litigation is Not Relevant and Therefore Inadmissible.*

It is anticipated that New York Central will attempt to offer evidence at trial relating to the acts or omission of Quincy in monitoring the underlying litigation.  For the reasons that follow, it is submitted that this evidence is neither relevant nor admissible.

9

First, to the extent that this evidence is offered in support of a "failure to mitigate" theory, New York Central failed to plead a mitigation defense and therefore is precluded from asserting it at the time of trial. (*See* Point I, *supra*).

Second, as noted above, to the extent the evidence is offered in support of a "culpable conduct" defense, this defense is not available in a breach of fiduciary duty action. *See Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 511 (2d Cir. 1994) (award for breach of fiduciary duty cannot be reduced by plaintiff's purported culpable conduct); *Solutia Inc.,* 456 F. Supp. 2d at 452 (declining to recognize comparative negligence defense in context of claim for breach of fiduciary duty).

Third, as discussed in Point II(a), *supra*, New York law is settled that an excess insurer has no duty to contribute to a settlement until the limits of the primary policy are tendered. *Home Ins. Co. v. Liberty Mut. Ins. Co.*, 678 F. Supp. 1066, 1069 (S.D.N.Y. 1988) ("New York courts have consistently found that an umbrella policy is not required to contribute to the payment of a settlement until all other applicable policies have been exhausted regardless of the wording of those policies 'other insurance' clauses."); *State Farm Fire & Cas. Co. v. LiMauro*, 65 N.Y.2d 369, 371 (1985).

Thus, Quincy was not under a duty -- contractual or otherwise -- to take <u>any</u> action in the underlying litigation prior to the exhaustion of New York Central's primary policy limits and therefore, as a matter of law, its conduct has no legal relevance to any viable defense in this action. *Fieldston Prop. Owners Assn., Inc. v Hermitage Ins. Co., Inc.,* 16 N.Y.3d 257 ( 2011)(an excess insurer has "no obligation" to participate in the defense of the litigation); *Firemen's Ins. Co. of Washington, D.C. v Federal Ins. Co.*, 233 A.D.2d 193, 193 (1st Dept. 1996)(a primary insurer has a duty to defend "without any entitlement to contribution from an excess insurer").

10

It is respectfully submitted therefore that New York Central should be precluded from introducing evidence at trial regarding Quincy's action or inaction in monitoring the underlying litigation.   *See* FED. R. EVID. 401.

## Conclusion

For these reasons, New York Central should be precluded from introducing evidence in support of its "failure to mitigate" defense, through its expert or otherwise, on the grounds that (1) it failed to plead this affirmative defense in its answer; and (2) Quincy as an excess insurer, had no duty to contribute toward a settlement until New York Central tendered the full amount of its primary coverage.   In addition, New York Central should be precluded from introducing evidence at trial regarding Quincy's action or inaction in monitoring the underlying litigation on the grounds that Quincy's culpable conduct, if any, is not a defense to a breach of fiduciary duty claim and Quincy had no duty to participate in the underlying defense before New York Central tendered on September 28, 2009.

Dated: January 17, 2014

**WARD GREENBERG HELLER & REIDY LLP**

By: _____ *s/ Scott R. Jennette* _____

Scott R. Jennette (Bar Roll No. 302827)
William R. Leinen (Bar Roll No. 517638)
300 State Street
Rochester, New York 14614
585-454-0700
sjennette@wardgreenberg.com
wleinen@wardgreenberg.com

*Attorneys for Plaintiff Quincy Mutual Fire
Insurance Co.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
━━━━━━━━━━━━━━━━━━━━━━━━━━

QUINCY MUTUAL FIRE INSURANCE CO.,

               Plaintiff,

     -vs-

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.,

               Defendant,

━━━━━━━━━━━━━━━━━━━━━━━━━━

**DECLARATION OF**
**SCOTT R. JENNETTE, ESQ.**

Case No.: 3:12-CV-1041 (DEP)

**SCOTT R. JENNETTE, ESQ.,** pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.    I am an attorney duly admitted to practice before this Court and am a member of Ward Greenberg Heller & Reidy LLP, attorneys for plaintiff Quincy Mutual Fire Insurance Co. ("Quincy").

2.    I make this declaration in support of Quincy's motion *in limine* to preclude defendant, New York Central Mutual Fire Insurance Co. ("New York Central"), from introducing any evidence at trial in support of its unpleaded defense that Quincy failed to mitigate its damages by deferring settlement negotiations of the excess coverage until the full limits of New York Central's primary coverage was tendered on the following grounds:

- New York Central waived the right to assert a failure to mitigate damages defense because it has not been pleaded in its answer;

- As a matter of law, Quincy, as an excess insurer, had no legal duty to contribute toward settlement of the underlying action until New York Central tendered the full amount of its primary coverage.

3.     I also make this declaration in support of Quincy's motion *in limine* to preclude New York Central from introducing evidence at trial of Quincy's actions or inactions with respect to its monitoring of the underlying litigation on the ground that Quincy's culpable conduct, if any, is not a defense to a breach of fiduciary duty claim and Quincy had no duty to participate in the underlying defense *before* NewYork Central tendered the primary policy limits on September 28, 2009.  Thus, the evidence is neither relevant nor admissible as a matter of law

4.     Quincy filed this action against New York Central in June 2012. (*See* Complaint, Dkt. No. 1).  It is alleged that New York Central, the primary insurer with limits of $500,000, breached its fiduciary duty to Quincy, the excess insurer with limits of $1,000,000, in failing to act in good faith in settling the underlying personal injury action, arising out of a November 2000 motor vehicle accident, brought by Peggy Horton against their mutual insured, Randolph Warden.

5.     More particularly, it is alleged that New York Central was, or should have been, aware early on in the litigation, that value of the underlying claim exceeded its policy limits. Nevertheless, it pursued a frivolous defense strategy and refused to engage in good faith settlement discussions until nine years after the accident and four years after the May 18, 2005 entry of summary judgment on liability and serious injury.  By the time New York Central tendered its policy limits on the eve of trial in September 2009, prior opportunities to settle the case for significantly less than the full amount of Quincy's limits no longer were available. (*See* Complaint at ¶¶ 21-40).

6.     New York Central filed an Answer denying liability and advancing six affirmative defenses. (*See* Answer, Dkt. No. 9).  New York Central did not assert a failure to mitigate damages affirmative defense. (*See Id.* at ¶¶ 6-11).

2

7.    In response to New York Central's demands, Quincy produced a copy of the Quincy Umbrella Policy issued to Mr. Warden.  (*See* Exhibit A, attaching pertinent portions of the policy).   In relevant part, the Personal Umbrella Liability Endorsement to the Homeowners Policy, states, in no uncertain terms, that Quincy's "liability for damages resulting from one occurrence is only for that portion of damages which exceeds the [primary insurance] limit" and that "this [policy] shall be excess to and will not contribute with such other insurance." (*Id.*).

8.    Quincy's claims representative, James Hardy, was deposed on April 23, 2013. Selected portions of the transcript are annexed hereto as Exhibit B.

9.    New York Central's claims representative, David Monahan, and Claims Manager, Diane Wildey, were deposed on March 26, 2013 and July 26, 2013.   Selected portions of the transcripts are annexed as Exhibits C and D, respectively.

10.    Despite requests by counsel for an extension, the Court closed the discovery in this action on August 30, 2013. (*See* Dkt. No. 34; Text Order Entered June 11, 2013).

11.    On August 29, 2013, the day prior to the discovery cut-off date, New York Central served the Report of its Expert, Thomas R. Newman, Esq. ("Newman Report").  Among other things, Mr. Newman opines that Quincy failed to mitigate its damages because it could have chosen to voluntarily attempt to settle its excess exposure *prior to* the exhaustion of New York Central's policy limits. (*See* Newman Report at ¶¶ 35-44, attached hereto as Exhibit E).[1]

12.    The non-jury trial of this matter is scheduled to commence on February 4, 2014.

13.    In further support of this motion, Quincy offers the Declarations of Christopher D'Amato, Esq., counsel to the plaintiff, Peggy Horton, and Raymond Schlather, Esq., personal

---

[1] Quincy and New York Central have agreed to offer the reports of their experts, Thomas Segalla, Esq., and Thomas Newman, Esq., respectively, in lieu of their testimony.  In the event that the Court grants Quincy's preclusion motion, Quincy respectfully requests that Mr. Newman's mitigation opinions in paragraphs 35-44 be redacted from his report.

A-86

counsel to the defendant, Randolph Warden, dated July 9, 2013 and October 16, 2013, respectively.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 17, 2014

By: _____ */s/ Scott R. Jennette* _____
                         Scott R. Jennette

A-87

# EXHIBIT A



# QUINCY MUTUAL FIRE INSURANCE COMPANY

THIS POLICY JACKET WITH THE DECLARATIONS PAGE AND FORMS AND ENDORSEMENTS,
IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETES THIS POLICY

MUTUAL COMPANY                                    NONASSESSABLE POLICY

QUINCY 000001

QUINCY MUTUAL GROUP
57 Washington Street
Quincy, MA 02169

## HOMEOWNERS POLICY
### RENEWAL DECLARATION EFFECTIVE 07/29/2000

| POLICY NUMBER | POLICY PERIOD | | COVERAGE IS PROVIDED IN THE | AGENCY |
|---|---|---|---|---|
| HP 195802 | 07/29/2000 | 07/29/2001 | QUINCY MUTUAL FIRE INSURANCE COMPANY | 01262 |

| NAMED INSURED AND ADDRESS | AGENT |
|---|---|
| RANDOLPH A WARDEN<br>PO BOX 288<br>JACKSONVILLE          NY 14854 | J.B. TRUE COMPANY, INC.<br>124 SENECA WAY<br>ITHACA               NY 14850-4399<br><br>(607) 273-7511 |

POLICY PERIOD 12:01 A.M. STANDARD TIME AT THE RESIDENCE PREMISES.
THE RESIDENCE PREMISES COVERED BY THIS POLICY IS LOCATED AT:
    45 N APPLEGATE RD
    ITHACA               NY 14850

DEDUCTIBLE: EACH CLAIM FOR LOSS UNDER SECTION I OF THIS POLICY SHALL BE
            ADJUSTED SEPARATELY AND FROM EACH CLAIM $ 250 SHALL BE DEDUCTED.


COVERAGE AT THE ABOVE DESCRIBED LOCATION IS PROVIDED ONLY WHERE A LIMIT OF
LIABILITY IS SHOWN OR A PREMIUM IS STATED.

| SECTION I COVERAGE | LIMIT OF LIABILITY | PREMIUMS |
|---|---|---|
| A. DWELLING | $97,000 | |
| B. OTHER STRUCTURES | $9,700 | |
| C. PERSONAL PROPERTY | $67,900 | |
| D. LOSS OF USE | $19,400 | |
| SECTION II COVERAGE | | |
| E. PERSONAL LIABILITY | $100,000 EACH OCCURRENCE | |
| F. MEDICAL PAYMENTS TO OTHERS | $1,000 EACH PERSON | |
| BASE PREMIUM- - - - - - - - - - - | | $247.00 |
| ADDITIONAL COVERAGES/CREDITS | | |
| WORKER'S COMPENSATION, HO-90 | | $2.00 |
| PERSONAL UMBRELLA $1,000,000 HO-440 | | $115.00 |
| SELECT HOMEOWNERS CREDIT | | INCLUDED |
| 2% PROTECTIVE DEVICE CREDIT, HO216 | | INCLUDED |
| INFLATION GUARD, HO243 | | NO CHARGE |
| GUARANTEED REPLACEMENT COST - DWELLING, HO400 | | NO CHARGE |
| TOTAL ADDITIONAL PREMIUM- - - - - - - - - - - | | $117.00 |
| TOTAL PREMIUM- - - - - - - - - - - | | $364.00 |

FORMS AND ENDORSEMENTS - HO3 04/84, HO300NY 08/92, HO90 09/86, HO322 09/87,
    HO350 09/87, HO216 04/84, HO400 03/89, HO243 04/84, HO442 12/86,
    HO440 02/94.

AUTHORIZED SIGNATURE:                              DATE: 12/11/2012

INSURED COPY

Case: 14-1377    Document: 34-1    Page: 108    08/20/2014    1299936    154

**A-90**

## IMPORTANT NOTICE TO POLICYHOLDERS
## 65 YEARS OF AGE OR OLDER

Senior Citizen insureds are permitted to designate an individual to whom your insurance company should direct all cancellation and renewal information.

If you would like to make such a designation, please complete the lower part of this form, have it acknowledged by the party you have designated, and return it to Quincy Mutual Fire Insurance Co., 57 Washington Street, Quincy, MA 02169, **by certified mail**, return receipt requested.

### DESIGNATION

I, _____ hereby designate
         (Name and Address of Policyholder/Insured)

_____ whose address is _____
(Name of Designee)

_____ as the individual to whom Quincy Mutual Fire Insurance Company shall transmit all cancellation, renewal and non-renewal notices. I understand and acknowledge that my designation of the above-named individual shall not constitute his or her acceptance of any liability for services provided to me. My policy number is _____ .

Dated: _____    _____
                                        Signature of Policyholder/Insured

### ACKNOWLEDGMENT

I, _____ hereby accept designation as the
         (Name of Designee)

party to whom cancellation and renewal information is to be transmitted for the above-named insured. I understand that if I wish to terminate my status as such designee, I must provide **written notice** to both Quincy Mutual Fire Insurance Company and the policyholder/insured.

Dated: _____    _____
                                        Signature of Designee

65ADV

HO-300
(Ed. 8-92)
**SPECIAL PROVISIONS**                                      NEW YORK

**ADDITIONAL COVERAGES**

**In all Forms and in Endorsement HO-350,** item **1. Debris Removal** is deleted and replaced by the following:

1.  **Debris Removal.** We will pay your reasonable expense for the removal of:

    a.  Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

    b.  Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

    This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

    We will also pay your reasonable expense, up to $500, for the removal from the residence premises of:

    a.  Your tree(s) felled by the peril of Windstorm or Hail;

    b.  Your tree(s) felled by the peril of Weight of Ice, Snow or Sleet (Forms **HO-2, HO-3, HO-4** and **HO-6** only); or

    c.  A neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

    provided the tree(s) damages a covered structure.

    The $500 limit is the most we will pay in any one loss regardless of the number of fallen trees.

Item **6. Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.** The first sentence is deleted and replaced by the following

We will pay up to $1,000 for:

**SECTION I - EXCLUSIONS**

Item 8. **Intentional Loss,** is deleted and replaced by the following:

8.  **Intentional Loss.** We do not provide coverage for an **Insured** who commits or directs an act with the intent to cause a loss.

(This is item **1.h.** in form **HO-3.**)

**SECTION I - CONDITIONS**

Item **8. Suit Against Us,** is deleted and replaced by the following:

8.  **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within two years after the date of loss.

**SECTION II - LIABILITY COVERAGES**

Under **Coverage E, Personal Liability,** item 2. is deleted and replaced by the following:

2.  Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate.

**SECTION II - EXCLUSIONS**

In Endorsement HO-350, under **1. Coverage E - Personal Liability** and **Coverage F - Medical Payments to Others,** item **b.** is deleted.

Under **2. Coverage E - Personal Liability,** item **f.** is deleted and replaced by the following in all Forms and Endorsement HO-73:

2.  **Coverage E - Personal Liability,** does not apply to:

    f.  **Bodily injury** to you or an **insured** within the meaning of part **a.** or **b.** of **insured** as defined.

        This exclusion also applies to any claim made or suit brought against you or any **insured:**

Copyright, Insurance Services Office, Inc., 1992
Page 1 of 3

HO-300 (Ed. 8-92)
**NEW YORK**

QUINCY 000004

**INFLATION GUARD**

HO-243
(Ed. 4-84)

For an additional premium, the limits of liability for Coverages A, B, C and D will be increased annually by   3 %, applied pro rata during the policy period.

Copyright, Insurance Services Office, Inc., 1984          HO-243 (Ed. 4-84)

QUINCY 000005

Case: 14-1377    Document: 34-1    Page: 111    08/20/2014    1299936    154

**A-93**

HO-300
(Ed. 8-92)
**NEW YORK**

**(d)** Physical changes in the property insured ocurring after issuance or last annual anniversary date of the policy which result in the property becoming uninsurable in accordance with our objective, uniformly applied underwriting standards in effect at the time the policy was issued or last voluntarily renewed, or

**(e)** A determination by the Superintendent of Insurance that the continuation of the policy would violate or would place us in violation of the New York Insurance Law.

If one of the reasons listed in this paragraph **(3)** exists, we may cancel the entire policy.

**(4)** If we have the right to cancel, we may, instead of cancelling this policy, amend the limits of liability or reduce coverage not required by law. If we take this action we will notify you by mail at least 20 days prior to the date of such change.

Delivery of such written notice by us to the **insured** at the mailing address shown in the Declarations or at a forwarding address shall be equivalent to mailing.

Paragraph **c.** is deleted and replaced by the following:

**c.** When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

However, when the premium is advanced under a premium finance agreement, we may retain a minimum earned premium on the policy of 10% of the total policy premium or $60, whichever is greater.

**6.** **Nonrenewal** is deleted and replaced by the following:

**6.** **Nonrenewal.** We will not refuse to renew or condition our renewal of this policy except as allowed by the laws of the State of New York. The conditions may include, but are not limited to, amending the limits of liability or reducing coverage not required by law. If we take this action, we will notify you by mail at least 45 days, but not more than 60 days prior to the expiration date of this policy. Proof of mailing shall be sufficient proof of notice.

Delivery of such written notice by us to the **insured** at the mailing address shown in the Declarations or at a forwarding address shall be equivalent to mailing.

All other provisions of this policy apply.

QUINCY 000006

Case: 14-1377    Document: 34-1    Page: 112    08/20/2014    1299936    154

A-94

**HO-300**
**(Ed. 8-92)**
**NEW YORK**

(1)    To repay; or

(2)    Share damages with;

another person who may be obligated to pay damages because of the **bodily injury** to an **insured**.

### SECTION II - ADDITIONAL COVERAGES

In Endorsement **HO-350**, under **3. Damage to Property of Others**, item **e.(1)** is deleted.

### SECTION II - CONDITIONS

Under item **3. Duties After Loss.** The first paragraph and paragraph **a.** are deleted and replaced by the following:

3.    **Duties After Loss.**  In case of an accident or **occurrence**, the **insured** or someone acting for the **insured** will perform the following duties that apply.  You will help us by seeing that these duties are performed.  Any written notice given by any claimant to us or any of our agents in this state, containing particulars sufficient to identify the **insured**, will be deemed notice to us.

a.    Give written notice to us or any of our agents in this state as soon as is practical, which sets forth:

(1)    The identity of the policy and **insured**;

(2)    Reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

(3)    Names and addresses of any claimants and witnesses;

Item **4. Duties of an Injured Person - Coverage F - Medical Payments to Others.**  Paragraph **a.** is deleted and replaced by the following:

a.    Give us or any of our agents in this state written proof of claim, under oath if required, as soon as is practical; and

### SECTION I AND II CONDITIONS

**In all Forms and in Endorsement HO-350, item 2. Concealment or Fraud** is deleted and replaced by the following:

2.    **Concealment or Fraud.**  We do not provide coverage for an **insured** who, whether before or after a loss, has:

a.    Intentionally concealed or misrepresented any material fact or circumstance; or

b.    Engaged in fraudulent conduct;

relating to this insurance.

5.    **Cancellation.**  Paragraph **b.** is deleted and replaced by the following:

b.    We may cancel the entire policy only for the reasons stated in this condition.  The cancellation notice shall be mailed to you at the address shown in the Declarations.  Proof of mailing shall be sufficient proof of notice.

(1)    When you have not paid the premium, we may cancel the entire policy at any time by mailing to you at least 15 days notice of cancellation.

(2)    When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel the entire policy for any reason by letting you know at least 30 days before the date cancellation takes place.

(3)    When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel the entire policy only for one or more of the following reasons by notifying the **insured** at least 30 days prior to the proposed cancellation date:

(a)    Conviction of a crime arising out of acts increasing the hazard insured against;

(b)    Discovery of fraud or material misrepresentation in obtaining the policy or in the presentation of a claim thereunder;

(c)    Discovery of willful or reckless acts or omissions increasing the hazard insured against;

Copyright, Insurance Services Office, Inc., 1992
Page 2 of 3

**HO-300 (Ed. 8-92)**
**NEW YORK**

QUINCY 000007

Case: 14-1377    Document: 34-1    Page: 113    08/20/2014    1299936    154

**A-95**

| | HO-350 |
|---|---|
| **SUPPLEMENTAL PROVISIONS** | (Ed. 9-87) |

**DEFINITIONS**

**Definition 5.** is deleted and replaced by the following:

**5.** **"occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

    a. **bodily injury**; or

    b. **property damage**.

**SECTION I - PROPERTY COVERAGES**

Under **COVERAGE C - Personal Property, Special Limits of Liability**, item 2. is deleted and replaced by the following:

**2.** $1,000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

    This limit includes the cost to research, replace or restore the information from the lost or damaged material.

Under **COVERAGE C - Personal Property, Property Not Covered**, item 8. is deleted and replaced by the following:

**8.** **business** data, including such data stored in:

    a. books of account, drawings or other paper records; or

    b. electronic data processing tapes, wires, records, discs or other software media.

       However, we do cover the cost of blank recording or storage media, and of pre-recorded computer programs available on the retail market.

Under **ADDITIONAL COVERAGES**:

Item **1. Debris Removal** is deleted and replaced by the following:

**1.** **Debris Removal.** We will pay your reasonable expense for the removal of:

    a. debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

    b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

We will also pay your reasonable expense, up to $500 in the aggregate, for the removal from the **residence premises** of:

    a. your tree(s) felled by the peril of Windstorm or Hail;

    b. your tree(s) felled by the peril of Weight of Ice, Snow or Sleet (Forms HO-2, HO-3, HO-4 and HO-6 only); or

    c. a neighbor's tree(s) felled by a Peril Insured Against under Coverage C;

provided the tree(s) damages a covered structure.

Item **2. Reasonable Repairs** is deleted and replaced by the following:

**2.** **Reasonable Repairs.** In the event that covered property is damaged by an applicable Peril Insured Against, we will pay the reasonable cost incurred by you for necessary measures taken solely to protect against further damage. If the measures taken involve repair to other damaged property, we will pay for those measures only if that property is covered under this policy and the damage to that property is caused by an applicable Peril Insured Against.

This coverage:

    a. does not increase that limit of liability that applies to the covered property;

QUINCY 000008

A-96

## NO SECTION II - LIABILITY COVERAGES FOR HOME DAY CARE BUSINESS
## LIMITED SECTION I - PROPERTY COVERAGES FOR
## HOME DAY CARE BUSINESS

HO-322
(Ed. 9-87)

If an **Insured** regularly provides home day care services to a person or persons other than **Insureds** and receives monetary or other compensation for such services, that enterprise is a **business** . Mutual exchange of home day care services, however, is not considered compensation. The rendering of home day care services by an **Insured** to a relative of an **Insured** is not considered a **business** .

Therefore, with respect to a home day care enterprise which is considered to be a **business** this policy:

1. does not provide Section II - Liability Coverages because a **business** of an **insured** is excluded under exclusion 1.b. (1) of Section II - Exclusions;

2. does not provide Section I - Coverage B coverage where other structures are used in whole or in part for **business**;

3. limits coverage for property used on the **residence premises** for the home day care enterprise to $2,500, because Coverage C - Special Limits of Liability - item 9 imposes that limit on **business** property on the **residence premises**;

4. limits coverage for property used off the **residence premises** for the home day care enterprise to $250, because Coverage C - Special Limits of Liability - item 10 imposes that limit on **business** property off the **residence premises.**

THIS ENDORSEMENT DOES **NOT** CONSTITUTE A REDUCTION OF COVERAGE.

Copyright, Insurance Services Office, Inc., 1987          **HO-322** (Ed. 9-87)

QUINCY 000009

b. does not relieve you of your duties, in case of a loss to covered property, as set forth in Section I Condition 2.d.

Item **7. Loss Assessment** is deleted and replaced by the following:

**7. Loss Assessment.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A - Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments.

Condition 1. Policy Period, under Sections I and II Conditions, does not apply to the coverage provided by this endorsement.

**SECTION I - PERILS INSURED AGAINST**

The following perils are deleted from **Form HO-6**: 2. Windstorm and Hail; 6. Vehicles; 11. Falling Objects; 12. Weight of ice, snow or sleet; 13. Accidental discharge or overflow of water or steam; and replaced by the following:

**2. Windstorm or Hail.**

This peril does not include loss to the inside of a building or the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

**6. Vehicles.**

This peril does not include loss to a fence, driveway or walk caused by a vehicle owned or operated by a resident of the **residence premises.**

**11. Falling Objects**

This peril does not include loss to the inside of a building or property contained in the building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

**12. Weight of ice, snow or sleet** which causes damage to a building or property contained in the building.

This peril does not include loss to an awning, fence, patio, pavement, swimming pool, foundation, retaining wall, bulkhead, pier, wharf, or dock.

**13. Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance. We also pay for tearing out and replacing any part of the building which is covered under Coverage A and on the **residence premises**, if necessary to repair the system or appliance from which the water or steam escaped.

This peril does not include loss:

a. to a building caused by constant or repeated seepage or leakage over a period of weeks, months or years;

b. on the **residence premises**, if the unit has been vacant for more than 30 consecutive days immediately before the loss. A unit being constructed is not considered vacant;

c. to the system or appliance from which the water or steam escaped;

Copyright, Insurance Services Office, Inc., 1987

Case: 14-1377    Document: 34-1    Page: 116    08/20/2014    1299936    154

HO-350
(Ed. 9-87)

d.   caused by or resulting from freezing except as provided in the peril of freezing below; or

e.   on the **residence premises** caused by accidental discharge or overflow which occurs away from the building where the **residence premises** is located.

The following sentence is added to the peril, **Accidental Discharge or Overflow of Water of Steam,** in all Forms except HO-1 and HO-8:

In this peril, a plumbing system does not include a sump, sump pump or related equipment.

**SECTION I - EXCLUSIONS**

Under Exclusion **3. Water Damage,** paragraph b. is deleted and replaced by the following:

b.   water which backs up through sewers or drains or which overflows from a sump; or

(In Form HO-3, this is item 1.c.(2).)

**SECTION I - CONDITIONS**

Under **3. Loss Settlement** in Forms HO-1, HO-2 and HO-3, paragraph b. (4) is deleted and replaced by the following:

(4)   We will pay no more than the actual cash value of the damage unless:

(a)   actual repair or replacement is complete; or

(b)   the cost to repair or replace the damage is both:

(i)   less than 5% of the amount of insurance in this policy on the building; and

(ii)   less than $2500.

**SECTION II - LIABILITY COVERAGE**

Under **Coverage E, Personal Liability,** item 1. is deleted and replaced by the following in all Forms and Endorsement HO-73:

1.   pay up to our limit of liability for the damages for which the **Insured** is legally liable. Damages include prejudgment interest awarded against the **Insured.**

**SECTION II - EXCLUSIONS**

Under item **1. Coverage E - Personal Liability and Coverage F - Medical Payments to Others,** item b. is deleted and replaced by the following in all Forms and Endorsement HO-73:

b.   (1)   arising out of or in connection with a ~~business engaged in by an Insured. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the business;~~

b.   (2)   arising out of the rental or holding for rental of any part of any premised by an **insured.** This exclusion does not apply to the rental or holding for rental of an **Insured location:**

(i)   on an occasional basis if used only as residence;

(ii)   in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

(iii)   in part, as an office, school, studio or private garage;

Under item **1. Coverage E - Personal Liability** and **Coverage F - Medical Payments to Others,** the following exclusion is added to all Forms and Endorsement HO-73:

i.   which arises out of the transmission of a communicable disease by an **Insured.**

(This is exclusion j. in HO-73.)

Under item **2. Coverage E - Personal Liability,** item a.(1) is deleted and replaced by the following in all Forms and Endorsement HO-73:

(1)   for any loss assessment charged against you as a member of an association, corporation or community of property owners;

**SECTION II - ADDITIONAL COVERAGES**

QUINCY 000011

Case: 14-1377    Document: 34-1    Page: 117    08/20/2014    1299936    154

HO-350
(Ed. 9-87)

Under item **1. Claim Expenses**, paragraph e. is deleted.

Under **3. Damage to Property of Others**, item e. (1) is deleted and replaced by the following:

(1)   a **business** engaged in by an **insured**;

Item **4. Loss Assessment** is deleted an replaced by the following:

4.   **Loss Assessment.** We will pay up to $1,000 for your share of loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

   a.   **bodily injury** or **property damage** not excluded under Section II of this policy; or

   b.   liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

      (1)   the director, officer or trustee is elected by the members of a corporation or association of property owners; and

      (2)   the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

   a.   one accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

   b.   a covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

The following do not apply to this coverage:

1.   Section II - Coverage E - Personal Liability Exclusion 2.a.(1);

2.   Condition 1. Policy Period, Under Sections I and II Conditions.

**SECTION II - CONDITIONS**

Item **1. Limit of Liability,** is deleted and replaced by the following:

1.   **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **insureds,** claims made or persons injured. All **bodily injury** and **property damage** resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one **occurrence.**

Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

**SECTIONS I AND II - CONDITIONS**

Item **2. Concealment or Fraud,** is deleted and replaced by the following:

2.   **Concealment or Fraud.**   The entire policy will be void if, whether before or after a loss, an **insured** has:

   a.   intentionally concealed or misrepresented any material fact or circumstance;

   b.   engaged in fraudulent conduct; or

   c.   made false statements;

   relating to this insurance.

Item **3. Liberalization Clause** is deleted an replaced by the following:

3.   **Liberalization Clause.**   If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your in-

QUINCY 000012

HO-350
(Ed. 9-87)

surance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented through introduction of a subsequent edition of our policy.

All other provisions of this policy apply.

Copyright, Insurance Services Office, Inc., 1987
Page 5 of 5

HO-350 (Ed. 9-87)

QUINCY 000013

| | HO-90 |
|---|---|
| **WORKERS COMPENSATION** | (Ed. 9-86) |
| **Certain Residence Employees** | New York |

We agree, with respect to covered **residence employees:**

**Under Coverage I**

To pay when due all benefits required of an **insured** by the New York Workers' Compensation Law; and

**Under Coverage II**

To pay on behalf of an **insured** all damages for which the **insured** is legally liable because of **bodily injury** sustained by a covered **residence employee.** The **bodily injury** must be caused by accident or disease and arise out of and in the course of employment by the **insured** while:

a.   in the United States of America, its territories or possessions, or Canada, or

b.   temporarily elsewhere if the covered **residence employee** is a citizen or resident of the United States or Canada.

Coverage II does not apply to any suit brought in or judgment rendered by any court outside the United States of America, its territories and possessions, or Canada, or to any action on such judgment.

**Who Is Covered**

A covered **residence employee** under this endorsement is a **residence employee** who is both:

a.   engaged in regular employment of less than 40 hours per week or is engaged in casual employment, and

b.   defined under the New York workers' compensation law as an employee for whom workers' compensation benefits must be provided.

**Application of Coverage**

This insurance applies only to **bodily injury** which occurs during the policy period. If the **bodily injury** is a disease, it must be caused or aggravated by the conditions of the covered **residence employee's** employment by the **insured.**

The covered **residence employee's** last day of last exposure to the conditions causing or aggravation such **bodily injury** by disease must occur during the policy period.

**Policy Provisions**

This insurance is subject to all the provisions of this endorsement and the following provisions of this policy:

a.   Under Sections I and II - Conditions:

    4.   Waiver or Change of Policy Provisions.

    5.   Cancellation.

    7.   Assignment.

    8.   Subrogation.

b.   Under Section II - Conditions:

    3.   Duties After Loss.

    6.   Suit Against Us.

    7.   Bankruptcy of an Insured.

c.   Our Agreement to defend the **insured** as provided under Coverage E- Personal Liability.

d.   Under Section II-Additional Coverages:

    1.   Claim Expenses.

e.   The definition of **"bodily injury," "business," "insured"** and **"residence employee."**

**Additional Provisions Applicable to Coverage I**

The following provisions are applicable to Coverage I:

a.   As between the covered **residence employee** and us, notice to or knowledge of the occurrence of the injury on the part of an **insured** will be deemed notice or knowledge on our part.

b.   The jurisdiction of an **insured** will, for the purpose of the law imposing liability for compensation, be our jurisdiction.

**Limits of Liability Coverage II**

We may not limit our liability to pay damages for which we become legally liable to pay because of **bodily injury** to an **insured's** covered **residence employees** if the **bodily injury** arises out of and in the course of employment that is subject to and is compensable under the Workers' Compensation Law of New York.

Copyright Insurance Services Office, Inc., 1986
Page 1 of 2

HO-90 (Ed. 9-86)
New York

A-102

HO-90
(Ed. 9-86)
**New York**

**Other Insurance**

If a loss covered by this insurance is also covered by other insurance, we will not pay more than our share of benefits and costs. The shares of all applicable insurance will be equal until the loss is paid.

**Conformity to Statute**

Terms of this insurance which are in conflict with the New York Workers' Compensation Law are amended by this statement to conform to that law.

**Exclusions**

This policy does not apply:

a.   to liability for **bodily injury** arising out of **business** pursuits of an **insured.**

b.   Under Coverage II:

1.   to liability assumed by the **insured** under any contract or agreement.

2.   to any obligation under a workers' compensation, unemployment or disability benefits law or any similar law.

3.   to punitive or exemplary damage because of **bodily injury** to a covered **residence employee** employed in violation of law.

4.   to **bodily injury** to a covered **residence employee** employed in violation of law with the knowledge of an **insured.**

5.   to **bodily injury** intentionally caused or aggravated by an **insured.**

6.   to damages arising out of the unlawful discharge or coercion of, or unlawful discrimination against, a covered **residence employee.**

Copyright Insurance Services Office, Inc., 1986
Page 2 of 2

HO-90 (Ed. 9-86)
**New York**

QUINCY 000015

**GUARANTEED REPLACEMENT COST PROTECTION**  HO-400
**COVERAGE A - DWELLING**  (Ed. 3-89)

For no additional premium, we agree to amend the present coverage amounts indicated on the Declarations page in accordance with the following provisions:

1.  If you have:

    a.  allowed us to adjust the Coverage A limit of liability and the premium in accordance with:

        (1)  the property evaluations we make; and

        (2)  any increases in inflation; and

    b.  notified us, within 30 days of completion, of any alterations to the dwelling which increase the replacement cost of the dwelling by 5% or more; and

    c.  elected to repair or replace the damaged building;

    We will:

    a.  increase the Coverage A limit of liability to equal the current replacement cost of the dwelling if the amount of loss to the dwelling is more than the limit of liability indicated on the Declarations page;

    b.  also increase by the same percentage applied to Coverage A the limits of liability for Coverages B, C and D. However, we will do this only if the Coverage A limit of liability is increased under paragraph a. above as a result of a Coverage A loss;

    c.  adjust the policy premium from the time of loss for the remainder of the policy term based on the increased limits of liability.

2.  If you comply with the provisions of this endorsement and there is a loss to a building insured under Coverage A, Section I Condition 3. Loss Settlement paragraph b. is deleted and replaced by paragraphs b., c. and d. as follows:

    b.  Buildings under Coverage A or B at replacement cost without deduction for depreciation. We will pay no more than the smallest of the following amounts for equivalent construction and use on the same premises:

        (1)  the replacement cost of the building or any parts of it;

        (2)  the amount actually and necessarily spent to repair or replace the building or any parts of it;

        (3)  the applicable limit of liability whether increased or not, adjusted in accordance with paragraph 1. above.

    c.  We will pay no more than the actual cash value of the damage until actual repair or replacement is completed.

    d.  You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis and then make claim within 180 days after loss for any additional liability on a replacement cost basis.

This policy does not apply to land, including land on which the building or structures are located.

All other provisions of this policy apply.

Quincy Mutual Fire Insurance Company    HO-400 (Ed. 3-89)

QUINCY 000016

| PREMISES ALARM OR | HO-216 |
|---|---|
| FIRE PROTECTION SYSTEM | (Ed. 4-84) |

For a premium credit, we acknowledge the installation of an alarm system or automatic sprinkler system approved by us on the **residence premises.** You agree to maintain this system in working order and to notify us promptly of any change made to the system or if it is removed.

Copyright, Insurance Services Office, Inc., 1984          **HO-216** (Ed. 4-84)

| | HO-400 |
|---|---|
| **PERSONAL PROPERTY REPLACEMENT COST** | (Ed. 3-89) |

When Coverage C is increased to 70% of Coverage A and the normal premium increase is applied, Replacement Cost on Contents will be automatically included in this contract, in accordance with the following provisions:

SECTION I

For no additional premium, subsection a. paragraphs (1) and (2) of Condition 3 Loss Settlement are deleted and replaced by the following:

    (1)  Personal Property;

    (2)  Awnings, carpeting, domestic appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

    at replacement cost.

1.   PROPERTY NOT ELIGIBLE

Property listed below is not eligible for replacement cost settlement. Any loss shall be settled at actual cash value at time of loss but not exceeding the amount necessary to repair or replace.

    a.  antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

    b.  memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

    c.  articles not maintained in good or workable condition.

    d.  articles that are outdated or obsolete and are stored or not being used.

2.   REPLACEMENT COST

    a.  We will pay not more than the smallest of the following amounts:

        (1)  Replacement cost at time of loss without deduction for depreciation;

        (2)  the full cost of repair at time of loss;

        (3)  the limit of liability applying to Coverage C; or

        (4)  any special limits of liability stated in this policy.

    b.  When the replacement cost for the entire loss under this endorsement exceeds $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is completed.

    c.  You may make a claim for loss on an actual cash value basis and then make claim within 180 days after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply.

    Quincy Mutual Fire Insurance Company        **HO-400** (Ed. 3-89)

QUINCY 000018

| | HO-442 |
|---|---|
| **NEW YORK AMENDATORY ENDORSEMENT** | (Ed. 12-86) |

Personal Umbrella Liability Endorsement, HO-440, is amended as follows:

Exclusion 4 is added:

This endorsement does not cover **personal injury** due to discrimination because of race, color, creed or national origin.

**HO-442** (Ed. 12-86)

**PERSONAL UMBRELLA LIABILITY ENDORSEMENT**

HO 440
(Ed. 2-94)

This endorsement forms an extension of your Homeowners Policy.

The following is a Table of Contents for this endorsement only:

| | Begins on page: |
|---|---|
| Notice | 2 |
| Agreement | 2 |
| Definitions | 2 |
| Endorsement Period and Territory | 2 |
| Coverages | 2 |
| Limit of Liability | 3 |
| Exclusions | 3 |
| Conditions of this Endorsement | 3 |
| Schedule A - Underlying Insurance | 4 |

QUINCY 000020

HO 440
(Ed. 2-94)

## PERSONAL UMBRELLA LIABILITY ENDORSEMENT

**NOTICE**

In this endorsement, "you", "your" and "yours" refer to the person named in the policy declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Quincy Mutual Fire Insurance Company.

The AGREEMENT and DEFINITIONS sections of this endorsement apply in place of any other such sections in this policy.

**AGREEMENT**

We will provide the insurance described in this endorsement in return for the premium and compliance with all terms of this endorsement.

**DEFINITIONS**

This endorsement contains words and phrases which are given specific meaning in this section. When these words and phrases are used, they appear in bold-faced type.

1.  **Covered person** means you and the following residents of your household:

    a.  a relative of yours;

    b.  any person under the age of 21 who is in your care or the care of a covered person in a. above;

    c.  a person using your covered auto or your covered watercraft with your consent.

2.  **Personal injury** means:

    a.  bodily harm or mental harm;

    b.  false arrest; wrongful entry; eviction or detention; malicious prosecution or humiliation;

    c.  libel, slander, defamation of character or invasion of privacy.

3.  **Property damage** means physical injury to tangible property. It includes loss of use of such injured property.

4.  **Business:**

    a.  means trade, profession, occupation or employment;

    b.  means commercial or financial, venture or investment;

    c.  does not mean rental properties covered by the basic Homeowners' Personal Liability.

5.  **Auto** means a land motor vehicle, trailer, or semi trailer, including farm implements. It does not include unlicensed vehicles designed and used to maintain residential property.

6.  **Retained limit** means the larger of:

    a.  the total of the applicable limit(s) of all required underlying insurance described in Schedule A of this endorsement and any other insurance available to a **covered person;**

    b.  $1,000.

7.  **Occurrence** means a **personal injury** or **property damage** that happens as a result of an accident which includes accidental and repeated exposure to injurious conditions.

**ENDORSEMENT PERIOD AND TERRITORY**

This endorsement applies to **occurrences** which happen anywhere in the world during the period this endorsement is in effect.

**COVERAGES**

1.  We will pay that portion of the damages for **personal injury** or **property damage** a **covered person** is legally responsible for which exceeds the **retained limit.** You must promptly pay us any amount of the damages we may pay which falls within the **retained limit.**

2.  a.  If it is claimed that a **covered person** is legally responsible for damages 1) which are not payable under any underlying insurance due to exhaustion of all underlying insurance, 2) which are covered under this endorsement except for the **retained limit,** we will:

        (1)  provide a defense by counsel of our choice. We may investigate and settle the claim or suit as we see fit. Our duty to defend ends when our limit of liability is exhausted by payment for damages;

QUINCY 000021

HO 440
**PERSONAL UMBRELLA LIABILITY ENDORSEMENT**     (Ed. 2-94)

(2) pay premiums on all appeal bonds required in a suit we defend. We have no duty to apply for or furnish a bond;

(3) pay all our expenses; pay all court costs a **covered person** is charged; pay all interest accruing after judgement is entered until we pay, tender or deposit in court that part of the judgement this policy covers;

(4) pay the **covered person** for all reasonable expenses, including lost earnings up to $100 a day, incurred at our request.

b. These amounts are in addition to the limit of liability of this endorsement.

c. In a country where we are prevented by law from carrying out this agreement, we will pay any covered expense which is incurred with our written consent.

**LIMIT OF LIABILITY**

1. The limit of liability of this endorsement is one million dollars ($1,000,000) for any one **occurrence.** Our liability for damages resulting from one **occurrence** is only for that portion of the damages which exceeds the **retained limit.**

2. The insurance provided by this endorsement applies separately to each **covered person** against whom a claim is made. But including more than one **covered person** will not increase our limit of liability. We will not pay more than one million dollars ($1,000,000) for all damages resulting from one **occurrence** regardless of the number or size of suits or awards or number of **covered persons** involved.

**EXCLUSIONS**

1. This endorsement does not cover **personal injury** to a **covered person.**

2. This endorsement does not cover **property damage** to property owned by any **covered person.**

3. This endorsement does not cover **personal injury** or **property damage** arising out of:

a. any obligation under any worker's compensation, disability benefits or similar laws;

b. any **auto** owned by a **covered person,** other than you, or furnished for that person's regular use. This exclusion does not apply to such an **auto** while used by you or owned by you.

c. watercraft with inboard motors of greater than fifty (50) horsepower or with outboard motors of greater than twenty-five (25) horsepower. The horsepower indicated above applies to the combined power when there is more than one motor;

d. sailing vessels, with or without auxiliary power, greater than twenty-five (25) feet in overall length;

e. aircraft;

f. an act committed or directed by a **covered person** with intent to cause **personal injury** or **property damage;**

g. a nuclear energy **occurrence** which is subject to coverage by a nuclear energy liability policy whether or not such coverage is available;

h. **business** activity or **business** property. This does not apply to a **covered person's** use of a private passenger vehicle;

i. rendering or failure to render a professional service of any nature;

j. an act or failure to act as an officer, trustee or director of a corporation, trust or association. This exclusion does not apply to a nonprofit charitable or religious or civic organization;

k. an act or failure to act as a holder of public office;

**CONDITIONS OF THIS ENDORSEMENT**

1. Duties after an **occurrence.**

a. You must notify us in writing of an **occurrence** involving any **covered person** as soon as you become aware that this coverage might apply. The notice may be given

HO 440

**PERSONAL UMBRELLA LIABILITY ENDORSEMENT**                              (Ed. 2-94)

to our agent from whom the coverage was purchased.

b.   If a claim is made against a **covered person** or a suit is brought against a **covered person** you must notify us as soon as possible. You must also make certain that we receive all available papers and documents the **covered person** receives in connection with the claim.

c.   You and the **covered person** involved in the **occurrence** must assist us and fully cooperate with us in the preparation and presentation of any defense. Such assistance and cooperation may include any appeal of a judgement, even if the companies who write the underlying coverages are not willing to participate with us.

2.   Subrogation. All of a **covered person's** rights to recover from others will become our rights to the extent of any payment we make for a covered loss and the related expenses. The **covered person** must do everything possible to secure and protect such rights.

3.   Changes. The terms of this endorsement may not be changed or waived except by a written endorsement issued by us.

4.   Assignment. No one covered by this endorsement may assign or turn over any right or interest or duty, under this endorsement, to another without our written consent.

5.   Legal Action against us. No legal action may be brought against us until all terms of this endorsement have been complied with. No legal action may be brought against us until we agree in writing that the **covered person** is obligated to pay or until the amount of the obligation has been determined by judgement after trial. No

person or organization has a right under this endorsement to bring us into an action to decide the liability of a **covered person.**

6.   Bankruptcy. Your bankruptcy or your insolvency will not relieve us of our obligations under this endorsement.

7.   Death. If you die we will cover your legal representative in your place.

8.   Other insurance. If a **covered person** has other collectible insurance that covers damages this endorsement also covers, this endorsement shall be excess to and will not contribute with such other insurance. This does not include insurance bought to apply in excess of the amount of deductible plus the limit of coverage of this endorsement.

**SCHEDULE A - UNDERLYING INSURANCE**

The following underlying insurance and limits of liability are required to be maintained by you:

1.   auto bodily injury and property damage liability insurance with respect to autos owned or leased by or regularly furnished to you at limits not less than (a) $250,000 each person and $500,000 each occurrence for bodily injury and $100,000 each occurrence for property damage or (b) a combined single limit of not less than $300,000 each occurrence.

2.   personal liability insurance at a limit of not less than $100,000 each occurrence applying to your personal (non-business) activities, and to personal (non-business) property owned or leased by you.

3.   employer's liability insurance at a limit of not less than $100,000 each occurrence applying to your personal (non-business) employees.

QUINCY 000023

MUTUALS - MEMBERSHIP AND VOTING NOTICE:  The assured is hereby notified that by virtue of this policy, he is a member of the Quincy Mutual Fire Mutual Insurance Company, and is entitled to vote either in person or by proxy at any and all meetings of said Company. The Annual Meetings are held at its Home Office, 57 Washington Street, Quincy, Massachusetts, on the first Wednesday of February in each year, at 2:00 o'clock (P.M.)

MUTUALS - PARTICIPATION CLAUSE WITHOUT CONTINGENT LIABILITY:
No Contingent Liability:  This policy is non-assessable.  The holder of this policy is not subject to any contingent liability, nor liable to assessment.  The policyholder is a member of the Company and shall participate, to the extent and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

**In Witness Whereof,** the Company has caused this policy to be executed and attested.


James J Moran Jr.

Secretary                                           R. Douglas Briggs

                                                    President

Case: 14-1377    Document: 34-1    Page: 130    08/20/2014    1299936    154

Homeowners 3
Special Form
Ed. 4-84

# AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

# DEFINITIONS

In this policy, "you" and "your" refer to the "named insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the Company providing this insurance. In addition, certain words and phrases are defined as follows:

1. **"bodily injury"** means bodily harm, sickness or disease, including required care, loss of services and death that results.

2. **"business"** includes trade, profession or occupation.

3. **"Insured"** means you and residents of your household who are:

   a. your relatives; or

   b. other persons under the age of 21 and in the care of any person named above.

   Under Section II "Insured" also means:

   c. with respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by you or any person included in 3a or 3b above. A person or organization using or having custody of these animals or watercraft in the course of any **business** or without consent of the owner is not an **Insured;**

   d. with respect to any vehicle to which this policy applies:

      (1) persons while engaged in your employ or that of any person included in 3a or 3b above; or

      (2) other persons using the vehicle on an **insured location** with your consent.

4. **"insured location"** means:

   a. the **residence premises;**

   b. the part of other premises, other structures and grounds used by you as a residence and:

      (1) which is shown in the Declarations; or

      (2) which is acquired by you during the policy period for your use as a residence;

   c. any premises used by you in connection with a premises in 4a or 4b above;

   d. any part of a premises:

      (1) not owned by an **Insured;** and

      (2) where an **Insured** is temporarily residing;

   e. vacant land, other than farm land, owned by or rented to an **Insured;**

   f. land owned by or rented to an **Insured** on which a one or two family dwelling is being built as a residence for an **Insured;**

   g. individual or family cemetery plots or burial vaults of an **insured;** or

   h. any part of a premises occasionally rented to an **Insured** for other than **business** use.

5. **"occurrence"** means an accident, including exposure to conditions, which results, during the policy period, in:

   a. **bodily Injury;** or

   b. **property damage.**

6. **"property damage"** means physical injury to, destruction of, or loss of use of tangible property.

7. **"residence employee"** means:

   a. an employee of an **Insured** whose duties are related to the maintenance or use of the **residence premises,** including household or domestic services; or

   b. one who performs similar duties elsewhere not related to the **business** of an **Insured.**

HO-3 Ed. 4-84            Copyright, Insurance Services Office, Inc., 1984            Page 1 of 15

QUINCY 000025

8. **"residence premises"** means:

   a. the one family dwelling, other structures, and grounds; or

   b. that part of any other building;

   where you reside and which is shown as the **"residence premises"** in the Declarations.

**"Residence premises"** also means a two family dwelling where you reside in at least one of the family units and which is shown as the **"residence premises"** in the Declarations.

# SECTION I—PROPERTY COVERAGES

## COVERAGE A—Dwelling

We cover:

1. the dwelling on the **residence premises** shown in the Declarations, including structures attached to the dwelling; and

2. materials and supplies located on or next to the **residence premises** used to construct, alter or repair the dwelling or other structures on the **residence premises**.

This coverage does not apply to land, including land on which the dwelling is located.

## COVERAGE B—Other Structures

We cover other structures on the **residence premises** set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

This coverage does not apply to land, including land on which the other structures are located.

We do not cover other structures:

1. used in whole or in part for **business**; or

2. rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage.

The limit of liability for this coverage will not be more than 10% of the limit of liability that applies to Coverage A. Use of this coverage does not reduce the Coverage A limit of liability.

## COVERAGE C—Personal Property

We cover personal property owned or used by an **insured** while it is anywhere in the world. At your request, we will cover personal property owned by:

1. others while the property is on the part of the **residence premises** occupied by an **insured**;

2. a guest or a **residence employee**, while the property is in any residence occupied by an **insured**.

Our limit of liability for personal property usually located at an **insured's** residence, other than the **residence premises**, is 10% of the limit of liability for Coverage C, or $1000, whichever is greater. Personal property in a newly acquired principal residence is not subject to this limitation for the 30 days from the time you begin to move the property there.

**Special Limits of Liability.** These limits do not increase the Coverage C limit of liability. The special limit for each numbered category below is the total limit for each loss for all property in that category:

1. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum, coins and medals.

2. $1000 on securities, accounts, deeds, evidences of debt, letters of credit, notes other than bank notes, manuscripts, passports, tickets and stamps.

3. $1000 on watercraft, including their trailers, furnishings, equipment and outboard motors.

4. $1000 on trailers not used with watercraft.

5. $1000 on grave markers.

6. $1000 for loss by theft of jewelry, watches, furs, precious and semi-precious stones.

7. $2000 for loss by theft of firearms.

8. $2500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold or pewter.

9. $2500 on property, on the **residence premises**, used at any time or in any manner for any **business** purpose.

10. $250 on property, away from the **residence premises**, used at any time or in any manner for any **business** purpose.

QUINCY 000026

**Property Not Covered.** We do not cover:

1. articles separately described and specifically insured in this or other insurance;

2. animals, birds or fish;

3. motor vehicles or all other motorized land conveyances. This includes:

   a. equipment and accessories; or

   b. any device or instrument for the transmitting, recording, receiving or reproduction of sound or pictures which is operated by power from the electrical system of motor vehicles or all other motorized land conveyances, including:

      (1) accessories or antennas; or

      (2) tapes, wires, records, discs or other media for use with any such device or instrument;

   while in or upon the vehicle or conveyance.

   We do cover vehicles or conveyances not subject to motor vehicle registration which are:

   a. used to service an **Insured's** residence; or

   b. designed for assisting the handicapped;

4. aircraft and parts. Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

5. property of roomers, boarders and other tenants, except property of roomers and boarders related to an **insured**;

6. property in an apartment regularly rented or held for rental to others by an **Insured**;

7. property rented or held for rental to others off the **residence premises**;

8. a. books of account, drawings or other paper records; or

   b. electronic data processing tapes, wires, records, discs or other software media;

   containing **business** data. But, we do cover the cost of blank or unexposed records and media;

9. credit cards or fund transfer cards except as provided in Additional Coverages 6.

**COVERAGE D—Loss Of Use**

The limit of liability for Coverage D is the total limit for all the coverages that follow.

1. If a loss covered under this Section makes that part of the **residence premises** where you reside not fit to live in, we cover, at your choice, either of the following. However, if the **residence premises** is not your principal place of residence, we will not provide the option under paragraph b. below.

   a. **Additional Living Expense,** meaning any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living; or

   b. **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** where you reside less any expenses that do not continue while the premises is not fit to live in.

   Payment under a. or b. will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

2. If a loss covered under this Section makes that part of the **residence premises** rented to others or held for rental by you not fit to live in, we cover the:

      **Fair Rental Value,** meaning the fair rental value of that part of the **residence premises** rented to others or held for rental by you less any expenses that do not continue while the premises is not fit to live in.

   Payment will be for the shortest time required to repair or replace that part of the premises rented or held for rental.

3. If a civil authority prohibits you from use of the **residence premises** as a result of direct damage to neighboring premises by a Peril Insured Against in this policy, we cover the Additional Living Expense or Fair Rental Value loss as provided under 1 and 2 above for no more than two weeks.

The periods of time under 1, 2 and 3 above are not limited by expiration of this policy.

We do not cover loss or expense due to cancellation of a lease or agreement.

**ADDITIONAL COVERAGES**

1. **Debris Removal.** We will pay your reasonable expense for the removal of:

   a. debris of covered property if a Peril Insured Against causes the loss; or

   b. ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit of liability is available for debris removal expense.

We will also pay your reasonable expense for the removal of fallen trees from the **residence premises** if:

    a.　coverage is not afforded under Additional Coverages 3. Trees, Shrubs and Other Plants for the peril causing the loss; or

    b.　the tree is not covered by this policy;

provided the tree damages covered property and a Peril Insured Against under Coverage C causes the tree to fall. Our limit of liability for this coverage will not be more than $500 in the aggregate for any one loss.

2.　**Reasonable Repairs.** We will pay the reasonable cost incurred by you for necessary repairs made solely to protect covered property from further damage if a Peril Insured Against causes the loss. This coverage does not increase the limit of liability that applies to the property being repaired.

3.　**Trees, Shrubs and Other Plants.** We cover trees, shrubs, plants or lawns, on the **residence premises,** for loss caused by the following Perils Insured Against: Fire or lightning, Explosion, Riot or civil commotion, Aircraft, Vehicles not owned or operated by a resident of the **residence premises,** Vandalism or malicious mischief or Theft.

    The limit of liability for this coverage will not be more than 5% of the limit of liability that applies to the dwelling, or more than $500 for any one tree, shrub or plant. We do not cover property grown for **business** purposes.

    This coverage is additional insurance.

4.　**Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

    This coverage is additional insurance. No deductible applies to this coverage.

5.　**Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

6.　**Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

    We will pay up to $500 for:

    a.　the legal obligation of an **Insured** to pay because of the theft or unauthorized use of credit cards issued to or registered in an **Insured's** name;

    b.　loss resulting from theft or unauthorized use of a fund transfer card used for deposit, withdrawal or transfer of funds, issued to or registered in an **Insured's** name;

    c.　loss to an **insured** caused by forgery or alteration of any check or negotiable instrument; and

    d.　loss to an **Insured** through acceptance in good faith of counterfeit United States or Canadian paper currency.

We do not cover use of a credit card or fund transfer card:

    a.　by a resident of your household;

    b.　by a person who has been entrusted with either type of card; or

    c.　if an **Insured** has not complied with all terms and conditions under which the cards are issued.

All loss resulting from a series of acts committed by any one person or in which any one person is concerned or implicated is considered to be one loss.

We do not cover loss arising out of **business** use or dishonesty of an **Insured.**

This coverage is additional insurance. No deductible applies to this coverage.

Defense:

    a.　We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

    b.　If a suit is brought against an **Insured** for liability under the Credit Card or Fund Transfer Card coverage, we will provide a defense at our expense by counsel of our choice.

    c.　We have the option to defend at our expense an **Insured** or an **Insured's** bank against any suit for the enforcement of payment under the Forgery coverage.

7.　**Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against you by a corporation or association of property owners. This only applies when the assessment is made as a result of each direct loss to the property, owned by all members collectively, caused by a Peril Insured Against under Coverage A—Dwelling, other than earthquake or land shock waves or tremors before, during or after a volcanic eruption.

This coverage applies only to loss assessment charged against you as owner or tenant of the **residence premises.**

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

QUINCY 000028

Case: 14-1377    Document: 34-1    Page: 134    08/20/2014    1299936    154

8. **Collapse.** We insure for direct physical loss to covered property involving collapse of a building or any part of a building caused only by one or more of the following:

  a. Perils Insured Against in Coverage C.—Personal Property. These perils apply to covered building and personal property for loss insured by this additional coverage;

  b. hidden decay;

  c. hidden insect or vermin damage;

  d. weight of contents, equipment, animals or people;

  e. weight of rain which collects on a roof; or

  f. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.

  Loss to an awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under items b, c, d, e, and f unless the loss is a direct result of the collapse of a building.

  Collapse does not include settling, cracking, shrinking, bulging or expansion.

  This coverage does not increase the limit of liability applying to the damaged covered property.

# SECTION I—PERILS INSURED AGAINST

**COVERAGE A—DWELLING and**
**COVERAGE B—OTHER STRUCTURES**

We insure against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property; however, we do not insure loss:

1. involving collapse, other than as provided in Additional Coverage 8;

2. caused by:

  a. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion applies only while the dwelling is vacant, unoccupied or being constructed unless you have used reasonable care to:

    (1) maintain heat in the building; or

    (2) shut off the water supply and drain the system and appliances of water;

  b. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

    (1) fence, pavement, patio or swimming pool;

    (2) foundation, retaining wall or bulkhead; or

    (3) pier, wharf or dock;

  c. theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

  d. vandalism and malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

  e. constant or repeated seepage or leakage of water or steam over a period of weeks, months or years from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance;

  f. (1) wear and tear, marring, deterioration;

    (2) inherent vice, latent defect, mechanical breakdown;

    (3) smog, rust, mold, wet or dry rot;

    (4) smoke from agricultural smudging or industrial operations;

    (5) release, discharge or dispersal of contaminants or pollutants;

    (6) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; or

    (7) birds, vermin, rodents, insects or domestic animals.

    If any of these cause water damage not otherwise excluded, from a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance, we cover loss caused by the water including the cost of tearing out and replacing any part of a building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which this water escaped.

3. excluded under Section I—Exclusions.

Under items 1 and 2, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

## COVERAGE C—PERSONAL PROPERTY

We insure for direct physical loss to the property described in Coverage C caused by a peril listed below unless the loss is excluded in Section I—Exclusions.

1. **Fire or lightning.**

2. **Windstorm or hail.**

   This peril does not include loss to the property contained in a building, caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

   This peril includes loss to watercraft and their trailers, furnishings, equipment, and outboard motors, only while inside a fully enclosed building.

3. **Explosion.**

4. **Riot or civil commotion.**

5. **Aircraft,** including self-propelled missiles and spacecraft.

6. **Vehicles.**

7. **Smoke,** meaning sudden and accidental damage from smoke.

   This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

8. **Vandalism or malicious mischief.**

9. **Theft,** including attempted theft and loss of property from a known place when it is likely that the property has been stolen.

   This peril does not include loss caused by theft:

   a. committed by an **Insured;**

   b. in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied; or

   c. from that part of a **residence premises** rented by an **Insured** to other than an **Insured.**

   This peril does not include loss caused by theft that occurs off the **residence premises** of:

   a. property while at any other residence owned by, rented to, or occupied by an **Insured,** except while an **Insured** is temporarily living there. Property of a student who is an **Insured** is covered while at a residence away from home if the student has been there at any time during the 45 days immediately before the loss;

   b. watercraft, including their furnishings, equipment and outboard motors; or

   c. trailers and campers.

10. **Falling objects.**

    This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

11. **Weight of ice, snow or sleet** which causes damage to property contained in a building.

12. **Accidental discharge or overflow of water or steam** from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

    This peril does not include loss:

    a. to the system or appliance from which the water or steam escaped;

    b. caused by or resulting from freezing except as provided in the peril of freezing below; or

    c. on the **residence premises** caused by accidental discharge or overflow which occurs off the **residence premises.**

13. **Sudden and accidental tearing apart, cracking, burning or bulging** of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

    We do not cover loss caused by or resulting from freezing under this peril.

14. **Freezing** of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance.

    This peril does not include loss on the **residence premises** while the dwelling is unoccupied, unless you have used reasonable care to:

    a. maintain heat in the building; or

    b. shut off the water supply and drain the system and appliances of water.

15. **Sudden and accidental damage from artificially generated electrical current.**

    This peril does not include loss to a tube, transistor or similar electronic component.

16. **Damage by glass or safety glazing material** which is part of a building, storm door or storm window.

    This peril does not include loss on the **residence premises** if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant.

17. **Volcanic Eruption** other than loss caused by earthquake, land shock waves or tremors.

QUINCY 000030

# SECTION I—EXCLUSIONS

1. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

   **a.** **Ordinance or Law,** meaning enforcement of any ordinance or law regulating the construction, repair, or demolition of a building or other structure, unless specifically provided under this policy.

   **b.** **Earth Movement,** meaning earthquake including land shock waves or tremors before, during or after a volcanic eruption; landslide; mudflow; earth sinking, rising or shifting; unless direct loss by:

   (1) fire;

   (2) explosion; or

   (3) breakage of glass or safety glazing material which is part of a building, storm door or storm window;

   ensues and then we will pay only for the ensuing loss.

   This exclusion does not apply to loss by theft.

   **c.** **Water Damage,** meaning:

   (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

   (2) water which backs up through sewers or drains; or

   (3) water below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;

   Direct loss by fire, explosion or theft resulting from water damage is covered.

   **d.** **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the **residence premises.** But, if a Peril Insured Against ensues on the **residence premises,** we will pay only for that ensuing loss.

   **e.** **Neglect,** meaning neglect of the **insured** to use all reasonable means to save and preserve property at and after the time of a loss.

   **f.** **War,** including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

   **g.** **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I—Conditions.

   **h.** **Intentional Loss,** meaning any loss arising out of any act committed:

   (1) by or at the direction of an **insured;** and

   (2) with the intent to cause a loss.

2. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

   **a.** **Weather conditions.** However, this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss;

   **b.** **Acts or decisions,** including the failure to act or decide, of any person, group, organization or governmental body;

   **c.** **Faulty, inadequate or defective:**

   (1) planning, zoning, development, surveying, siting;

   (2) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   (3) materials used in repair, construction, renovation or remodeling; or

   (4) maintenance;

   of part or all of any property whether on or off the **residence premises.**

# SECTION I—CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. to the **Insured** for more than the amount of the **Insured's** interest at the time of loss; or

   b. for more than the applicable limit of liability.

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

   a. give prompt notice to us or our agent;

   b. notify the police in case of loss by theft;

   c. notify the credit card or fund transfer card company in case of loss under Credit Card or Fund Transfer Card coverage;

   d. (1) protect the property from further damage;

   (2) make reasonable and necessary repairs to protect the property; and

   (3) keep an accurate record of repair expenses;

   e. prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

   f. as often as we reasonably require:

   (1) show the damaged property;

   (2) provide us with records and documents we request and permit us to make copies; and

   (3) submit to questions under oath and sign and swear to them;

   g. send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

   (1) the time and cause of loss;

   (2) the interest of the **Insured** and all others in the property involved and all liens on the property;

   (3) other insurance which may cover the loss;

   (4) changes in title or occupancy of the property during the term of the policy;

   (5) specifications of damaged buildings and detailed repair estimates;

   (6) the inventory of damaged personal property described in 2e above;

   (7) receipts for additional living expenses incurred and records that support the fair rental value loss; and

   (8) evidence or affidavit that supports a claim under the Credit Card, Fund Transfer Card, Forgery and Counterfeit Money coverage, stating the amount and cause of loss.

3. **Loss Settlement.** Covered property losses are settled as follows:

   a. (1) Personal property;

   (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and

   (3) Structures that are not buildings;

   at actual cash value at the time of loss but not more than the amount required to repair or replace.

   b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

   (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

   (a) the limit of liability under this policy that applies to the building;

   (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or

   (c) the necessary amount actually spent to repair or replace the damaged building.

 Copyright, Insurance Services Office, Inc., 1984 **HO-3 Ed. 4-84**

QUINCY 000032

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

    (a) the actual cash value of that part of the building damaged; or

    (b) that proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

(3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

    (a) excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

    (b) those supports in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

    (c) underground flues, pipes, wiring and drains.

(4) We will pay no more than the actual cash value of the damage unless:

    (a) actual repair or replacement is complete; or

    (b) the cost to repair or replace the damage is both:

      (i) less than 5% of the amount of insurance in this policy on the building; and

      (ii) less than $1000.

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis.

4. **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

    a. repair or replace any part to restore the pair or set to its value before the loss; or

    b. pay the difference between actual cash value of the property before and after the loss.

5. **Glass Replacement.** Loss for damage to glass caused by a Peril Insured Against will be settled on the basis of replacement with safety glazing materials when required by ordinance or law.

6. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the **residence premises** is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

    a. pay its own appraiser; and

    b. bear the other expenses of the appraisal and umpire equally.

7. **Other Insurance.** If a loss covered by this policy is also covered by other insurance, we will pay only the proportion of the loss that the limit of liability that applies under this policy bears to the total amount of insurance covering the loss.

8. **Suit Against Us.** No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss.

9. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with like property.

10. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

    a. reach an agreement with you;

    b. there is an entry of a final judgment; or

    c. there is a filing of an appraisal award with us.

11. **Abandonment of Property.** We need not accept any property abandoned by an **Insured.**

QUINCY 000033

**12. Mortgage Clause.**

The word "mortgagee" includes trustee.

If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

a. notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

b. pays any premium due under this policy on demand if you have neglected to pay the premium; and

c. submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

If the policy is cancelled or not renewed by us, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

If we pay the mortgagee for any loss and deny payment to you:

a. we are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

b. at our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

Subrogation will not impair the right of the mortgagee, to recover the full amount of the mortgagee's claim.

**13. No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

**14. Nuclear Hazard Clause.**

a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against in Section I.

c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

**15. Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

**16. Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

# SECTION II—LIABILITY COVERAGES

## COVERAGE E — Personal Liability

If a claim is made or a suit is brought against an **Insured** for damages because of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:

1. pay up to our limit of liability for the damages for which the **Insured** is legally liable; and

2. provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when the amount we pay for damages resulting from the **occurrence** equals our limit of liability.

## COVERAGE F — Medical Payments To Others

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing **bodily injury.** Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except **residence employees.** As to others, this coverage applies only:

1. to a person on the **Insured location** with the permission of an **Insured;** or

QUINCY 000034

2. to a person off the **Insured location**, if the **bodily injury**:

  a. arises out of a condition on the **Insured location** or the ways immediately adjoining;

  b. is caused by the activities of an **Insured**;

c. is caused by a **residence employee** in the course of the **residence employee's** employment by an **Insured**; or

d. is caused by an animal owned by or in the care of an **Insured**.

# SECTION II—EXCLUSIONS

1. **Coverage E — Personal Liability and Coverage F — Medical Payments to Others** do not apply to **bodily injury** or **property damage**:

  a. which is expected or intended by the **insured**;

  b. arising out of **business** pursuits of an **Insured** or the rental or holding for rental of any part of any premises by an **Insured**.

    This exclusion does not apply to:

    (1) activities which are usual to non-**business** pursuits; or

    (2) the rental or holding for rental of an **Insured location**:

      (a) on an occasional basis if used only as a residence;

      (b) in part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders; or

      (c) in part, as an office, school, studio or private garage;

  c. arising out of the rendering of or failure to render professional services;

  d. arising out of a premises:

    (1) owned by an **Insured**;

    (2) rented to an **Insured**; or

    (3) rented to others by an **Insured**;

    that is not an **Insured location**;

  e. arising out of:

    (1) the ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an **Insured**;

    (2) the entrustment by an **Insured** of a motor vehicle or any other motorized land conveyance to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a conveyance excluded in paragraph (1) or (2) above.

    This exclusion does not apply to:

    (1) a trailer not towed by or carried on a motorized land conveyance.

    (2) a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and:

      (a) not owned by an **Insured**; or

      (b) owned by an **Insured** and on an **Insured location**.

    (3) a motorized golf cart when used to play golf on a golf course.

    (4) a vehicle or conveyance not subject to motor vehicle registration which is:

      (a) used to service an **Insured's** residence;

      (b) designed for assisting the handicapped; or

      (c) in dead storage on an **Insured location**.

  f. arising out of:

    (1) the ownership, maintenance, use, loading or unloading of a watercraft described below;

    (2) the entrustment by an **Insured** of a watercraft described below to any person; or

    (3) statutorily imposed vicarious parental liability for the actions of a child or minor using a watercraft described below.

    Watercraft:

    (1) with inboard or inboard-outdrive motor power owned by an **insured**;

    (2) with inboard or inboard-outdrive motor power of more than 50 horsepower rented to an **Insured**;

HO-3 Ed. 4-84          Copyright, Insurance Services Office, Inc., 1984          **Page 11 of 15**

(3) that is a sailing vessel, with or without auxiliary power, 26 feet or more in length owned by or rented to an **insured; or**

(4) powered by one or more outboard motors with more than 25 total horsepower if the outboard motor is owned by an **insured.** But, outboard motors of more than 25 total horsepower are covered for the policy period if:

(a) you acquire them prior to the policy period and:

(i) you declare them at policy inception; or

(ii) your intention to insure is reported to us in writing within 45 days after you acquire the outboard motors;

(b) you acquire them during the policy period.

This exclusion does not apply while the watercraft is stored.

g. arising out of:

(1) the ownership, maintenance, use, loading or unloading of an aircraft;

(2) the entrustment by an **insured** of an aircraft to any person; or

(3) statutorily imposed vicarious parental liability for the actions of a child or minor using an aircraft.

An aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo.

h. caused directly or indirectly by war, including undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

Exclusions d., e., f., and g. do not apply to **bodily injury** to a **residence employee** arising out of and in the course of the **residence employee's** employment by an **insured.**

**2. Coverage E — Personal Liability,** does not apply to:

a. liability:

(1) for your share of any loss assessment charged against all members of an association, corporation or community of property owners;

(2) under any contract or agreement. However, this exclusion does not apply to written contracts:

(a) that directly relate to the ownership, maintenance or use of an **insured location;** or

(b) where the liability of others is assumed by the **insured** prior to an **occurrence;**

unless excluded in (1) above or elsewhere in this policy;

b. **property damage** to property owned by the **insured;**

c. **property damage** to property rented to, occupied or used by or in the care of the **insured.** This exclusion does not apply to **property damage** caused by fire, smoke or explosion;

d. **bodily injury** to any person eligible to receive any benefits:

(1) voluntarily provided; or

(2) required to be provided;

by the **insured** under any:

(1) workers' compensation law;

(2) non-occupational disability law; or

(3) occupational disease law;

e. **bodily injury** or **property damage** for which an **insured** under this policy:

(1) is also an insured under a nuclear energy liability policy; or

(2) would be an insured under that policy but for the exhaustion of its limit of liability.

A nuclear energy liability policy is one issued by:

(1) American Nuclear Insurers;

(2) Mutual Atomic Energy Liability Underwriters;

(3) Nuclear Insurance Association of Canada;

or any of their successors; or

f. **bodily injury** to you or an **insured** within the meaning of part a. or b. of "**insured**" as defined.

QUINCY 000036

Case 3:12-cv-01041-DEP   Document 46-3   Filed 01/17/14   Page 38 of 41

3. **Coverage F—Medical Payments to Others** does not apply to **bodily injury:**

a.  to a **residence employee** if the **bodily injury:**

(1) occurs off the **Insured location;** and

(2) does not arise out of or in the course of the **residence employee's** employment by an **Insured;**

b.  to any person eligible to receive benefits:

(1) voluntarily provided; or

(2) required to be provided;

under any:

(1) workers' compensation law;

(2) non-occupational disability law; or

(3) occupational disease law;

c.  from any:

(1) nuclear reaction;

(2) nuclear radiation; or

(3) radioactive contamination,

all whether controlled or uncontrolled or however caused; or

(4) any consequence of any of these.

d.  to any person, other than a **residence employee** of an **Insured,** regularly residing on any part of the **Insured location.**

# SECTION II—ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability.

1.  **Claim Expenses.** We pay:

a.  expenses we incur and costs taxed against an **Insured** in any suit we defend;

b.  premiums on bonds required in a suit we defend, but not for bond amounts more than the limit of liability for Coverage E. We need not apply for or furnish any bond;

c.  reasonable expenses incurred by an **Insured** at our request, including actual loss of earnings (but not loss of other income) up to $50 per day for assisting us in the investigation or defense of a claim or suit;

d.  interest on the entire judgment which accrues after entry of the judgment and before we pay or tender or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

e.  prejudgment interest awarded against the **Insured** on that part of the judgment we pay. If we make an offer to pay the applicable limit of liability, we will not pay any prejudgment interest based on that period of time after the offer.

2.  **First Aid Expenses.** We will pay expenses for first aid to others incurred by an **Insured** for **bodily injury** covered under this policy. We will not pay for first aid to you or any other **Insured.**

3.  **Damage to Property of Others.** We will pay at replacement cost, up to $500 per **occurrence** for **property damage** to property of others caused by an **Insured.**

We will not pay for **property damage:**

a.  to the extent of any amount recoverable under Section I of this policy;

b.  caused intentionally by an **Insured** who is 13 years of age or older;

c.  to property owned by an **Insured;**

to property owned by or rented to a tenant of an **Insured** or a resident in your household; or

d.  arising out of:

(1) **business pursuits;**

(2) any act or omission in connection with a premises owned, rented or controlled by an **Insured,** other than the **Insured location;** or

(3) the ownership, maintenance or use of aircraft, watercraft or motor vehicles or all other motorized land conveyances.

This exclusion does not apply to a motorized land conveyance designed for recreational use off public roads, not subject to motor vehicle registration and not owned by an **Insured.**

4.  **Loss Assessment.** We will pay up to $1000 for your share of any loss assessment charged during the policy period against you by a corporation or association of property owners, when the assessment is made as a result of:

each **occurrence** to which Section II of this policy would apply;

QUINCY 000037

b.  liability for each act of a director, officer or trustee in the capacity as a director, officer or trustee, provided:

 (1) the director, officer or trustee is elected by the members of a corporation or association of property owners; and

 (2) the director, officer or trustee serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

This coverage applies only to loss assessments charged against you as owner or tenant of the **residence premises**.

We do not cover loss assessments charged against you or a corporation or association of property owners by any governmental body.

Section II — Coverage E — Personal Liability Exclusion 2.a.(1) does not apply to this coverage.

# SECTION II—CONDITIONS

1. **Limit of Liability**. Our total liability under Coverage E for all damages resulting from any one **occurrence** will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of **Insureds**, claims made or persons injured.

   Our total liability under Coverage F for all medical expense payable for **bodily injury** to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations.

2. **Severability of Insurance**. This insurance applies separately to each **Insured**. This condition will not increase our limit of liability for any one **occurrence**.

3. **Duties After Loss**. In case of an accident or **occurrence**, the **Insured** will perform the following duties that apply. You will help us by seeing that these duties are performed:

   a. give written notice to us or our agent as soon as is practical, which sets forth:

    (1) the identity of the policy and **Insured**;

    (2) reasonably available information on the time, place and circumstances of the accident or **occurrence**; and

    (3) names and addresses of any claimants and witnesses;

   b. promptly forward to us every notice, demand, summons or other process relating to the accident or **occurrence**;

   c. at our request, help us:

    (1) to make settlement;

    (2) to enforce any right of contribution or indemnity against any person or organization who may be liable to an **Insured**;

    (3) with the conduct of suits and attend hearings and trials;

    (4) to secure and give evidence, and obtain the attendance of witnesses;

   d. under the coverage — Damage to Property of Others — submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property (if in the **Insured's** control;

   e. the **Insured** will not, except at the **Insured's** own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the **bodily injury**.

4. **Duties of an Injured Person—Coverage F—Medical Payments to Others**.

   The injured person or someone acting for the injured person will, as often as we require:

   a. give us written proof of claim, under oath if required, as soon as is practical; and

   b. authorize us to obtain copies of medical reports and records.

   The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim—Coverage F—Medical Payments to Others**. Payment under this coverage is not an admission of liability by an **Insured** or us.

6. **Suit Against Us**. No action can be brought against us unless there has been compliance with the policy provisions.

   No one will have the right to join us as a party to any action against an **Insured**. Also, no action with respect to Coverage E can be brought against us until the obligation of the **Insured** has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured**. Bankruptcy or insolvency of an **Insured** will not relieve us of our obligations under this policy.

8. **Other Insurance — Coverage E — Personal Liability**. This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

Copyright, Insurance Services Office, Inc., 1984

HO-3 Ed. 4-84

QUINCY 000038

# SECTIONS I AND II—CONDITIONS

1. **Policy Period.** This policy applies only to loss in Section I or **bodily injury** or **property damage** in Section II, which occurs during the policy period.

2. **Concealment or Fraud.** We do not provide coverage for an **Insured** who has:

   a. intentionally concealed or misrepresented any material fact or circumstance; or

   b. made false statements or engaged in fraudulent conduct;

   relating to this insurance.

3. **Liberalization Clause.** If we adopt a revision which would broaden the coverage under this policy without additional premium within 60 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

4. **Waiver or Change of Policy Provisions.**

   A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

5. **Cancellation.**

   a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

   b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations.

   Proof of mailing will be sufficient proof of notice.

   (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

   (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

   (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

   (a) if there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

   (b) if the risk has changed substantially since the policy was issued.

   This can be done by letting you know at least 30 days before the date cancellation takes effect.

   (4) When this policy is written for a period of more than one year, we may cancel for any reason at anniversary by letting you know at least 30 days before the date cancellation takes effect.

   c. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

   d. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

6. **Non-Renewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

7. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

8. **Subrogation.** An **Insured** may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

   If an assignment is sought, an **Insured** must sign and deliver all related papers and cooperate with us.

   Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

9. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

   a. we insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

   b. **Insured** includes:

   (1) any member of your household who is an **Insured** at the time of your death, but only while a resident of the **residence premises;** and

   (2) with respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

HO-3 Ed. 4-84            Copyright, Insurance Services Office, Inc., 1984            **Page 15 of 15**

MUTUALS – MEMBERSHIP AND VOTING NOTICE: The insured is notified that by virtue of this policy, he is a member of Quincy Mutual Fire Insurance Company of Quincy, Massachusetts, and is entitled to vote either in person or by proxy at any and all meetings of said Company. The Annual Meetings are held in its Home Office, on the first Wednesday of February, in each year, at 2 o'clock (P.M.).
This policy is Nonassessable. The holder of this policy is not subject to any contingent liability, nor liable to assessment.

MUTUALS – PARTICIPATION CLAUSE WITHOUT CONTINGENT LIABILITY: No Contingent liability: This policy is nonassessable. The policyholder is a member of the Company and shall participate, to the extend and upon the conditions fixed and determined by the Board of Directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

  In Witness Whereof, the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

_James J. Moran Jr._
**Secretary**

_R Douglas Briggs_
**President**

# EXHIBIT B

Page 1

1   UNITED STATES DISTRICT COURT        Volume  I
    NORTHERN DISTRICT OF NEW YORK       Exhibits: 1-13
2                                       Case No.: 3:12-CV-1041
3

4

5

6   QUINCY MUTUAL FIRE INSURANCE
    COMPANY,
7

                      Plaintiff
8

     VS.
9

10  NEW YORK CENTRAL MUTUAL FIRE
    INSURANCE COMPANY
11

                      Defendant
12

13

14

                      DEPOSITION of  JAMES HARDY, a Witness
15

    called by Counsel on behalf of  the Defendant, before
16

    Susan Baxter,  a Court Reporter and Notary Public  in
17

    and for the Commonwealth of  Massachusetts, at Quincy
18

    Mutual Fire Insurance Company, 57 Washington Street,
19

    Quincy, Massachusetts, 02169,  Tuesday, April 23,
20

    2013, commencing at 10:21 a.m.
21

22

23

24      Job No. CS1650410

Page 27

1   Q.   Do you still want to make sure that your notepad

2        entries are timely and completed?

3   A.   I try to.

4   Q.   And you also, in terms of your handling, do you

5        want to ensure that the reserves are properly set?

6   A.   It's one of the things you look at, yes.

7   Q.   In terms of setting those reserves, do you

8        personally then evaluate and assess a Plaintiff's

9        damages?

10  A.   In a primary case, yes.

11  Q.   How about umbrella?

12  A.   Monitor it, but there's little you can do in an

13       excess case until primary exposure.

14  Q.   Do you know who was handling the claim from the

15       primary policy in this particular case?

16  A.   I believe it was Mr. Monahan.

17  Q.   Did you have any personal discussions with

18       Mr. Monahan regarding this particular case

19       throughout the course of the litigation?

20  A.   Not that I remember.

21  Q.   If you did have any personal conversations with

22       him, would they be reflected somewhere in your

23       claim file?

24  A.   My notepad, yes.

Page 70

1    Q.    Now in that entry for September 12, 2007 on Page

2          113, you indicate that you were greatly concerned

3          about their handling, meaning New York Central,

4          and their good faith efforts to resolve the case;

5          do you see that?

6    A.    Yes.

7    Q.    Do you mention anything in there about good faith

8          efforts on the part of Quincy Mutual?

9    A.    It was not our issue.

10                   MR. JENNETTE: Answer the question.

11   Q.    That's your understanding, it was not your issue

12         at that time?

13   A.    Yes.

14   Q.    What do you base that on?

15   A.    We are excess carrier.

16   Q.    Let's go back then to Exhibit 6, the Barnes letter

17         dated June 4, 2007, where he's making the claim

18         that Quincy Mutual is also dealing in bad faith.

19         Despite receiving that particular letter, was it

20         still your impression then as of September 12,

21         2007 that it was not your issue to deal with?

22   A.    Yes.

23   Q.    What do you base that on?

24   A.    We're the excess carrier.

Page 82

| | | |
|---|---|---|
| 1 | Q. | That's a letter dated June 11, 2007 from Frank |
| 2 | | Losurdo to yourself; is that correct? |
| 3 | A. | Yes. |
| 4 | Q. | In a response to this particular letter, do you |
| 5 | | have any recollection of contacting Mr. Losurdo? |
| 6 | A. | No, I don't. |
| 7 | Q. | In response to this particular letter, did you |
| 8 | | have any discussion with anybody within the |
| 9 | | company? |
| 10 | A. | I don't recall. |
| 11 | Q. | If you look at Paragraph 2 of that letter, he |
| 12 | | indicates that counsel, meaning Plaintiff |
| 13 | | attorney, has asserted that the insurance carriers |
| 14 | | are not negotiating in good faith; do you see |
| 15 | | that? |
| 16 | A. | Yes. |
| 17 | Q. | Did you have any opinion at that time as to |
| 18 | | whether or not Quincy Mutual was acting in good |
| 19 | | faith? |
| 20 | A. | Oh, yes. |
| 21 | Q. | What do you base that on? |
| 22 | A. | The fact that we -- it was not our call.  It's |
| 23 | | still a primary case.  We had no basis for |
| 24 | | negotiating at that point.  It was not our call. |

Page 83

1   Q.   Even though then Mr. Warden is also Quincy

2        Mutual's insured in addition to that of New York

3        Central, was it your position that it was New York

4        Central's primary handling of this file which

5        would take precedence over Quincy Mutual's

6        handling of the file?

7   A.   Yes.

8               MR. JENNETTE: Objection.

9   Q.   Up through June of 2007, is it your position that

10       you were handling this file in accordance with the

11       policies and procedures of Quincy Mutual?

12  A.   Yes.

13  Q.   And were you of the opinion that you were

14       protecting your insured, Mr. Warden, as of June

15       2007?

16  A.   Yes.

17  Q.   Now on the next entry on Page 115 of your notepad,

18       Exhibit 1, there's a date there February 23, 2009,

19       R. Congdon; do you see that?

20  A.   Yes.

21  Q.   Who would have typed that in?

22  A.   He would have.

23  Q.   And he requested an update; is that right?

24  A.   That's what it says.

Page 106

1

2

3                    C E R T I F I C A T E

4

5           COMMONWEALTH OF MASSACHUSETTS

6    PLYMOUTH, ss.

7              I, Susan Baxter, a Court Reporter and Notary

8         Public in and for the Commonwealth of

9         Massachusetts, do hereby certify:

10             That JAMES HARDY, personally appeared before

11        me and proved to me to be the Witness whose

12        testimony is hereinbefore set forth.  He was duly

13        sworn by me; his testimony thereupon given was

14        recorded by me and transcribed by me, and such

15        deposition is a true record of the testimony given

16        by said witness, to the best of my knowledge,

17        skill and ability.

18             IN WITNESS WHEREOF, I hereunto set my hand

19        and notarial seal this 6th day of May, 2013.

20

21

                        Susan Baxter

22                      Notary Public

                        My Commission Expires

23                      February 23, 2018

24

# EXHIBIT C

DEPOSITION OF DAVID J. MONAHAN, MARCH 26, 2013

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

QUINCY MUTUAL FIRE
INSURANCE CO.,

      Plaintiff,

vs.                                    Case No. 3:12-CV-1041

NEW YORK CENTRAL MUTUAL
FIRE INSURANCE CO.

      Defendant.

_____/

      Deposition of DAVID J. MONAHAN, held on
Tuesday, March 26, 2013, at Accurate Court Reporting,
Landmark Theatre, 108 West Jefferson Street, Suite 302,
Syracuse, New York, commencing at 10:00 a.m., before
David T. Robinson, Court Reporter and Notary Public in
and for the State of New York.