# 14-1377-cv

## United States Court of Appeals

*for the*

## Second Circuit

QUINCY MUTUAL FIRE INSURANCE CO.,

*Plaintiff-Appellee,*

— v. —

NEW YORK CENTRAL MUTUAL FIRE INSURANCE CO.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

SCOTT R. JENNETTE
WILLIAM R. LEINEN
WARD GREENBERG HELLER & REIDY LLP
*Attorneys for Plaintiff-Appellee*
300 State Street
Rochester, New York 14614
(585) 454-0700

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-appellee Quincy Mutual Fire Insurance Company ("Quincy") is a corporation organized under the laws of the Commonwealth of Massachusetts with no parent corporation and no publically held corporation owns more than 10% of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ..............................................................................v

STATEMENT OF ISSUES ................................................................................1

STATEMENT OF THE CASE ...........................................................................2

    A. The Accident and the Action .................................................................2

    B. NYC's Assumption of the Defense ........................................................2

    C. Quincy's Initial Involvement ................................................................3

    D. Horton's Traumatic Injuries and Treatment .........................................4

    E. Discovery Depositions ..........................................................................4

    F. The Defense IME ..................................................................................5

    G. Summary Judgment ..............................................................................5

    H. Lost Settlement Opportunity No.1 ........................................................6

    I. Summary Judgment Affirmed ...............................................................7

    J. Damages Trial Scheduled .....................................................................8

    K. Lost Settlement Opportunity No.2 ......................................................10

    L. Plaintiff's Additional Surgeries .........................................................12

    M. NYC's Trial Strategy .........................................................................13

    N. Events Leading to October 2009 Damages Trial ...............................14

    O. Resolution of the Action.....................................................................14

    P. The District Court's Decision .............................................................16

SUMMARY OF THE ARGUMENT ................................................................19

STANDARD OF REVIEW ..............................................................................22

ARGUMENT ...................................................................................................24

POINT I:

NYC'S PROTRACTED DELAY IN TENDERING ITS POLICY WAS BAD FAITH AND CAUSED DAMAGES TO QUINCY ...............................................24

A. NYC Acknowledged it Owed Quincy a Duty to Settle the Action in Good Faith ....................................................................................................24

B. NYC Breached its Duty to Settle in Good Faith ...............................25

1. Liability was Resolved by December 2005. ..................................25

2. NYC was, or should have been, Aware that the Verdict Potential Exceeded its $500,000 Policy. ....................................................25

a. Evidence of Horton's Damages Known to NYC when the First Opportunity to Settle was Available (December 2005 to January 2007) ....................................................................................25

b. Evidence of Horton's Damages Known to NYC When the Second Opportunity to Settle was Available in July 2007 .....................29

3. The District Court Properly Concluded that NYC's Failure to Conduct a Timely Verdict Potential Assessment Evinced its Bad Faith ...................30

4. The District Court Properly Found that NYC's Intractable Settlement Position was in Bad Faith and Placed Quincy's Policy at Risk....................35

C. The District Court Properly Determined that NYC's Bad Faith Conduct Caused it to Lose Two Opportunities to Settle ...............................40

1. First Lost Opportunity: December 2005 – January 2006 ............40

2. Second Lost Opportunity:  Plaintiff was willing to Settle for $750,000 During July 2007 .........................................................................44

POINT II:

NYC'S MITIGATION DEFENSE HAS NO MERIT.............................................46

A. NYC Waived the Right to Assert its Mitigation Defense ..............47

1. NYC Failed to Plead Mitigation ..................................................47

2. NYC's Mitigation Theory on Appeal was Never Raised Below.................48

B. NYC's Mitigation Defense is Contrary to New York Law..............49

1. Quincy had no Duty to Step Down and Tender the Primary Limits to Remedy NYC's Bad Faith Failure to Settle..................................................49

2. The Cases Cited by NYC are Inapposite .......................................................53

3. Certification to the Court of Appeals is not Warranted ...............................54

C. NYC Failed to Carry its Burden to Establish its Mitigation Defense ............57

POINT III:
THE DISTRICT COURT PROPERLY AWARDED PREJUDGMENT
INTEREST FROM THE TIME OF NYC's BREACH OF ITS FIDUCIARY
DUTY TO SETTLE IN JANUARY 2006...............................................................61

POINT IV:
REMAND IS APPROPRIATE FOR ADJUDICATION OF QUINCY'S SECOND
CAUSE OF ACTION .............................................................................................63

CONCLUSION .......................................................................................................64

CERTIFICATE OF COMPLIANCE.......................................................................65

# TABLE OF AUTHORITIES

## CASES

*Agway, Inc. v. Travelers Indem. Co.,* 1993 U.S.Dist. LEXIS 21092
(N.D.N.Y 1993) ................................................................................52

*Ali v. Fed. Ins. Co.* 719 F.3d 83 (2d Cir. 2012) ......................................49

*Ariz. Premium Fin. Co. v. Employers Ins. of Wausau*, 2014 U.S. App.
LEXIS 18100 (2d Cir. 2014) ...................................................... 23, 61

*Barrowman v. Niagara Mohawk Power Corp.*, 252 A.D.2d 946
(4th Dept. 1998) ..............................................................................31

*Bessemer Trust Co., N.A. v. Banin¸* 618 F.3d 76 (2d Cir. 2010) ............................22

*California Union Ins. Co. v. Excess Ins. Co.*, 780 F. Supp. 1010
(S.D.N.Y. 1991) ...............................................................................33

*Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.*, 176 F.3d 601
(2d. Cir. 1999) ..................................................................................58

*Carrols Equities Corp. v. Villanave*, 57 A.D.2d 1044 (4th Dept. 1977) ................58

*Certain Underwriters of Lloyds v. General Acc. Ins. Co.,* 699 F.Supp. 732
(S.D. Ind. 1988) ...............................................................................50

*Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103
(2d Cir. 1991) ..................................................................................55

*Continental Casualty Co. v. U.S. Fidelity & Guarantee Co.*, 516 F.Supp. 384
(N.D. Cal. 1981) ..............................................................................57

*Denham v. Bedford*, 407 Mich. 517 (1980) ...........................................................63

*Diblasi v. Aetna Life & Cas. Ins. Co.*, 147 A.D.3d (2d Dept. 1989) ............... 26, 34

*Diebold Found., Inc. v. Comm'r*, 736 F.3d 172 (2d Cir. 2013) ..............................22

*Doherty v. Merchants Mut. Ins. Co*., 74 A.D.3d 1870 (4th Dept. 2010)................30

*Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288 (2d Cir. 1961)........58

*Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399 (1993) ..........................62

*Fed. Ins. Co. v. Liberty Mut. Ins. Co.*, 158 F.Supp.2d 290 (S.D.N.Y. 2001) ... 44, 45

*Fed. Ins. Co. v. The Estate of Irving Gould*, 2011 LEXIS 114000
    (S.D.N.Y. 2011)........................................................................................50

*Feliberty v. Damon*, 72 N.Y.2d 112 (1988)................................................................39

*Fieldston Prop. Owners Ass'n v. Hermitage Ins. Co.,* 16 N.Y.3d 257 (2011)........49

*Forest Ins. v. American Motorists Ins. Co.¸* 1994 U.S.Dist. LEXIS 3334
    (S.D.N.Y. 1994)........................................................................................44

*General Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377
    (3d Cir. 1992) ...........................................................................................39

*Geron v. Seyfarth Shaw LLP*, 736 F.3d 213(2d Cir. 2013) .....................................55

*GMAC v. Nationwide Ins. Co.*, 4 N.Y.3d 451 (2005)........................................ 49, 50

*Gordon v. Nationwide Mut. Ins.* Co., 37 A.D.2d 265 (2d Dept. 1971) ..................47

*Gordon v. Nationwide*, 30 N.Y.2d 427 (1972) ........................................................47

*Greenidge v. Allstate Ins. Co.,* 446 F.3d 356 (2d Cir. 2006)..................................53

*Hartford Ins. Co. v. Methodist Hosp.,* 785 F.Supp. 38 (E.D.N.Y. 1992)...............45

*Home Ins. Co. v. Liberty Mut.  Ins.Co.*, 678 F.Supp. 1066 (S.D.N.Y. 1988)..........49

*Home v. Royal Indem. Co.* 68 Misc.2d 737 (N.Y. Co.), *aff'd*, 39 A.D.2d
    678 (1st Dept. 1972)................................................................................53

*Huff v. Rodriguez*, 45 A.D.3d 1430 (4th Dept. 2007)..............................................32

*In re AXIS Reinsur. Co. Refco Related Ins. Litig.*, 2010 U.S.Dist. LEXIS 33377
(S.D.N.Y. Mar. 7, 2010) ......................................................................23

*Kack v. National Union Fire Ins. Co.*, 20 S.W.3d 692 (S.Ct. Tx. 2000)................56

*Kirschhoffer v. Van Dyke*, 173 A.D.2d 7 (3d Dept. 1991) .....................................31

*Knobloch v. Royal Globe Ins. Co.*, 38 N.Y.2d 471 (1976).............................. 30, 46

*Korea Life Ins. Co., Ltd. v. Moran Guar. Trust Co. of N.Y.*, 2004 U.S.Dist.
LEXIS 16436 (S.D.N.Y. 2004) .......................................................58

*LaSalle Bank Nat'l Assoc. v. Nomura's at Capital Corp.*, 72 A.D.3d 409
(1st Dept. 2010) ...........................................................................57

*Leonard v. Unisys Corp.*, 238 A.D.2d 747 (3d Dept. 1997)...................................32

*Levantino v. Ins. Co. of North America*, 102 Misc. 2d 77 (Suffolk Co. 1979) .......59

*Lienemann v. State Farm Mut. Auto Fire and Cas. Co.*, 540 F.2d 333
(8th Cir. 1976) ...............................................................................56

*Lipshie v. Lazarus*, 235 N.Y.S.2d 764 (N.Y. Co. 1962)........................................59

*Love v. State*, 78 N.Y.2d 540 (1991)......................................................................62

*Matsushita Elec. Corp. of America v. Gottlieb*, 1991 U.S.Dist. LEXIS 10511
(S.D.N.Y. 1991)..............................................................................58

*Miller v. Lovett*, 879 F.2d 1066 (2d Cir. 1989)................................................ 48, 60

*Morgenstern v. County of Nassau*, 2009 U.S.Dist. LEXIS 116602
(E.D.N.Y. 2009) ............................................................................47

*NES Fin. Corp. v. JPMorgan Chase Bank, N.A.*, 556 Fed. Appx. 13
(2d Cir. 2014) ................................................................................22

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.*,
295 F.3d 232 (2d Cir. 2002) ........................................... 23, 41, 43, 46

*New England Ins. Co., v. Healthcare Underwriters Mut. Ins Co.,*
352 F.3d 599 (2d Cir. 2003) ................................................................62

*New England Ins. Co., v. Healthcare Underwriters Mut. Ins. Co.*,
333 F.Supp.2d 87 (E.D.N.Y. 2004).....................................................62

*Pavia v. State Farm Mut. Auto Ins. Co.*, 82 N.Y.2d 445 (1993) .......... 26, 38, 40, 55

*Pinto v. Allstate Ins. Co.¸* 221 F.3d 394 (2d Cir. 2000)..................................passim

*Poole v. CONRAIL*, 242 A.D.2d 966 (4th Dept. 1997) ...........................................32

*Reifenstein v. Allstate Ins. Co.*, 92 A.D.2d 715 (4th Dept. 1983)...........................46

*Russo v. Rochford¸* 123 Misc.2d 55 (Queens Co. 1984) ........................................53

*Scottsdale Ins. Co. v. Indian Harbor Ins. Co.¸* 994 F.Supp.2d 438
(S.D.N.Y. 2014)................................................................................ passim

*Solutia Inc. v. FMC Corp.*, 456 F.Supp.2d 429 (S.D.N.Y. 2006) ..........................48

*St. Paul Fire & Marine Ins. Co. v. United States Fidelity & Guaranty Co.,* 43
N.Y.2d 977 (1978)..............................................................................35

*State Farm Fire & Cas. Co. v. LiMauro*, 65 N.Y.2d 369 (1985) ...........................49

*State v. Merchants Ins. Co. of N.H.,* 109 A.D.2d 935 (3d Dept. 1985)...... 40, 43, 44

*Stone v. Satriana*, 41 P.3d 705 (Colo.2002) ..........................................................59

*Taveras v. American Tr. Ins. Co.*, 33 Misc.3d 1210(A) (Kings Co. 2011) .............32

*Technest Holding, Inc. v. Deer Creek Fund, LLC*, 2008 U.S.Dist. LEXIS
61560 (S.D.N.Y. 2008).......................................................................57

*Transcare N.Y., Inc. v. Finkelstein, Levine & Gittlesohn & Partners*, 23 A.D.3d
250 (1st Dept. 2005) ..........................................................................32

*Travelers Indem. Co. v. Arch Spec. Ins. Co*., 2012 U.S.Dist. LEXIS 80775 (E.D.
Cal. 2012) ........................................................................................33

*Travelers Indem. Co. v. Arch Spec. Ins. Co.*, 2012 U.S.Dist. LEXIS 80775
   (E.D. Cal. 2012)....................................................................56

*Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251 (2003) ...........................................33

*Valentine v. Aetna Ins. Co.*, 564 F.2d 292 (9th Cir. 1977) ....................................51

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc,* 396 F.3d 96 (2d Cir. 2005) ..................49

*West American Ins. v. RLI Ins. Co.,* 2013 U.S.Dist. LEXIS 47284
   (W.D. Mo. 2013) ....................................................................56

*White v. White Rose Food,* 237 F.3d 174 (2d Cir. 2001)................................. 22, 23

*Young v. American Cas. Co.*, 416 F.2d 906 (2d Cir. 1969)........................ 32, 44, 46

## OTHER AUTHORITIES

N.Y.P.J.I. 4:67................................................................... 26, 34, 47

## RULES

C.P.L.R. §1411..................................................................................48

C.P.L.R. §5001(b)..............................................................................62

Fed. R. Civ. P. 8(c)...........................................................................47

## STATEMENT OF ISSUES

1.    Whether it was clearly erroneous for the District Court to find that New York Central Mutual Fire Insurance Company ("NYC") grossly disregarded Quincy's interests by its failure to perform a timely case assessment and by its long-standing refusal to tender its limits until the eve of trial even though liability was clear, the claimant sustained catastrophic spinal injuries, significant special damages were projected, and substantial interest was mounting.

2.    Whether it was clearly erroneous for the District Court to find that, as a direct and proximate result of its bad faith, NYC lost opportunities to settle in December 2005 and July 2007 when liability was clear and NYC should reasonably have anticipated that the verdict potential exceeded the primary coverage.

3.    Whether the District Court properly concluded that Quincy, as an excess carrier, did not have a duty to contribute to the defense or indemnity of the Action until NYC's policy limits were exhausted.

4.    Whether the District Court abused its discretion in awarding pre-judgment interest from the earliest date of the breach (December 2005) pursuant to C.P.L.R 5001.

## STATEMENT OF THE CASE

### A.    *The Accident and the Action*

On November 21, 2000, Horton was travelling 50+ MPH into an intersection with the right of way in a 55 MPH zone. (A-1762).  At the same time, Warden, pulled from a stop sign into Horton's lane causing a collision. (*Id.*).  Horton was a 37-year old married mother of three, and was employed as a nurse full-time, earning $12.36/hr.  (A-33, ¶14).

Horton's attorney D'Amato commenced a civil action against Warden on October 18, 2001 seeking $1,000,000 for personal injuries. (A-32, ¶¶6-8).

### B.    *NYC's Assumption of the Defense*

Warden had a $500,000 primary liability policy with NYC, and a $1,000,000 umbrella policy with Quincy, which did not trigger until NYC's underlying policy was exhausted.  (A-31, ¶¶1-4; A-740-42).

NYC accepted coverage without reservation and assigned the adjustment of the claim to Monahan under the supervision of Wildey.  (A-32, ¶11).  Monahan's settlement authority was limited to $75,000; additional authority had to be obtained from his supervisor or the Claims Committee. (A-450).  NYC retained attorney Losurdo to defend Warden. (A-33, ¶13).

NYC assumed control of the defense and was responsible for authorizing retention of experts, defense strategy, and determining the amount and timing of

settlement offers. It also had the duty to promptly investigate, assess verdict potential, and to tender its policy limits when liability was clear and the damages exceeded its coverage. Finally, NYC had an obligation to keep Warden and Quincy abreast of settlement negotiations and consider their interests. (A-355-56; A-457-61, A-598-600, A-611). Despite acknowledgement of these duties, NYC did not have *any* written policies for the adjustment of claims. (A-348-49; A-456-57).

Before the Action was filed, NYC concluded that Warden was negligent for failing to yield the right of way and paid 100% of Horton's property damage claim. (A-476; A-1525; A-1426).

Horton had two prior motor vehicle accidents and a history of degenerative disc disease. (A-1529-30). However, she was asymptomatic at the time of the accident. (A-1784; A-2065; A-35, ¶29).

## C.    *Quincy's Initial Involvement*

Quincy accepted coverage and assigned the claim to Hardy. (A-33, ¶12). As the excess insurer, Quincy passively monitored the claim for exposure beyond the $500,000 primary policy limits. (A-790). In December 2001, Hardy requested Monahan to contact him. (A-1739). Monahan corresponded: "At this time, we feel we do have adequate coverage for the damages the plaintiff has sustained." (A-1751). Based upon this assurance, Hardy closed his file. (A-381-82).

3

**D.    *Horton's Traumatic Injuries and Treatment***

NYC's initial impression was that Horton suffered minor injuries.  (A-1522).  However, it soon learned her injuries were serious.   In June 2001, Horton's neurosurgeon concluded she suffered from "disabling lower back pain with radiation through the right leg since the car accident."  (A-2318-19; A-1785). In 2001-2004, Horton underwent three spinal surgeries, including a fusion at the L4-L5 level and a surgical repair of a large hernia. (A-33, ¶18; A-2321; A-33, ¶20; A-34, ¶21; A-2342; A-36, ¶34). The surgeries left extensive, permanent abdominal scars.  (A-601-02).

Horton's physician placed her on permanent disability; she never returned to work following the accident. (A-33, ¶15; A-2346; A-321; A-505).

In September 2003, NYC received an IME report, concluding that Horton had "Major Depression" and "Post-Traumatic Stress Disorder" as a result of the accident.   (A-34-35,  ¶¶25-26; A-1777). As a matter of policy, NYC did not authorize Losurdo to retain experts to counter these findings.   (A-507).

**E.    *Discovery Depositions***

In March 2003, Losurdo sent a deposition report to Monahan, stating, among other things "[t]here is the potential for a large lost wage claim."  (A-34, ¶23; A-1767).  In March 2003, NYC increased its reserve to $175,000, based on the "two surgeries and the lost wage issue." (A-34, ¶23; A-490).

In August 2003, Losurdo advised NYC that he "expect[ed] that the majority of fault will be assessed to our insured" and that "we have limited evidence to defeat" a motion for summary judgment on liability. (A-34 ¶24; A-1768). Monahan concurred. (A-494).

## F.     The Defense IME

Horton underwent a defense IME in December 2003. (A-35, ¶27). In Dr. Avellenosa's report, he concluded Horton's disc injuries were caused by the accident, that her surgeries were medically necessary, and that she has a "significant and permanent injury." (A-35, ¶¶27-29; A-1784). Monahan conceded that this report "was not a good development for the defense." (A-504).

Quincy was provided with a copy of the report and reactivated its file for monitoring in February 2004. (A-1404).

## G.     Summary Judgment

In November 2004, Losurdo advised NYC that plaintiff filed a motion for summary judgment on liability and serious injury, and "expected that the liability would be assessed against our insured at trial," regardless of the outcome of the motion. (A-36, ¶32-33; A-1809).

On May 18, 2005, Horton's summary judgment motion was granted, causing 9% interest to accrue. (A-36-7, ¶¶36, 39; A-519-20). Although NYC knew that an appeal had "no legal basis" and "not much of a chance of succeeding," it

5

nonetheless authorized Losurdo to proceed to create leverage for settlement. (A-36-37, ¶¶37-40; A-522-525).

## H.     Lost Settlement Opportunity No.1

In December 2005, in advance of a settlement conference, D'Amato, with his client's fully authority, demanded NYC's $500,000 policy. (A-37, ¶41; A-1036-39; A-1036-39). NYC, through Losurdo, offered $75,000. (A-299; A-37, ¶42).

Contrary to NYC's assertions, D'Amato testified that the conference did not occur because Losurdo told him that NYC was unwilling to offer more than $75,000. (A-1035-38).

In January 2006, Losurdo informed D'Amato that Warden had a $1M excess policy with Quincy. (A-1041-42).[1] Following this disclosure, D'Amato kept his $500,000 settlement offer open until January 2007. (A-1042-47, A-1164-67 ("[E]ven after [the $1M excess policy] was disclosed, the appeal was pending. I never raised my demand … I didn't raise it until we had another settlement conference [in January 2007] … NYC never came to the table to negotiate.").

---

[1] Although NYC shirks responsibility for non-disclosure of the coverage, it neglected to state that D'Amato made a written request to NYC to disclose Warden's coverage in December 2000 pursuant to Insurance Law 3420(f)(2)(A). (A-1729). In response, NYC disclosed only its $500,000 policy limits. (A-1730).

(A-1167; *see also* A-1830). Monahan was aware that Horton was willing to settle for the policy up to January 2007. (A-540).

D'Amato testified that following NYC's $75,000 settlement offer in December 2005, NYC showed no interest in negotiating. (A-1052-53). Monahan conceded that although the appeal was perfected to create leverage, NYC did not do anything "to take advantage of that situation" and never gave Losurdo more authority. (A-533-34; A-529, 611).

Tellingly, NYC never called Losurdo as a witness to counter D'Amato's testimony or to validate its settlement position.

## I.  *Summary Judgment Affirmed*

In August 2006, the Appellate Division affirmed, finding defendant's liability and medical causation arguments "meritless." (A-37, ¶¶43-44). NYC conceded that the "case wasn't looking very good for the defense" at this point and that it had no viable defenses on liability, serious injury and causation. (A-38, ¶45; A-318, A-370-73; A-534-37).[2] Although plaintiff's $500,000 demand was kept open for an additional five months, (A-1051-53, 1167), NYC made no effort to settle. (A-537).

---

[2] NYC's interrogatory responses identify August 9, 2006 as the date it learned that liability and proximate causation were certain. (A-1393).

## J.     *Damages Trial Scheduled*

The case was remanded, and at a pretrial conference in January 2007, the damages trial was scheduled for August 2007.  (A-1828).  Frustrated with NYC unwillingness to "come to the table," D'Amato substantially increased his demand from $500,000 to $3.5M in January 2007 based on consultations with experts. (A-38, ¶48; A-1065-66).   Horton's expert disclosure, served in February 2007, contained opinions that Horton was permanently and totally disabled and suffered $1.2M in wage loss and $2.4M-$4.4M in life care expenses.  (A-38, ¶¶48-51).

Monahan admitted that a "big verdict" was possible in light of these disclosures.  (A-599).  Yet, he did not adjust NYC's offer.  (A-537).   Instead, he authorized Dr. Avellanosa in March 2007 to prepare an addendum to his 2003 IME report, concluding that Horton could perform sedentary work in a limited capacity. (A-1967).  However, his opinion was based on an outdated medical records review conducted in February 2006.  (A-1967).   Losurdo also served vocational rehabilitation and economic lost wage reports, based on the opinion of Dr. Avellanosa.  (A-1960; A-1967; A-553, 574, 607).  NYC did not authorize Losurdo to retain a life care expert despite a request by its insured.  (A-38, ¶51; A-546-57; A-2034).

In May 2007, Quincy requested NYC's assessment of the value of the Action.  (A-1559).   Although NYC raised its internal reserves for the claim to

8

$375,000 in May 2007, (A-40, ¶¶63-4), and "internally, NYC recognized this as a significant case," (A-555), NYC did not respond. (A-761-62).

In early 2007, after receiving notice of plaintiff's $3.5M demand, Warden retained attorney Schlather, an experienced litigator (A-627-28), to represent his interests. (A-39, ¶55; A-628-29).

In June 2007, a pretrial conference was held before Justice Garry. (A-41, ¶65). At this conference, D'Amato lowered his demand from $3.5M to $1.5M to give NYC the opportunity "to try to come to the table and resolve the case." (A-41, ¶66, A-1065-66). NYC did not budge. (A-41, ¶67-68) D'Amato described NYC's position as:

> ridiculous, me bidding against myself because [NYC was] still at $75,000. They don't move. So I go from the demand of $3.4 or $3.5 to within the coverage, and they're still doing nothing.

(A-1062-64). Schlather also considered NYC's offer "a nonstarter," "not a good faith offer," "problematic for [Warden]" and "absolutely untenable." (A-646-649).

D'Amato sent a letter asserting that the damages were likely to exceed the available coverage, that NYC's failure to tender its policy was in bad faith, that Dr. Avellanosa's license had been suspended, that Horton was granted social security disability, and that Horton was being treated for depression. (A-41, ¶68).[3]

---

[3] This letter confirms that D'Amato was continuing to press the psychological claim, despite NYC's assertions to the contrary. (NYC Br. at 8).

9

Monahan acknowledged Dr. Avellanosa's disciplinary problems were a significant mar to his credibility and that this development increased the verdict potential. (A-42, ¶70; A-564-65). Monahan was made aware that, at the pretrial conference, Justice Garry:

> was putting significant pressure on NYC to increase its offer of $75,000 … she viewed this as a significant case with potential over the NYCM coverage (she relied on the fact that negligence and serious injury had been decided as a matter of law and our own expert, Dr. Avellanosa indicates that this is a significant injury as quoted in the appellate decision.)

(A-41, ¶69).

However, in response to plaintiff's bad faith letter and the Judge's urgings, NYC still refused to increase its offer. (A-42, ¶71; A-2030).

## K.    *Lost Settlement Opportunity No.2*

Counsel convened at another pretrial conference in July 2007. (A-42, ¶72). At this conference, Justice Garry continued to apply pressure on Losurdo to encourage NYC to negotiate. (A-2032). In addition, D'Amato advised Schlather that he had Horton's authority to settle the Action for $750,000 and authorized Schlather to convey Horton's position to Losurdo. (A-1083-84, 1093-94). D'Amato chose to negotiate through Schlather because settlement talks with Losurdo and NYC "were going nowhere." (*Id*.) In accordance therewith, Schlather wrote:

10

> At the pre-trial conference held in the case on July 13, 2007, plaintiff's counsel stated that if New York Central Mutual offered its policy limits ($500,000), the plaintiff would negotiate a settlement within the limits of the umbrella coverage. My sense is that the plaintiff is prepared to settle the case for less than $1,000,000 in toto."[4]

(A-43, ¶¶76-77; A-2034). Had NYC tendered, Quincy's Claims Manager would have authorized a contribution of $250,000. (A-768).

Incredibly, instead of engaging in settlement negotiations, NYC responded by refusing to increase its $75,000 offer and invited Warden to contribute his own money. (A-2037; A-43, ¶79). Monahan admitted he did not "have any information to believe that Schlather's representation" that the Action could have been settled for less than $1M was incorrect. (A-578-82). In fact, Monahan conceded that "[NYC] did not avail itself of [the] opportunity" to negotiate with Schlather or plaintiff's attorney in July 2007 and that the facts set forth in Schlather's case assessment were accurate. (A-579-82, 594-95).

In August 2007, Quincy was "greatly concerned" with NYC's efforts to resolve the case because "no negotiations [were] moving forward with anybody."

---

[4] Although Schlather was unable to recall the specific amount at trial, he confirmed that the conversation took place and that the amount conveyed by D'Amato was less than $1Million. In any event, D'Amato testified that he demanded $750,000. (A-1083-84, 1093-94).

(A-1353). As a result, Quincy retained attorney Leonard to evaluate the case and to apply pressure on NYC to negotiate. (A-43, ¶81; A-772; A-1412).

## L.    *Plaintiff's Additional Surgeries*

At the July 2007 conference, Justice Garry adjourned the trial because Horton's physician recommended an *additional* spinal fusion to her spine at the L5-S1 segment. (A-43, ¶73). In December 2007, Horton underwent a spinal fusion at the L5-S1 level. (A-44, ¶82). In 2008, Horton underwent a *sixth* surgical procedure, involving the repair of a hernia caused by the most recent fusion surgery. (A-44, ¶88).

According to Monahan, an additional fusion "was not a good development for the defense" and increased the value of the case. (A-573-74; A-322). Monahan further admitted that the additional fusion rendered moot Dr. Avellanosa's 2007 addendum report, as well as the defendant's vocational and lost wage expert reports. (A-607).

Thus, by 2007, NYC had no expert opinions to rebut plaintiff's injuries, let alone her $2M-4M special damages claim. Although Monahan admitted this was a "good time to try to get the case settled," (A-593), NYC refused to increase its $75,000 offer. (A-575). Instead, Monahan allowed the case to go "off [his] radar screen" for the remainder of 2007 and all of 2008, on the pretext that he was awaiting the outcome of Horton's additional spinal fusion surgery so he could

further evaluate the case. (A-338-39, 595). Monahan acknowledged the absurdity of this position at trial. (A-338-39). Monahan was also aware that this delay was not beneficial to the defense as interest was accruing. (A-595).

**M.    NYC's Trial Strategy**

Although Horton's medical condition continued to deteriorate and interest continued to accrue, NYC abandoned all efforts to settle the Action. (A-597-600). In fact, according to Schlather, NYC ignored the advice of Losurdo to tender its policy limits following the July 2007 conference. (A-664-65). Instead, Monahan confessed that NYC was "headed toward trial" and replaced Losurdo with Miller, an attorney with more trial experience. (A-44, ¶84; A-597-600).

Even though Quincy had at least twice the amount of financial risk, NYC did not inform Quincy that it decided to abandon a settlement strategy. (A-597-600; A-775-76).[5]

Schlather was also not informed. In March 2008, when Warden was asked to consent to the change of counsel, he wrote:

> NYC Mutual is persisting in grossly undervaluing this case and unreasonably exposing the personal assets of Warden to judgment. Further, the reassignment [to Miller] under the circumstances suggests that New York Central Mutual has rejected your recommendation with respect to settlement of the claim, and apparently is

---

[5] Monahan testified that he did not communicate with Quincy at any time during the Action beyond the single letter in 2001. (A-596-97).

13

> gearing up for trial with counsel who may be more amenable to such a strategy.

(A-44, ¶86; A-2059). Schlather also sought all of NYC's "valuations of the underlying claim and all recommendations with respect to settlement[.]" (SA-1).[6] However, NYC did not respond to Schlather's request. (A-665).

## N.  *Events Leading to October 2009 Damages Trial*

The damages trial was rescheduled for October 19, 2009. (A-45, ¶90). NYC authorized the retention of Dr. Nolan to perform an updated IME on Horton in May 2009. (A-45, ¶91). Dr. Nolan confirmed what NYC had already known for years: Horton has "a failed back syndrome" and is in constant pain. (A-43, ¶91; A-2065). Dr. Nolan's report did not provide any support for, let alone address, Horton's ability to return to work. (A-606; A-2065).

## O.  *Resolution of the Action*

On September 11, 2009, NYC was informed that Horton withdrew her offer to settle within the policy limits. (A-45, ¶95; A-1213). Instead, Horton increased her demand to 2.5M. (A-2205). In late September 2009, after almost eight years of litigation, Monahan had his *first and only* discussion with his supervisor about increasing the $75,000 settlement offer. (A-611, 615). Around this time, Miller provided an oral case valuation to NYC. This valuation, later memorialized in

---

[6] Citation to "SA-1" refers to the proposed Special Appendix filed pursuant to Quincy's unopposed motion concurrently filed with this brief.

writing, was the *first valuation* completed by or at the request of NYC. (A-46-48, ¶¶98, 109; A-615-16). Miller concluded that the verdict potential was well in excess of NYC's limits. (A-47 ¶107; A-2256). Monahan admitted that this analysis contained information known to NYC for years and could have been performed "years earlier." (A-465; A-618; A-353). Moreover, at no time did NYC request its counsel to perform jury verdict research, even though it knew that Horton had "long period of conscious pain and suffering that the jury could consider." (A-543-44).

Finally, on September 28, 2009, after increasing its offer to $200,000 in late September,[7] NYC tendered. (A-46, ¶99). At this point, with less than three weeks until trial, Quincy was permitted to negotiate. (A-783-84; A-1489). Plaintiff's pending demand was $2.5M. (A-881; A-2263). Quincy promptly offered $250,000 and indicated it was willing to mediate. (A-826; A-1217-18; A-2213). In response, plaintiff reduced her demand to $1.5M. (A-881-82; A-293).

A dispute developed between Quincy and NYC, wherein Quincy requested NYC to contribute additional funds due to its bad faith delay in tendering its policy. NYC refused. (A-786).

---

[7] NYC's contention that this offer was made in April 2009 is supported by an interrogatory response verified by an attorney without personal knowledge. (NYC Br. at 18, citing A-1391; *see* A-1396 (verification)). At trial, however, D'Amato, Monahan, and Miller consistently testified that the $200,000 offer was made in September 2009. (A-611; A-899; A-938-39; A-1103-06; *accord* A-2213).

15

At Schlather's suggestion (A-668-70), the parties and insurers agreed to resolve the case by entering a judgment on November 6, 2009 for $1,069,726.20, plus 9% interest from May 20, 2005 (the date of the liability judgment) in the amount of $427,831.87. (A-49, ¶118; A-2306). NYC and Quincy also reserved the right to pursue any claims between them. (A-49, ¶117). On November 20, 2009, Quincy paid the balance of the judgment ($572,168), plus the accrued interest ($427,831.87) for a total of $1,000,000. (A-49, ¶118, 120). On November 12, 2009, NYC paid $497,558.07 toward the judgment. (A-49, ¶119).[8] On December 2, 2009, Horton's counsel filed a satisfaction of judgment. (A-49, ¶121).

**P.    *The District Court's Decision***

This bad faith action was tried before Hon. David E. Peebles in February 2014. Relying on many of the stipulated facts and testimony summarized above, the Court made the following factual findings:

- NYC knew liability was likely to be assessed against its insured from early in the litigation and in December 2005, there was no serious doubt about Warden's liability (SPA-38-39);

- By December 2005, Horton's damages were likely to exceed NYC's $500,000 policy limits (SPA-40-42);

- NYC had an opportunity to settle the case for $500,000 in December 2005 (SPA-35);

---

[8]According to NYC's payment sheet, which was stipulated into evidence, NYC's "net loss" was only $132,479.00. (A-1674). The remaining amount was reimbursed by its reinsurer, General Reinsurance Company. (*Id.*; A-346).

16

- NYC had an opportunity to settle the Action for $500,000 in July 2007 with a contribution from Quincy of $250,000 (SPA-43);

- NYC did not undertake a valuation of the case until September 2009. (SPA-44).

These findings supported the District Court's conclusions of law, which held that NYC's actions were in "gross disregard" of Quincy's interests and its decision not to evaluate the case was "bad faith." (SPA-54-55). Further, NYC grossly disregarded Quincy's interests by failing to increase its $75,000 offer between December 2005 and September 2009. (SPA-54). As a result, two opportunities to settle the case were lost at a time when liability was clear and the damages likely exceeded its policy limits. (SPA-55).

The Court also rejected NYC's defense that Quincy's conduct caused or contributed to NYC's bad faith. (SPA-45, 55). The Court awarded compensatory damages in the amount of $1M, with mandatory prejudgment interest assessed from January 1, 2006 (the date of the breach) until the March 31, 2014 entry of judgment at a rate of 9% per year. (SPA-55-56).

The Court did not address Quincy's claim for reimbursement for accrued interest pursuant to NYC's "Supplementary Payments" provision in its policy because it awarded full damages on the bad faith cause of action. (SPA-49).

17

Last, the District Court denied Quincy's claim for attorney's fees under N.Y.

Gen. Business Law §349. (SPA-50-53). Quincy has not appealed this ruling.

## SUMMARY OF THE ARGUMENT

The overwhelming evidence at trial established that NYC's unexplained delay in evaluating and tendering its policy in the face of clear liability and damages was in gross disregard of Quincy's pecuniary interests.

For nine years, New York Central's lowball settlement posture remained unchanged, even though: (1) Warden' liability was acknowledged from the outset; (2) Defense experts confirmed Horton sustained significant, disabling, and permanent spinal injuries; (3) Horton never returned to work as nurse; (4) Horton endured six surgical procedures; (5) Horton's experts estimated special damages in the millions; (6) NYC's adjuster acknowledged the potential for a "big verdict;" and (7) the value of the claim was steadily increasing due to the deterioration of Horton's medical condition and the accrual of 9% interest.

The District Court's findings of fact that Horton was willing to settle for NYC's $500,000 policy limit in December 2005–January 2007, and for $750,000 in July 2007, were supported by the unrefuted testimony of her counsel, D'Amato, and other corroborating proof. Had NYC tendered its policy limits at these points, when liability was clear and Horton's damages were likely to produce a large excess verdict, Quincy's contribution would have been nil, or alternatively, $250,000. Yet, NYC ignored the pleas of the court, the insured, and even its own assigned defense counsel to take advantage of these opportunities to tender. It

19

stubbornly offered $75,000, and not a penny more, which suppressed any hope for a policy limit settlement.

Instead, the course charted by NYC was to bring the case to trial and pursue a hopeless defense strategy which served only to delay the litigation, jack up interest, and plaintiff's demand. Even after experiencing a number of setbacks in the litigation, NYC never budged from its intractable settlement stance. NYC ignored requests from Quincy and its insured for its assessment and never bothered to inform them it had no intention of settling the case all along.

Finally, 9 years after receiving notice of Horton's claim, NYC tendered based on an evaluation from its defense counsel predicting a verdict in excess of $1.5 Million on facts known to NYC for years. This was the first, and only, potential verdict assessment. It confirmed the obvious—NYC's settlement position was bereft of reality. At this point, interest had accrued to 40% and Horton's medical condition had deteriorated further. There was no hope for a resolution below $1.5 Million. Quincy was left "holding the bag" and had no choice but to consent to the entry of a judgment and pay the full amount of accrued interest.

NYC's appeal does not address, let alone challenge, many of the factual findings the District Court held to be indicative of bad faith. Instead, it attempts to excuse its conduct on the platitudes that it was always willing to negotiate in good faith and/or was merely protecting its insured by investigating defenses. These

arguments are easily dismissed and cannot be reconciled by NYC's admitted four-year refusal to offer more than $75,000 when its defenses proved futile, and by its failure to even attempt to perform an evaluation of the claim until the eve of trial in 2009.

Recognizing the weakness of these arguments, NYC tries to divert attention from its own conduct and contends that Quincy's internal claims handling of the Horton claim justify NYC's actions. As the District Court concluded, however, NYC failed to offer any evidence that Quincy's passive monitoring of the claim influenced or affected NYC's decisions. In fact, Quincy's claims diary was not even disclosed until this bad faith action.

Moreover, NYC waived its mitigation defense because its answer did not assert it and because it is raised for the first time on appeal. In any event, NYC's mitigation argument that Quincy should have known that NYC was guilty of bad faith and therefore had a duty to assume NYC's policy obligations by advancing a $425,000 payment to Horton, has no merit and is contrary to New York law.

Finally, Quincy submits that the District Court did not abuse its discretion in awarding prejudgment interest from the date of NYC's first breach of its fiduciary duty to tender in December 2005.

21

Accordingly, the District Court's Decision should be affirmed in its entirety. Alternatively, Quincy requests that the case be remanded to the District Court for a disposition on Quincy's second cause of action for reimbursement.

## **STANDARD OF REVIEW**

The District Court's findings of fact shall be reviewed for clear error, and its conclusions of law shall be reviewed *de novo*. *Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 182 (2d Cir. 2013). Any mixed questions "are reviewed *de novo* to the extent that the alleged error is based on the misunderstanding of a legal standard, and for clear error to the extent that the alleged error is based on a factual determination." *Id.*; *see also NES Fin. Corp. v. JPMorgan Chase Bank, N.A.*, 556 Fed. Appx. 12, 13 (2d Cir. 2014).

Under the clear error standard, "there is a strong presumption in favor of [the District Court's] findings of fact if supported by substantial evidence." *White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir. 2001). The presumption should not be disturbed unless this Court is "left with the definite and firm conviction that a mistake has been committed." *Id.*; *Bessemer Trust Co., N.A. v. Banin*¸ 618 F.3d 76, 85 (2d Cir. 2010).

Whether an insurer acted in bad faith "is a highly fact-dependent analysis" within the province of the District Court to resolve as the trier of fact. *In re AXIS Reinsur. Co. Refco Related Ins. Litig.*, 2010 U.S.Dist. LEXIS 33377 (S.D.N.Y.

22

Mar. 7, 2010)(citing *Pinto v. Allstate Ins. Co.¸* 221 F.3d 394, 399 (2d Cir. 2000)). Thus, whether NYC grossly disregarded the interests of Quincy by failing to seize settlement opportunities when liability was clear and the probable case value exceeded the primary limits are determinations of fact subject to challenge only for clear error. *White,* 237 F.3d at 178; *see also Pinto* 221 F.3d at 401; *Scottsdale Ins. Co. v. Indian Harbor Ins. Co.¸* 994 F.Supp.2d 438, 456-58 (S.D.N.Y. 2014); *see also New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.¸* 295 F.3d 232, 246-47 (2d Cir. 2002).

Finally, the District Court's award of prejudgment interest shall be overturned only for an abuse of discretion. *Ariz. Premium Fin. Co. v. Employers Ins. of Wausau*, 2014 U.S. App. LEXIS 18100 (2d Cir. 2014).

# ARGUMENT

## POINT I

## NYC'S PROTRACTED DELAY IN TENDERING ITS POLICY WAS BAD FAITH AND CAUSED DAMAGES TO QUINCY

The standards governing bad faith claims in New York were properly observed by the District Court. (SPA-31-35).[9] The District Court correctly applied those standards in finding that NYC breached its duty to settle in good faith by failing to tender its policy limits in December 2005 and July 2007 when liability was clear and the verdict potential exceeded the primary limits.

### A. *NYC Acknowledged it Owed Quincy a Duty to Settle the Action in Good Faith*

NYC assumed and controlled the defense of the Action from its inception to its conclusion 9 years later. As a result, NYC had a fiduciary duty to settle in good faith and to place the interests of Warden and Quincy on equal footing with its own. NYC also a duty to *promptly* tender its policy limits when Warden's liability was reasonably clear and when credible information became available demonstrating that the verdict potential was likely to exceed its $500,000 limit. (A-354-59; A-457-61, 598-600; A-2360, 2373-75).

---

[9] With one exception, addressed below, NYC concurs with the District Court's articulation of the bath faith standard. (NYC. Br. at 26-27).

24

**B.** *NYC Breached its Duty to Settle in Good Faith*

**1. Liability was Resolved by December 2005.**

NYC does not challenge the District Court's determination that Warden's liability was established when Horton was willing to settle for NYC's policy limits in December 2005 through August 2006. (SPA-35-42). Any attempt to do so would be futile since summary judgment on liability, proximate causation and serious injury was granted in May 2005. (A-36, ¶36). Although NYC authorized Losurdo to appeal, it knew there was little, if any, chance of reversal. (A-523). In August 2006, the Appellate Division affirmed, finding defendant's arguments on comparative negligence speculative and on medical causation "meritless." (A-37, ¶¶43-44).

A a result of these dispositive rulings, the defense had no credible defenses on liability, serious injury, and causation, and the only issue to be tried was the amount of damages. (A-38, ¶¶45-46; A-318; A-370-73; A-534-35; A-1393; A-1804; A-1809).

**2. NYC was, or should have been, Aware that the Verdict Potential Exceeded its $500,000 Policy.**

**a. Evidence of Horton's Damages Known to NYC when the First Opportunity to Settle was Available (December 2005 to January 2007)**

NYC contends the District Court should have made an indeterminate finding, pursuant to *Pavia*, that the value "far exceeded" the NYC policy limits.

(NYC Br. at 27, 35, 43 (citing *Pavia v. State Farm Mut. Auto Ins. Co.*, 82 N.Y.2d

445, 454 (1993)). However, NYC reads too much into *Pavia*. The Pattern Jury

Instructions do not contain a "far exceed" threshold, but merely charge the jury to

find whether "it appeared likely the judgment … would exceed the policy limit."

*See* N.Y.P.J.I. 4:67.[10]   Thus, the "touchstone inquiry is whether there was a high

probability that the excess insurer would be subject to personal liability because of

the [primary] insurer's actions, and whether an excess verdict [or settlement]

reasonably could have been predicted." *Scottsdale Ins. Co. v. Indian Harbor Ins.*

*Co.¸* 994 F.Supp.2d 438, 454 (S.D.N.Y. 2014) (quoting *Pinto v. Allstate Ins. Co.¸*

221 F.3d 394, 399 (2d Cir. 2000)).[11]

Regardless of these semantics, the record evidence unquestionably satisfies

either threshold. As the District Court observed (SPA-40-42), by December 2005,

NYC was aware that Horton's life was filled with unrelenting pain, disability,

depression, and multiple surgeries that provided little, if any, relief:

- As a result of the November 21, 2000 high-speed collision, Horton
  sustained traumatic tears, fissures and herniation of her L4-5 disc,
  confirmed objectively by discogram and CT (A-33, ¶18; A-2321);

---

[10] This Court has accorded considerable deference to this charge in other contexts.
*New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.¸* 295 F.3d 232,
242-43 (2d Cir. 2002) (rejecting argument that *Pavia* has a "clear liability"
standard based on the broader language adopted by PJI committee in section 4:67).

[11] *Diblasi v. Aetna Life & Cas. Ins. Co.,* cited by NYC, applied this same test. 147
A.D.2d 93, 99 (2d Dept. 1989)("whether it was 'highly probable' that the severity
of the injuries would result in a verdict in excess of the policy limits.").

- Horton was a gainfully employed, 37-year old, married mother of three young children (A-33, ¶14);

- Horton was described as a credible and likeable witness (A-2035);

- Although Horton had pre-existing degenerative disc disease and a history of a prior MVA, she was asymptomatic at the time of the accident (A-35, ¶29; A-1784);

- Horton had undergone *four* surgeries:

  o October 2001 – discectomy and surgical fusion at the L4/L5 segment (A-33, ¶18);

  o August 2002 – percutaneous pedicle screw instrumentation at the same level due to lumbar instability at the fusion site caused by *pseudarthrosis* (non-union) of the L4 and L5 segments (A-33, ¶20);

  o October 2002 – repair of an uncomfortable abdominal hernia the "size of a football" (A-34, ¶21; A-2342); and

  o November 2004 – removal of pedicle screws because Horton had been experiencing "a lot of pain" (A-36, ¶34; A2346-49);

- Horton had unsightly and permanent surgical scars in her abdomen; (A-44, ¶89; A-601-02);

- Horton was being treated for "major depression" and "post-traumatic stress disorder" as a result of the accident; (A-34-36, ¶¶25-26, 30);[12]

- A defense medical exam in 2003 concluding:

---

[12] The psychological claim was being pursued by plaintiff throughout the litigation and considered by NYC for valuation and defense purposes. (A-507-08; A-1957). Although plaintiff ultimately chose to withdraw a psychological injury claim in 2009, NYC obviously did not know that in 2005 and 2007.

27

- o Horton sustained a radial tear, two fissures and herniation of her L4-5 disc as a direct result of the subject motor vehicle accident;

- o Horton's surgical fusion surgeries were medically necessary;

- o Horton had not reached maximum medical improvement and required further physical therapy;

- o Horton was unable to return to her job as a nurse at the present stage; and

- o Horton's scar formation, surgical trauma, and surgical implantation will cause a significant and permanent injury.

(A-35, ¶¶27-28; A-1784);

- Horton never went back to work in any capacity. (A-33-35, ¶¶15, 29; A-508; A-1784;). By December 2005, Horton's past lost wages totaled $125,000 based on an annual salary of $26,000. (A-508-09). As early as 2003, Losurdo predicted a "large lost wage claim." (A-34, ¶22);

- Horton had been awarded disability benefits; (A-2346; A-321; A-505); and

- Statutory interest was accruing at a rate of 9% since May 2005. (A-37, ¶39).

At trial, Monahan admitted that by December 2005, Horton sustained "devastating and permanent injuries," and that Losurdo advised it was a good time to "reach out to plaintiff's counsel and try to negotiate a settlement," irrespective of the plaintiff's demand. (A-525-26).

28

**b. Evidence of Horton's Damages Known to NYC When the Second Opportunity to Settle was Available in July 2007**

The District Court's finding, in the alternative, that case value exceeded the primary limits when the second opportunity for settlement was presented in July 2007 is also well supported. In particular, NYC was aware of the following developments:

- Plaintiff's experts estimated Horton's pecuniary losses in the millions (A-38, ¶51);[13]

- Defendant's economist confirmed that Horton had a $557,265 pre-injury earning capacity as a nurse (A-40; ¶62; A-1960);

- Horton's neurosurgeon reported that Horton's condition continued to deteriorate and recommended a discectomy and fusion of additional vertebral segments at the L5/S1 level, which became unstable due to the prior fusion at L4/L5. (A-42, ¶73). Monahan agreed that the prospect of an additional fusion was "not a good development for the defense" and increased the case value (A-504; A-322; A-42, ¶74);

- The defense medical expert was suspended due to a rash of malpractice claims (A-2010-13);

- NYC received opinions from the trial court judge, plaintiff's counsel, and the insured's personal counsel that the value of the case was far in excess of the primary limits (A-41, ¶69; A-2005; A-2034);

- NYC was accused by its insured and plaintiff's counsel of not negotiating in good faith (A-646-649; A-2005; A-2034); and

- The verdict potential had increased by 20% due to the accumulation of interest. (A-37, ¶39).

---

[13] NYC did not authorize Losurdo to retain an expert to counter plaintiff's life care expenses, *despite* requests by its insured. (A-547; A-652; A-2034).

29

At trial, Monahan admitted that "[i]f the plaintiff's experts were believed, this was a case that was going to be a big verdict." (A-599; A-38, ¶51).

### 3. The District Court Properly Concluded that NYC's Failure to Conduct a Timely Verdict Potential Assessment Evinced its Bad Faith.

The failure of a primary insurer to conduct a potential verdict analysis for settlement purposes is strong evidence of bad faith. *See Knobloch v. Royal Globe Ins. Co.*, 38 N.Y.2d 471, 480 (1976); *Doherty v. Merchants Mut. Ins. Co.*, 74 A.D.3d 1870, 1874 (4th Dept. 2010)(dissenting opinion)(citing N.Y.P.J.I. 4:67)("Necessarily inherent in an insurer's duty to its insured is a well-reasoned and thorough analysis leading to the establishment of a predicted jury verdict value[.]").

Monahan admitted that NYC had a "legal obligation" to evaluate the Horton case on an ongoing basis, that he regularly commissioned his counsel to provide verdict potential opinions, and that he, too, had the experience to perform such evaluations. (A-462-67; A-591). Yet, in spite of the gravity of Horton's injuries, NYC inexplicitly did not have a verdict potential assessment in place by December 2005, and, in fact, waited another 4 years to even request one. (A-48, ¶109; A-591, 615-16).

NYC's first and only case value assessment was performed by NYC's trial counsel, Miller, on October 9, 2009. (A-46-48, ¶¶98, 109; A-615-16). Miller

concluded he had no chance of obtaining a verdict under NYC's policy limit, and, in all likelihood, under the $1.5M combined coverage. (A-2258). Miller and Monahan conceded that this analysis could have been done "years earlier" as it was based on information dating back to 2001. (A-39, 48, ¶¶57, 109; A-353; A-465; A-618; A-943-44). When asked why he waited nine years to perform an evaluation, or why he steadfastly refused to offer any more than $75,000 even though the case was worth much more, Monahan confessed: "I don't know." (A-616).

NYC also received, and ignored, case value assessments by Justice Garry, Schlather, and D'Amato, concluding that Horton's damages exceeded the primary limits, let alone NYC's paltry $75,000 offer. (A-562-63; A-578-81; A-565-68; A-2005; A-2010; A-2034). Importantly, Monahan admitted he did not have any information suggesting these assessments, or their factual predicates, were incorrect. (A-563, 578-81).

Although NYC commonly tasked its outside counsel to perform verdict research, one was never requested. (A-353-55; A-462-66; A-542-44). Had NYC done so, it would have found similar disc injury cases holding that the reasonable compensation for *pain* and *suffering* alone eclipsed its $500,000 policy limits.[14] Of course, Horton's experts estimated additional pecuniary losses in the millions.

---

[14] *E.g., Kirschhoffer v. Van Dyke*, 173 A.D.2d 7 (3d Dept. 1991)($1,850,000 single level fusion); *Barrowman v. Niagara Mohawk Power Corp.*, 252 A.D.2d 946 (4th Dept. 1998)($3,000,000); *Huff v. Rodriguez*, 45 A.D.3d 1430 (4th Dept.

31

NYC's bad faith is also evinced by its failure to respond to requests by Quincy and Warden's personal counsel for NYC's case assessment, presumably because it had none to offer. (A-761-62; A-662; A-615-18).

NYC's bald assertion that there is "no proof that the potential recovery would 'far exceed' NYCM's Coverage," is unaccompanied by any explanation why Horton's undisputed damages would not produce an excess verdict. Instead, NYC cherry picks a number of entries from Quincy's claim diary, which have no legal significance.

First, NYC had the exclusive control of the defense, not Quincy. (A-459-60). By its own admission, it had an independent duty to Warden and to Quincy to defend, investigate, evaluate, and settle the claim in good faith. (A-457-61, A-598-99; A-2367-68(Segalla Expert Report)); *see Taveras v. American Tr. Ins. Co.*, 33 Misc.3d 1210(A) (Kings Co. 2011); *Transcare N.Y., Inc. v. Finkelstein, Levine & Gittlesohn & Partners*, 23 A.D.3d 250, 250-51 (1st Dept. 2005); *Young v. American Cas. Co.*, 416 F.2d 906, 910 (2d Cir. 1969)(insurer has an affirmative duty to evaluate and pursue settlement opportunities).

Second, Hardy's role was to passively monitor the case. (A-380). He did not perform a verdict analysis, relying on NYC and Losurdo to do so. (A-793).

2007)($3,500,000 multi-level fusion); *Leonard v. Unisys Corp.*, 238 A.D.2d 747 (3d Dept. 1997)($1,500,000); *Poole v. CONRAIL*, 242 A.D.2d 966 (4th Dept. 1997)($2,000,000).

Quincy's duty to Warden was not triggered until NYC tendered, which did not occur until late September 2009. (*See* Point II(B)(1), infra). Thus, the District Court correctly found that Quincy's conduct prior to tender has no legal significance in determining whether NYC fulfilled its obligations in good faith. (SPA-46–47) (citing *Scottsdale Ins. Co.*, 944 F.Supp.2d at 459-60)(excess carrier has no duty to supervise the primary or to "object"); *accord Travelers Indem. Co. v. Arch Spec. Ins. Co*., 2012 U.S.Dist. LEXIS 80775 (E.D. Cal. 2012)("even if the excess carrier performs an internal assessment of the case, which it has no duty to make, such an assessment would still be irrelevant to whether the primary carrier breached its duties to the insured."); *Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, 256 (2003)("the excess carrier's conduct during the course of an underlying action against the insured is generally irrelevant to a determination of the core issue of the primary carrier's good faith[.]").[15]

Third, the references in the Hardy's diary simply echoed assurances from Losurdo advising (incorrectly) that Quincy's policy was not at risk. (*E.g.,* A-1404).

Fourth, if these statements represent an informed valuation, as NYC suggests, then why did Hardy request NYC's evaluation in May 2007, and why did

---

[15] The *California Union* case relied on by NYC is outdated. (NYC Br. at 54). It was decided before *Pavia,* did not interpret New York law, and has been cited by *no court* for the proposition that an excess carrier's failure to object is relevant to the determination of whether a primary insurer committed bad faith.

33

Quincy retain monitoring counsel at its own expense in August 2007 to obtain information from NYC and to evaluate the case? (A-1959; A-2042).

Fifth, until NYC tendered, Quincy did not have any reason to reserve the case for anything more than it did. (A-769, 790). A reserve does not, and is not intended to, represent a verdict analysis. (A-353).

Sixth, determining verdict potential is based on credible evidence of injuries and special damages in the underlying action, not on selective diary notes and subjective opinions of an excess insurance adjuster who is only passively and intermittently monitoring the case. *See* N.Y.P.J.I. 4:67; *Diblasi v. Aetna Life & Cas. Ins. Co.*¸ 147 A.D.2d 93, 99 (2d Dept. 1989)(employed the objective test of whether a "reasonably prudent insurance adjuster and/or defense attorney" should have realized it was "highly probable" that the verdict would be in excess of the primary limits).

Finally, since Quincy's claims diary was not disclosed until this bad faith action, the statements referenced therein obviously could not have had any bearing on NYC's valuation. Monahan never spoke to Hardy at any time during the 9-year period that he adjusted the claim. (A-596-97). *Scottsdale Ins. Co.*, 994 F.Supp.2d at 459-60 (excess insurer's conduct is relevant to a primary insurer's bad faith calculus only when it influenced primary insurer's conduct).

34

**4. The District Court Properly Found that NYC's Intractable Settlement Position was in Bad Faith and Placed Quincy's Policy at Risk.**

A primary insurer's adherence to an unrealistic and intractable settlement position is strong evidence of its bad faith. *Scottsdale Ins. Co.*, 994 F.Supp.2d at. at 455 ("a primary insurer's unrealistic settlement posture that exposes an excess carrier to risk is potentially significant evidence of bad faith."); *St. Paul Fire & Marine Ins. Co. v. United States Fidelity & Guaranty Co.,* 43 N.Y.2d 977, 978 (1978).

There was no testimony by anyone – including Monahan – that NYC's $75,000 "take it or leave it" settlement posture was realistic in light of the magnitude of Horton's damages. D'Amato and Schlather characterized NYC's offer as "pretty ridiculous," "incredibly low," a "nonstarter" and "not a good faith offer". (A-1036-38; A-646-49). Even Monahan acknowledged the $75,000 settlement offer was "low." (A-582; A-40, ¶63). Justice Garry concurred. (A-2010).

NYC assertion that it was willing to continue negotiations with D'Amato in good faith is demonstrably false. (NYC Br. at 36; *see* A-2030; A-1096).

First, while Monahan characterized *Horton* as a "significant case" with the potential for a "big verdict" in excess of NYC's policy limits, he never sought additional authority from the claims committee or his supervisor until September 2009. (A-555; A-599; A-611).

35

Second, NYC did not increase its offer after December 2005 despite a series of developments which increased the case value:

- The loss of the appeal; (A-534-37);

- Plaintiff's expert disclosures establishing $2-$4 Million of special damages; (A-610-11; A-38, ¶51);

- Dr. Avellanosa's disciplinary problems; (A-563-65; A-2010);

- The Social Security Disability determination; (A-555-65); and

- Horton's additional surgeries in 2007 and 2008. (A-44, ¶¶82, 88; A-592, 602-03).

Monahan even admitted that many of these developments increased the value of the case. (A-322; A-563-65, 592, 599).

Nor did NYC allow the steady accumulation of interest, at a rate of nine percent from May 20, 2005, to affect its settlement position. In fact, Monahan acknowledged that the case "went off [his] radar screen" from August 2007 until through the entirety of 2008, despite knowing that the "value of the case was increasing every day that went by" due to the accumulation of interest. (A-595).

Finally, NYC stubbornly refused to grant Losurdo additional settlement authority at the pretrial conferences held in June and July 2007, even though considerable pressure was being imposed by Schlather and Justice Garry to tender.

36

(A-559, 563, 571). NYC even rejected Losurdo's recommendation to tender. (A-644-45; SA-1).

NYC's assertion that it was justified in holding firm on settlement after December 2005, upon the expedient that it had the right to pursue an "aggressive" damage defense, is also disingenuous. Quincy certainly agrees that insurers are entitled, if not obligated, to pursue legitimate defenses in good faith. It is also commonplace for insurers to start low and gradually increase their offers to facilitate settlement. However, "the facts here are far afield" from either strategy. *Scottsdale Ins. Co.,* 994 F.Supp.2d at 460 (jury could find that insurer's defense that it was willing to negotiate in good faith was absurd since it never budged from lowball offer).

In December 2005, the Action had been pending for four years, and Horton was five years post-injury. NYC was not pursing any damages defense, let alone an "aggressive" one. NYC was aware that Horton had had four surgeries and her medical condition had plateaued. NYC was in possession of Horton's medical records before and after the accident, and its counsel provided those records to a defense medical expert for review.[16] Any legitimate hope of defending the case on Horton's pre-existing back problems, prior MVA's, and/or the medical necessity of

---

[16] Most of NYC's record citations relate to defense counsel's initial medical investigation which had been completed by December 2005. (*See* NYC Br. at 44-45).

Horton's surgeries had been extinguished by Dr. Avellanosa's IME report in 2003. (A-1793-94).

Moreover, by December 2005, the trial court had rejected NYC's medical causation defenses. (A-1804). Although the case was on appeal, Losurdo reported, and Monahan agreed, the chance of reversal was virtually nil. (A-36-37, ¶¶37, 43-44; A-370-73; A-533-37).

Although NYC later chose to retain experts to assess Horton's ability to work in sedentary jobs, this was, at best, a partial defense and certainly does not explain NYC's reluctance to offer more than $75,000.[17] In any event, this defense was not even pursued until May 2007, approximately *18 months* after plaintiff's December 2005 offer, distinguishing this case from *Pavia*. (A-1959; A-1991).[18]

In any event, this "defense" was futile. Monahan admitted that Dr. Avellanosa's opinion was outdated as it was based on medical records obtained prior to February 2006. Monahan further admitted that it was without foundation because Horton's condition had since worsened and her physician had recommended another fusion. (A-553, 607; A-44, ¶82). To make matters worse,

---

[17] NYC's argument that it was pursuing an "aggressive" damage defense is controverted by its failure to authorize the retention of experts to counter Horton's life care expenses at the recommendation. (A-39, ¶54; A-546, A-580; A-652).

[18] In *Pavia*, the Court held that it was reasonable for an insurer to investigate new facts supporting a *completely new defense* which emerged *seventeen days* prior to the expiration of plaintiff's time-limited settlement demand. 82 N.Y.2d at 450, 456. Here, Horton's demand remained open for thirteen months.

in June 2007, NYC learned that Dr. Avellanosa's credibility was shot as a result of significant disciplinary problems. (A-41 ¶70; A-564-65; A-2010; A-2013).[19]

Yet, even when NYC was stripped of any last vestige of a "defense," it still refused to negotiate. The reason was revealed at trial: Monahan confessed that NYC had no intention of settling all along. In January 2008, NYC decided to try the case and "changed horses" by replacing Losurdo with Miller, a more experienced trial lawyer. (A-597-600; A-2054; A-2058).

Although Schlather objected on behalf of Warden to any litigation strategy involving a trial, NYC did not bother to reply. (A-665; A-2059). *General Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 381 (3d Cir. 1992)("relevant evidence of bad faith includes … a refusal to respond to its insured's direct inquiry. . .")(citing *Feliberty v. Damon*, 72 N.Y.2d 112 (1988)). Incredibly, NYC also did not inform Quincy or its monitoring counsel of this drastic strategic change, despite acknowledging that a verdict above $500,000 "was a distinct possibility," and that Quincy had twice the amount of potential exposure as NYC. (A-597-600).[20] Monahan admitted that Quincy had a right to know that NYC planned to

---

[19] Although an updated medical exam was performed in 2008 by Dr. Nolan, his opinions fared no better for the defense. (A-43, ¶91; A-2065; A-339-40; A-605-06)(finding that Horton suffered from a "failed back syndrome" with "no pain free intervals").

[20] Actually, NYC ended up paying a net of $132,479 out of its $500,000 policy. The balance was paid by its reinsurer, Gen Re. (A-1674). The District Court

go to trial, since NYC would be gambling with Quincy's money in view of the likelihood of an excess verdict. (A-599-600; A-584).

Thus, in view of Horton's deteriorating medical condition, together with the continuing accrual of interest 9% per year, NYC's refusal to offer more than $75,000 for nine years until the eve of trial in September 2009 can only be characterized as a flagrant disregard of Quincy's interests and is strong evidence of its bad faith. *See Scottsdale Ins. Co.*, 994 F.Supp.2d at 456 ("failure to make a plausible offer in the face of palpable risk to the excess carrier evinced bad faith."); *State v. Merchants Ins. Co. of N.H.,* 109 A.D.2d 935, 936 (3d Dept. 1985)(insurer's awareness that proposed settlement figure was substantially lower than the liability it could reasonably expect to incur was evidence of bad faith). By then, any hope for a primary policy limit settlement had long been extinguished. (A-1110).

**C. *The District Court Properly Determined that NYC's Bad Faith Conduct Caused it to Lose Two Opportunities to Settle***

### 1. First Lost Opportunity: December 2005 – January 2006

The District Court's finding of fact that NYC had an opportunity to settle the case for its $500,000 policy limits in December 2005 through January 2007 is

---

properly considered this evidence as *Pavia* allows the trier of fact to consider "any other evidence which tends to establish or negate the insurer's bad faith in refusing to settle." 82 N.Y.2d at 455. Relative financial risk is certainly one of those factors.

supported by a preponderance of the credible evidence and can only be overturned for clear error. (SPA-45).

It is undisputed that D'Amato demanded the policy limits in December 2005 with Horton's full authority. (A-1037-39). It is further undisputed that he never withdrew this demand and that it remained "on the table" for 13 months until January 2007. (A-1043, 1167) Even after the appeal was decided, D'Amato was still willing to recommend a settlement of the $500,000 primary coverage until he retained experts substantiating his demand increase in January 2007. (A-1042-43, A-1047, A-1051-53). Although D'Amato responded to a hypothetical question that his initial demand may have been for the combined coverage had it been disclosed, the District Court found his testimony credible that he nevertheless would have recommended settlement for the $500,000. (SPA-40; *see also* SPA-35, n.19). In fact, D'Amato never raised his demand after he learned about the excess coverage. (A-1042-43).[21]

As noted by the District Court, D'Amato's testimony was consistent with proof held to be "legally sufficient to sustain the jury's findings of causation, i.e., that [the insurer] lost an actual opportunity to settle the [Action] within its policy limit." *New England Ins. Co*., 295 F.3d at 246-47. Conspicuously absent from

---

[21] NYC's assignment of blame upon D'Amato for never serving a written demand for insurance information is incorrect. (A-1729).

41

NYC's brief is any attempt to distinguish *New England*. Instead, NYC suggests it was ready and willing to negotiate at all times, that its $75,000 offer was an opening offer to get the ball rolling, that settlement talks were interrupted because the plaintiff's attorney abandoned the negotiation process, and that plaintiff's offer was terminated by NYC's counter-offer. (NYC Br. at 35-38). These arguments have no factual or legal support.

First, it is fallacious for NYC to argue it was willing to negotiate throughout 2006 while the appeal was pending when, as discussed at length above, it refused to modify its settlement position. Even after the appeal was decided, Horton's medical condition worsened, interest was continuing to accrue, and it was receiving considerable pressure from the trial judge, its insured's personal counsel, and even its own defense counsel. (*See* Points I(B)(2)(a), I(B)(3), *supra*). Monahan admitted that he did not even try to obtain any additional authority from his supervisor until September 2009. (A-611; A-46, ¶99).

Second, NYC's assumption that D'Amato "cut off" settlement negotiations is incorrect. D'Amato did not see the point in attending the January 2006 conference because he was told by Losurdo that NYC refused to offer any more than $75,000. (A-1035-37) Thus, his decision "was the direct result of the defendant's own conduct" because NYC "never indicated that it would make a fair and reasonable offer and, by failing to do so … suppressed negotiations."

42

*Merchants Ins. Co. of N.H.*, 109 A.D.2d at 937. In any event, D'Amato attended three settlement conferences thereafter in January, June and July 2007. At each, NYC was not willing to offer more than $75,000. (A-1828; A-2010; A-2032).

Third, D'Amato was not required to "reoffer" Horton's $500,000 settlement demand at any period during the thirteen months in which it was open in order for a lost opportunity to settle the case to exist. In *Pinto,* this Court held:

> Where a settlement offer is not withdrawn and contains no time limit for acceptance, it would be unreasonable to impose on a plaintiff an ongoing obligation to re-offer a settlement each time a new factor at trial weighs in plaintiff's favor, particularly in light of the insurer's duty to pursue a good faith settlement in the interest of its insured."

221 F.3d at 401; *see also New England Ins. Co.,* 295 F.3d at 247 (the willful failure to pursue settlement negotiations cannot be used as a shield against bad faith liability); *Merchant's Ins. Co. of N.H.*, 109 A.D.2d at 937.

Finally, NYC's contention that plaintiff's $500,000 offer to settle the Action terminated in December 2005 is contrary to the record and *Pinto.* D'Amato unequivocally testified that his $500,000 offer was not withdrawn until January 2007 when it was increased, for the first time, above NYC's limits. (A-1042-43, A-1047, A-1051-53; A-540; A-1830). NYC's reliance on General Obligations Law 5-1109 is misplaced. (NYC Br. at 42-43). Section 5-1109 applies only to offers made in writing; D'Amato did not testify to a written offer, or even an irrevocable

43

offer.  Under the bad faith case law, a settlement remains open to acceptance until it is revoked.  *See Pinto,* 221 F.3d at 401*; Merchants Ins. Co. of N.H.*, 109 A.D.2d at 936-37.  NYC cannot be heard to complain that the offer did not continue when they never even explored a settlement at or close-to that figure.

## 2. Second Lost Opportunity:  Plaintiff was willing to Settle for $750,000 during July 2007.

The District Court correctly observed that damages can also be imposed for bad faith even if the opportunity to settle is for more than the primary policy, provided that excess insurer is willing to contribute the excess portion. (SPA-43); *Young,* 416 F.2d at 910; *Fed. Ins. Co. v. Liberty Mut. Ins. Co.*, 158 F.Supp.2d 290, 295 (S.D.N.Y. 2001); *Forest Ins. v. American Motorists Ins. Co.¸* 1994 U.S.Dist. LEXIS 3334, at *44 (S.D.N.Y. 1994); *see also Scottsdale Ins. Co.,* 994 F.Supp.2d 438, at 458.

The District Court's conclusion that the Action could have been settled in July 2007 for $750,000 is also supported by a preponderance of the evidence. (SPA-42-44).   D'Amato testified he had Horton's full authority to settle for $750,000 in July 2007.   (A-1080-81).  Because direct negotiations with NYC "were going nowhere," D'Amato asked Schlather at the July 2007 pretrial conference to convey Horton's position to the defense.  (A-1083-85; A-1093-94; A-717-18; A-2034).

After speaking with D'Amato, Schlather wrote to Losurdo stating that the case has a value in excess of the primary limits and that if NYC tendered its policy limits, the case could be settled for less than $1M in total. (A-2034). Monahan acknowledged receipt of the letter. (A-578). He testified that the predicate facts for Schlather's case value assessment were accurate, that he had no information to suggest that the case could not be settled for less than $1 Million, and that he viewed the letter as an "invitation to NYC to start to negotiate more seriously." (A-578-82). Monahan also admitted that July 2007 would have been "a good time" to settle the case before the plaintiff underwent yet another surgery. (A-592-93).

Monahan admittedly did absolutely nothing to take advantage of this opportunity. (A-593-95, 611; A-2032). Had NYC tendered, Quincy would have contributed $250,000 to resolve the case. (A-767-8); *Fed. Ins. Co.,* 158 F.Supp.2d at 295 (question of fact presented where there was proof that excess was willing to pay additional $200,000 in addition to $1M primary limits). Again, NYC cannot argue that a settlement for $750,000 was unavailable, when it did absolutely nothing to explore Schlather's overture.

The fact that D'Amato's "official" demand at that time was $1.5M does not preclude a finding of an opportunity to settle for less than the amount demanded. *See Hartford Ins. Co. v. Methodist Hosp.,* 785 F.Supp. 38, 41 (E.D.N.Y. 1992)("The New York cases have not established that an offer by a plaintiff to

45

settle within the policy limits is a prerequisite to liability for excess damages under New York law."); *Young*, 416 F.2d at 910 (New York law imposes an affirmative duty on an insurer to pursue settlement negotiations); *New England Ins. Co.*, 295 F.3d at 247.  Even the ultimate tender of NYC's policy limit on the eve of trial in September 2009 cannot shield NYC from liability for its bad faith failure to settle within the policy limits. (A-46, ¶99). *See Knobloch*, 38 N.Y.2d at 478 (a belated tender does not exonerate a carrier from a pre-existing liability for bad-faith failure to settle within policy limits); *Reifenstein v. Allstate Ins. Co.*, 92 A.D.2d 715, 716 (4th Dept. 1983); (Segalla Expert Report (A-2374-75)).

Thus, the District Court's finding, in the alternative, that NYC's failure to seize upon this settlement opportunity in July 2007 caused Quincy to pay an additional $750,000 in indemnity.

## POINT II

## NYC'S MITIGATION DEFENSE HAS NO MERIT

NYC argues that even if it breached its fiduciary duty and acted in bad faith, Quincy should recover nothing as it failed to mitigate its damages.  (NYC Br. at Point III).  In particular, it contends *for the first time on appeal,* that Quincy should have known that NYC was guilty of bad faith by December 2005 and therefore it had a duty to mitigate by tendering the balance of NYC's policy($425,000) and

then suing NYC for reimbursement. As discussed below, NYC waived the right to assert a mitigation defense and, in any event, it is contrary to New York law.

**A.** *NYC Waived the Right to Assert its Mitigation Defense*

**1. NYC Failed to Plead Mitigation**

Mitigation of damages is an affirmative defense that must be pleaded in the responsive pleading or it is waived. FED. R. CIV. P. 8(c); *Morgenstern v. County of Nassau*, 2009 U.S.Dist. LEXIS 116602, at 3-8 (E.D.N.Y. 2009); 2 N.Y. P.J.I. 3d 4:67 Comments, at 999 (2009)("Mitigation of damages, if applicable at all [in a bad faith action], must be pleaded by the insurer …")(citing *Gordon v. Nationwide Mut. Ins.* Co., 37 A.D.2d 265 (2d Dept. 1971)) *see also Gordon v. Nationwide*, 30 N.Y.2d 427, 452-453 (1972)(Breitel, J., dissenting)("In the absence of pleading and proving mitigation, the refusal to charge was proper.").

NYC's answer does not plead a mitigation of damages defense. (A-26). In fact, the word "mitigation" appears nowhere in its answer. The District Court agreed and denied NYC's motion to amend. (A-421-422)("[T]here is inherent prejudice in permitting an amendment on the eve of trial to assert a mitigation defense.").

NYC's "First Affirmative Defense" – that Quincy's conduct caused its own damages – pleads a comparative negligence defense, which is distinct from mitigation. (A-27). A failure to mitigate defense relates to the reasonable steps a

47

plaintiff could have taken *subsequent* to the injury to reduce his damages. *Miller v. Lovett*, 879 F.2d 1066 (2d Cir. 1989). Conversely, comparative negligence or culpable conduct is a defense available only in negligence actions and is appropriate where the *pre-injury* culpable conduct of the plaintiff caused or contributed to the injuries. *See* N.Y. C.P.L.R. §1411; *Solutia Inc. v. FMC Corp.*, 456 F.Supp.2d 429, 451 (S.D.N.Y. 2006).

Although the District Court allowed evidence of Quincy's conduct in monitoring the underlying action, its potential relevance was limited to whether NYC grossly disregarded Quincy's interests. (A-12; 421-22)(citing *Scottsdale Ins. Co. v. Indian Harbor Ins. Co.*, 944 F.3d at 549(excess insurer's conduct may be relevant if it influenced the primary insurer's settlement strategy).

### 2. NYC's Mitigation Theory on Appeal was Never Raised Below.

NYC, through its expert report, advanced the following mitigation defense below:

> While [Quincy] [was] not *required to* tender any portion of its excess policy limits until [NYC's] policy limits have been tendered and exhausted, Quincy could have attempted to settle the insured's excess exposure voluntarily and the claimant would have been free to continue the case and seek a recovery up to the limits of the primary policy. (A-2415).

NYC's counsel similarly confined the mitigation defense as a pre-tender settlement of the *excess* portion of the claim. (A-421).

NYC's appellate mitigation theory – that Quincy should have voluntarily settled the insured's *primary* exposure – was never raised below and cannot be considered for the first time on appeal. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc,* 396 F.3d 96, 124 n.29 (2d Cir. 2005).

## B. *NYC's Mitigation Defense is Contrary to New York Law*

### 1. Quincy had no Duty to Step Down and Tender the Primary Limits to Remedy NYC's Bad Faith Failure to Settle

Where a primary insurer accepts its defense obligation, an excess insurer has no duty, or even a right, to contribute to a settlement until the primary policy limit is tendered. *State Farm Fire & Cas. Co. v. LiMauro,* 65 N.Y.2d 369, 371 (1985);[22] *Fieldston Prop. Owners Ass'n v. Hermitage Ins. Co.,* 16 N.Y.3d 257, 264 (2011); *GMAC v. Nationwide Ins. Co.*, 4 N.Y.3d 451 (2005)("a primary insurer has a duty to defend 'without any entitlement to contribution from an excess insurer'"); *Home Ins. Co. v. Liberty Mut.  Ins.Co.*, 678 F.Supp. 1066, 1069 (S.D.N.Y. 1988); *Ali v. Fed. Ins. Co.* 719 F.3d 83, 91 (2d Cir. 2012)("The very nature of excess insurance is such that pre-determined amount of underlying primary coverage must be paid before the excess coverage is activated).

The rationale for this well-settled rule is that tendering the excess coverage prior to exhaustion of the primary limits inequitably shifts the excess carrier's

---

[22] The Quincy's policy contains the same language addressed in *LiMauro*. (A-1488).

bargained for position to that of the primary insurer, which is why excess policy premiums are lower. *Fed. Ins. Co. v. The Estate of Irving Gould*, 2011 LEXIS 114000, at *22 (S.D.N.Y. 2011); *GMAC,* 4 N.Y.3d at 455; *Ali,* 719 F.3d at 91. In contrast, primary policy premiums are set to account for the expense in defending a potential lawsuit and paying indemnity when it contracts with the insured. A primary insurer's duty to defend is not diminished simply because the insured chose to procure additional insurance to protect against excess exposure. In fact, primary insurers typically have no knowledge or expectancy as to whether the insured even intends to obtain excess coverage.

Thus, until the primary insurer has offered its limits, the excess insurer has no obligation to pay anything or even to supervise the underlying insurer's handling of the claim against the insured. *Scottsdale Ins. Co.,* 994 F.Supp.2d at 549*; accord Certain Underwriters of Lloyds v. General Acc. Ins. Co.,* 699 F.Supp. 732, 741 (S.D. Ind. 1988)("to expect [the excess' insurer] to participate in settlement negotiations before the primary limits were exhausted would be to alter the essential nature of the excess insurance contract.").

The mitigation argument espoused by NYC runs counter to these well-established legal principles and the customs and practices of the liability insurance industry.

50

First, tendering before exhaustion would inequitably shift the excess carrier's bargain for position. If excess insurers have to step down and assume the primary insurers' obligation, it no longer could passively monitor the underlying claim and would have to participate actively in the defense. This would require additional financial resources and therefore it would have to readjust its premium structure. The resultant effect would be higher costs for excess policies, which are currently relatively inexpensive.

Second, NYC's mitigation rule would effectively vitiate a primary insurers' extra-contractual liability for bad faith altogether. As a result, primary insurers will be intransigent in their opposition to settle claims in good faith since their liability would be capped at their policy limit. Thus, "[t]o allow an insurer to escape bad faith liability … would introduce a perverse and undesirable incentive into personal liability actions, discouraging rather than encouraging settlement." *Pinto*, 221 F.3d at 403; *Valentine v. Aetna Ins. Co.*, 564 F.2d 292 (9th Cir. 1977)("[I]f the existence of excess insurance relieved a primary insurer of its responsibility to negotiate and settle up to its policy limits in good faith, then the primary insurer would have a disincentive to settlement.").

Third, maneuvering excess insurers into unilaterally entering into pre-exhaustion settlements to avoid the potential of an excess verdict by using economic duress is contrary to the primary insurer's contractual and fiduciary

51

obligations and would allow them to avoid the very insurance coverage that they contracted to provide.

Finally, requiring excess insurers to advance the balance of the primary limits and then to commence an action to recoup its losses is a fool's errand. The excess insurer would have to risk paying the claim and then incur unrecoverable legal expenses in prosecuting an action without any guarantee of success. Whether an insurance company is guilty of bad faith cannot be assessed until the insurer's claim files are produced and the depositions of the claims representatives are conducted. Even if the merits of the case are strong, the excess insurer would likely be forced to accept a settlement offer well under the amount it advanced to avoid the costs and uncertainties of litigation. To be sure, primary insurers would vigorously defend the inter-insurer action since their exposure would be capped. They would contend that the excess insurer had no right to interfere with their exclusive right to control the defense and therefore the tender was a voluntary payment without consent. *Agway, Inc. v. Travelers Indem. Co.,* 1993 U.S.Dist. LEXIS 21092 (N.D.N.Y 1993).

Thus, in short, the interests of promoting settlements is not advanced by permitting primary insurers to benefit by their steadfast refusal to settle in bad faith.

## 2. The Cases Cited by NYC are Inapposite

NYC has not cited a single case which has endorsed an excess insurer's duty to mitigate by settling the primary exposure when the primary insurer accepts coverage and assumes control of the defense. The cases referenced on pages 52-53 of NYC's brief are readily distinguishable. *Russo v. Rochford* simply held that a coincident insurer deemed to be excess was responsible for contributing to a settlement where it caused a default judgment for failing to provide its policy information. 123 Misc.2d 55 (Queens Co. 1984). This case did not involve mitigation of damages in the context of a failure to settle, as claimed here, but rather a breach of an insurer's *duty to cooperate* in the defense.

NYC touts *Russo* because it quotes a dated trial court decision for the proposition that, in an equitable subrogation action, an excess insurer owes the primary insurer "the contractual duty of cooperation and the common-law duty to mitigate damages." *See Russo,* 123 Misc.2d at 58, *quoting Home v. Royal Indem. Co.* 68 Misc.2d 737 (N.Y. Co.), *aff'd,* 39 A.D.2d 678 (1st Dept. 1972). However, in *Home,* the court dismissed the primary insurer's counter-claim for reimbursement based on the excess insurer's alleged failure to mitigate. *Id.*, at 740.

*Greenidge v. Allstate Ins. Co.* also misses the mark. 446 F.3d 356 (2d Cir. 2006). The insured argued that Allstate committed bad faith by failing to accept a

settlement offer which included a deferred payment pending the outcome of a declaratory judgment action on whether the payment was covered under its policy. This Court simply held that Allstate did not grossly disregard the insured's interests because it had no obligation to consent to the extra-contractual remedy of commencing a declaratory judgment action. Similarly, in *Gordon v. Nationwide*, the dissent addressed whether an insured had a duty to protect himself by hiring counsel to defend a case where the insurer refused to defend for non-payment of premiums.

Contrary to *Greenidge* and *Gordon*, NYC did not assert any coverage defenses. It accepted its defense obligation and had the exclusive right to settle the case within its policy limits. Having been vested with that right, NYC had the concomitant obligation to negotiate in good faith and properly was held accountable for breaching that duty. Thus, unlike Allstate in *Greenidge*, which did not have any duty to assume an extra-contractual obligation, NYC's bad faith was the result of its failure to honor its *own* contractual obligations.

### 3. Certification to the Court of Appeals is not Warranted

NYC makes a footnote request for certification of the mitigation issue to the Court of Appeals. (NYC Br. at 51, n.5). Certification is unnecessary. There are guiding precedents from the Court of Appeals, the federal courts in this Circuit,

54

and other jurisdictions that permit this Court to predict how the Court of Appeals would rule.  *Geron v. Seyfarth Shaw LLP*, 736 F.3d 213, 224 (2d Cir. 2013).

As noted, the New York rule that an excess insurer has no duty or obligation to supervise the primary insurer and/or to make any monetary contributions toward a settlement *until* the primary policy limits are exhausted is well-settled.  (*See* Point II (B)(1), *supra*; SPA-45-47).

Moreover, the Court of Appeals has adopted a strong policy in favor of an excess insurer's right to sue primary insurers for extra-contractual damages for the bad faith failure to settle.  In fact, New York is one of the "few jurisdictions [that] ha[s] permitted a direct action by an excess insurer against a primary carrier, rather than limiting it to those rights available to the subrogee of the insured." *Continental Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103, 107 (2d Cir. 1991).  Since the mitigation argument advanced here would permit primary insurers to escape extra-contractual liability for bad faith, it is probable, if not certain, that the Court of Appeals would reject NYC's mitigation argument. *Pinto*, 221 F.3d at 398-99 ("The availability of a bad faith cause of action encourages settlements that are in the insured's best interests [] and also discourages insurance companies from refusing to settle as a matter of policy.")(*citing Pavia,* 82 N.Y.2d at 452-53).

Finally, courts in other jurisdictions have been reluctant to recognize a mitigation of damages defense in insurer bad faith cases. *See Pinto,* 221 F.3d at 402 (federal court can predict how the Court of Appeals "would resolve a question of state law . . . [by] taking into account relevant case law from other jurisdictions.").

- *West American Ins. v. RLI Ins. Co.,* 2013 U.S.Dist. LEXIS 47284 (W.D. Mo. 2013)(dismissed affirmative defense of mitigation of damages, estoppel, waiver and unclean hands because an excess insurer was under no duty to defend the insured and because there was nothing that excess did or failed to do that had any bearing on primary's refusal to settle in bad faith);

- *Lienemann v. State Farm Mut. Auto Fire and Cas. Co.*, 540 F.2d 333, 336 (8th Cir. 1976) ("State Farm cannot insist that the insurer attempt to mitigate its risk alone. Otherwise, State Farm is in the anomalous position of asking the court to sanction the insured for failing to accept an offer which State Farm itself rejected as too high.");

- *Travelers Indem. Co. v. Arch Spec. Ins. Co.*, 2012 U.S.Dist. LEXIS 80775 (E.D. Cal. 2012)(excess carrier has no duty to mitigate damages by attempting to settle the action on its own given that the primary carrier controls the litigation);

- *Kack v. National Union Fire Ins. Co.*, 20 S.W.3d 692 (S.Ct. Tx. 2000)(until the primary insurer tendered its limits, excess insurer had no duty to protect itself from liability under the excess policy by investigating the merits of the claims more thoroughly, hiring independent counsel to monitor the claims, supervising its adjuster more closely, evaluating the demand, and/or demanding settlement).

In *Continental Casualty Co. v. U.S. Fidelity and Guaranty Co.*, the Court expressly rejected the argument that an excess insurer has a duty to mitigate its damages by attempting to settle the action on its own before exhaustion:

> [W]ith USF&G in control of the litigation as the primary carrier, it would have been improper for the insured or excess carrier to step in and try to settle it.
>
> * * *
>
> Moreover, an excess carrier has no duty to contribute to a settlement until the primary carrier's policy limits have been exhausted. … To hold otherwise … would make the excess carrier a co-insurer with the primary carrier with a co-extensive duty to defend the insured. This finds further support in *Valentine*, *supra*, where the court said: "If during settlement negotiations the primary insurer is allowed to force the excess insurer to cover part of the primary's insurance exposure, the coverages and rate structures of the two different types of insurance – primary and excess – would have to be adjusted."

516 F.Supp. 384, 393 (N.D. Cal. 1981) (citations omitted).

Thus, in light of these guiding precedents, certification is unnecessary.

## C. *NYC Failed to Carry its Burden to Establish its Mitigation Defense*

A party alleging a failure to mitigate bears the burden to plead and prove that the injured party failed to make reasonable efforts to mitigate its injury, and that such efforts, if undertaken, would have diminished its damages. *See Technest Holding, Inc. v. Deer Creek Fund, LLC*, 2008 U.S.Dist. LEXIS 61560 (S.D.N.Y. 2008); *LaSalle Bank Nat'l Assoc. v. Nomura's at Capital Corp.*, 72 A.D.3d 409 (1st Dept. 2010). To that end, "[i]t is not fatal to recovery that one course of

action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it." *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 291 (2d Cir. 1961)("If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen."); *Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.*, 176 F.3d 601, 609 (2d. Cir. 1999).

Finally, a duty to mitigate does not include an obligation to undertake extraordinary and costly measures. *See Carrols Equities Corp. v. Villanave*, 57 A.D.2d 1044 (4th Dept. 1977); *Korea Life Ins. Co., Ltd. v. Moran Guar. Trust Co. of N.Y.*, 2004 U.S.Dist. LEXIS 16436, at *25-26 (S.D.N.Y. 2004); *Matsushita Elec. Corp. of America v. Gottlieb*, 1991 U.S.Dist. LEXIS 10511 (S.D.N.Y. 1991).

For the reasons that follow, NYC failed to prove that its *ad hoc* preferred course of action would have been feasible, let alone reasonable.

First, there was no expectation by any of the parties involved in the underlying litigation that Quincy would, or even could, voluntarily contribute to a settlement of the underlying litigation before the primary policy limits were tendered. Hardy testified that Quincy's role as an excess insurer was relegated to passively monitor the case until the primary policy limits were exhausted and "had no basis for negotiating" with plaintiff until NYC tendered its policy limits. (A-380, 387-88, 391). D'Amato, Schlather, and Monahan concurred. (A-39, 42-43,

58

¶¶58, 75, 77; A- 357-58; A-586; A-613; A-679-80; A-1077-78). In fact, D'Amato had no expectation Quincy would negotiate before NYC tendered because "that's not how it works." (A-1958; A-2034).

Second, Quincy's Executive Counsel and AVP of claims, Lisa Grealish, testified that a pre-tender offer by Quincy would have been precluded by its insurance contract, its internal business and underwriting practices, and its fiduciary obligation to its agents. (A-31 ¶¶3-4; A-1487; A-738-44, 783-84, 817, 823).

Third, the experts of both parties agreed that Quincy's position in waiting to actively participate in the settlement negotiations was consistent with the standards and customs of the insurance industry. (A-2375, A-2415, ¶42).

Fourth, advancing payment of $425,000 and commencing an action is an extraordinary and costly measure without any promise of success. *Levantino v. Ins. Co. of North America*, 102 Misc. 2d 77 (Suffolk Co.1979)(a plaintiff is not obligated to institute or to prosecute a lawsuit in order to mitigate damages); *Lipshie v. Lazarus*, 235 N.Y.S.2d 764, 769 (N.Y. Co. 1962); *accord Stone v. Satriana*, 41 P.3d 705 (Colo.2002)("Litigation is too uncertain and costly to impose such a duty [to mitigate] on a party.").

Fifth, if as NYC suggests there is no law on point, then how would Quincy have been on notice that it had an obligation to step down and tender the primary limits?

Sixth, the record is bare of any proof that NYC and plaintiff would have even consented to a policy-limit payment from Quincy with a reservation of rights permitting Quincy to commence a direct action against NYC. (Nor would such proof be expected since this argument was first raised on appeal). Undoubtedly, had the plaintiff's counsel became aware that Quincy was prepared to advance $425,000 payment without having any obligation to do so, he likely would have revisited Horton's settlement position.

Finally, NYC's assertion that Quincy's obligation to mitigate arose in December 2005 is rebutted by its contention that Quincy was not damaged until November 2009 when it paid the excess judgment. (NYC Br. at 58-59). *Miller v. Lovett*, 879 F.2d 1066 (2d Cir. 1989)(a duty to mitigate cannot arise until an injury occurs).

## POINT III

## THE DISTRICT COURT PROPERLY AWARDED PREJUDGMENT INTEREST FROM THE TIME OF NYC's BREACH OF ITS FIDUCIARY DUTY TO SETTLE IN JANUARY 2006

Quincy's entitlement to prejudgment interest at the New York statutory rate of 9% is not disputed.[23]  However, NYC argues that that interest should have been awarded from the date Quincy *paid* the judgment entered in the underlying action (November 20, 2009), and not from the date that NYC *breached* its fiduciary duty (January 1, 2006).  NYC maintains that the date of payment is appropriate because the purpose of prejudgment interest is to compensate the plaintiff for the loss of use of its money after it tendered payment to satisfy a judgment.  (NYC Br. at 58-59).

NYC correctly states that Quincy requested prejudgment interest from November 20, 2009.  However, further research reveals New York law mandates the District Court's award.  A bad faith action is classified as a breach of contract action for purposes of prejudgment interest determinations.  *See New England Ins.*

---

[23] The District Court's award of prejudgment interest shall be overturned only for an abuse of discretion.  *Ariz. Premium Fin. Co. v. Employers Ins. of Wausau*, 2014 U.S. App. LEXIS 18100 (2d Cir. 2014)

*Co., v. Healthcare Underwriters Mut. Ins Co.,* 352 F.3d 599, 603 (2d Cir. 2003).[24]

Pursuant to C.P.L.R. §5001(b), pre-verdict interest is awarded "from the earliest ascertainable date the cause of action existed." The District Court correctly recognized that a cause of action accrues in a contract action at earliest ascertainable date of the breach, which in this case was when NYC breached its fiduciary obligation to tender its policy limits in December 2005. (*See* Point I(C)(1), *supra*).[25]

The fact that Quincy's damages did not become fixed and liquidated by the entry of a judgment until a later date is of no moment. *Love v. State*, 78 N.Y.2d 540 (1991)(recognizing rule that prejudgment interest relates back to liability determination even though damages are not yet liquidated and assessed); *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399 (1993)("[T]he Statute runs from the time of the breach though no damage occurs until later")(quoting 6 Williston, Contracts §2004, at 5641 [rev. ed 1938], *quoted in*, McLaughlin,

---

[24] In *New England*, the determination of the date of accrual was remanded. However, the District Court did not address whether the date of accrual should relate back to the date of the breach, and limited its analysis to the date that the damages became fixed by the obligation on the part of the excess insurer to make payment. *New England Ins. Co., v. Healthcare Underwriters Mut. Ins. Co*., 333 F.Supp.2d 87 (E.D.N.Y. 2004).

[25] It is inconsistent for NYC to contend Quincy's cause of action for breach of the failure to tender its policy limits arose in December 2005 for purposes of a mitigation of damages analysis, and at the same time, argue Quincy's cause of action for bad faith arose when it paid the judgment on November 20, 2009 for purposes of a prejudgment interest analysis.

Practice Commentaries, MCKINNEY'S CONS LAWS OF NY, Book 7B, CPLR C203:1, at 143). Using the date of the breach of the fiduciary obligation is consistent with the purpose of bad faith actions of encouraging prompt settlements of claims where liability and damages are clear. *See Pinto v. Allstate*, 221 F.3d 394, 399 (2d Cir. 2000); *accord Denham v. Bedford*, 407 Mich. 517 (1980)("liability for pre-judgment interest may act as an incentive to the insurer to promptly settle a claim.").

In the event this Court accepts NYC's argument, it is submitted that the date of accrual should be November 6, 2009 (date judgment was entered) and not November 20, 2009 (date Quincy paid the judgment).

## POINT IV

## REMAND IS APPROPRIATE FOR ADJUDICATION OF QUINCY'S SECOND CAUSE OF ACTION

The District Court did not address Quincy's claim for reimbursement for accrued interest pursuant to NYC's "Supplementary Payments" provision because it awarded full damages on the bad faith cause of action. (SPA-49; A-21). Quincy briefed this argument in its post-trial submissions and incorporates it by reference herein. (A-2499-2501). If this Court grants NYC's appeal on the bad faith cause of action, Quincy respectfully requests the Court remand the action for adjudication of its second cause of action for reimbursement of interest.

63

## **CONCLUSION**

For the above stated reasons, Quincy respectfully requests that this Court affirm the District Court's Decision, Order and Judgment in their entirety.

Dated:  November 18, 2014

Respectfully submitted,

WARD GREENBERG HELLER & REIDY LLP

By: _____ s/ Scott R. Jennette _____
Scott R. Jennette
William R. Leinen

64

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 13,957 words, as counted by the word processing program used to prepare this brief, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Office Word 2010 SP1 MSO, in 14pt. Times New Roman font.


Dated: November 18, 2014

s/ Scott R. Jennette_____
*Attorney for Appellee*
